**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| OTI AMERICA, INC., Plaintiff, v. UNITED STATES, Defendant. | : | Civil Action No. 06-571-C (Judge Lettow) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF OTI AMERICA, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Electronically filed on
October 11, 2006

William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

Beth L. Jacobson
Joyce L. Tong
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2872
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... iii

I. STATEMENT OF THE QUESTIONS INVOLVED .......... 2

II. STATEMENT OF THE CASE .......... 2

A. Background .......... 2

B. Disclosed Evaluation Criteria .......... 4

C. The Undisclosed NIST Testing Criteria .......... 5

D. International Testing Criteria .......... 5

E. GPO Eliminates OTI From Competition Although Other Vendors' Products Suffered from Much More Serious Problems. .......... 6

F. The Contracting Officer's Reliance on Others and Lack of Independent Judgment. .......... 7

III. JURISDICTION .......... 8

IV. STANDARD OF REVIEW .......... 9

V. ARGUMENT .......... 11

A. GPO Violated the Applicable Procurement Regulations by Not Abiding by the Disclosed Evaluation Criteria as Set Forth in the Solicitation and by Relying on Undisclosed Evaluation Criteria .......... 11

1. GPO Deviated from the Solicitation Requirements .......... 12

(a) Impact Testing .......... 13

(b) Bend Testing .......... 15

(c) Load Modulation .......... 16

(d) ICAO Standards Contemplate Additional Durability Tests Not Conducted By NIST .......... 17

2. GPO Relied on Undisclosed and Still Unknown Evaluation Criteria .......... 18

(a) No Written Standards .......... 20

(b) TEMP Standards .......... 20

**AGREED-UPON REDACTED COPY
- MAY BE MADE PUBLIC**


(c) Impact Testing ........ 21

(d) Bend Testing ........ 22

(e) Load Modulation ........ 22

3. GPO Changed Evaluation Criteria During the Evaluation Process Without Notice to OTI. ........ 22

4. The Testing was Arbitrary and Capricious. ........ 23

5. OTI Was Prejudiced. ........ 24

B. GPO's Elimination of OTI Was Arbitrary and Capricious Due to the Reliance on the Results from Incorrect Technical Evaluations. ........ 24

C. The GPO Contracting Officer Did Not Act with Independent Judgment ........ 26

1. Broadnax Did Not Exercise Independent Judgment and Relied Solely Upon Her Subordinate's Recommendations. ........ 27

2. OTI Was Prejudiced. ........ 30

D. The GPO's Disparate Treatment of OTI. ........ 30

1. The GPO Applied the NIST Criteria (Some of Which Was Not Disclosed) Differently to Different Bidders. ........ 32

2. GPO's Arbitrary and Capricious Conduct Prejudiced OTI. ........ 33

E. The GPO's Improper Actions Require the Imposition of Injunctive Relief. ........ 33

1. Absent Permanent Injunctive Relief, OTI Will Suffer Immediate and Irreparable Injury. ........ 34

2. The Harm to OTI Outweighs the Harm to the GPO. ........ 36

3. Granting OTI Injunctive Relief Serves the Public Interest. ........ 37

VI. CONCLUSION ........ 39

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

## TABLE OF AUTHORITIES

### FEDERAL CASES

ACRA, Inc. v. United States, 44 Fed. Cl. 288 (1999) .......... 18

Al Ghanim Combined Group Co. General Trade & Cont. W.L.L. v. United States, 56 Fed. Cl. 502 (2003) .......... 35, 37

Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) .......... 13, 23

Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531 (1987) .......... 34

Arch Chemicals, Inc. v. United States, 64 Fed. Cl. 380 (2005) .......... 10

Asia Pacific Airlines v. United States, 68 Fed. Cl. 8 (2005) .......... 33, 34, 37

Banknote Corp. of Am. V. United States, 56 Fed. Cl. 377 (2003) (Fed. Cir. 2004) .......... 12, 20, 24, 31, 32

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005) .......... 9, 33

Beta Analytics International, Inc. v. United States, 67 Fed. Cl. 384 (2005) .......... 25

CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005) .......... 26

Cardinal Maintenance Serv., Inc. v. United States, 63 Fed. Cl. 98 (2004) .......... 35, 36, 37

DeMat Air, Inc. v. United States, 2 Cl. Ct. 197 (1983) .......... 34, 36

Doty v. United States, 53 F.3d 1244 (Fed. Cir. 1995) .......... 31

Dubinsky v. United States, 43 Fed. Cl. 243 (1999) .......... 18

Gentex Corp v. United States, 58 Fed. Cl. 634 (2003) .......... 10, 11, 12, 18, 31, 33, 34

Gulf Group, Inc. v. United States, 56 Fed. Cl. 391 (2003) .......... 12

Hawaiian Dredging Construction Co. v. United States, 59 Fed. Cl. 305 (2004) .......... 11, 34, 35, 36

Hospital Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618 (2005) .......... 8

**AGREED-UPON REDACTED COPY - MAY BE MADE PUBLIC**


Hunt Building Co. v. United States, 61 Fed. Cl. 243 (2004) .......... 10, 11, 34, 35, 36

Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421 (2002) .......... 26, 27, 28, 29

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001) .......... 10

Isratex, Inc. v United States, 25 Cl. Ct. 223 (1992) .......... 18, 19, 23

MVM, Inc. v. United States, 46 Fed. Cl. 126 (1999) .......... 23

OTI America, Inc. v. United States, 68 Fed. Cl. 108 (2005) .......... 8, 9

OTI America, Inc. v. United States, 68 Fed. Cl. 646 (2005) .......... 10, 11, 12, 27, 32, 35

PGBA, LLC v. United States, 60 Fed. Cl. 196 (Fed. Cir. 2004) .......... 32, 33

Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147 (Fed. Cir. 1994) .......... 37

Rotech Healthcare v. United States, 71 Fed. Cl. 393 (2006) .......... 34, 37

TLT Construction Corp. v. United States, 50 Fed. Cl. 212 (2001) .......... 31, 32

United Payors & United Providers Health Services V. United States, 55 Fed. Cl. 323 (2002) .......... 8, 10, 11, 34, 35, 38

University Research Co. v. United States, 65 Fed. Cl. 500 (2005) .......... 9, 10, 37


**UNPUBLISHED COURT ORDERS**


Asia Pacific Airlines v. United States, No. 05-711C (Fed. Cl. Oct. 14, 2005) .......... 20

OTI America v. United States, No. 05-904C (Fed. Cl. Oct. 14, 2005) .......... 3


**ADMINISTRATIVE PROCEEDINGS**


In re ABS Baumaschinenvertrieb GmbH, No. DAJA02-94-0023, 2000 WL 1279906, at *1 (A.S.B.C.A. Aug. 29, 2000) .......... 26

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

Appeal of Jamco Constructors, Inc., No. V501C-339, 1993 WL 393670, at *1 ((V.A.B.C.A. Oct. 5, 1993) ........ 26

Appeal of Kora and Williams Corp., No. 0680-AA-02-0-03-KA, 1994 WL 750301, at *1 (D.C.C.A.B. Mar. 7, 1994) ........ 26

Appeal of Walsky Constr. Co., No. F65503-90-C-0021, 1993 WL 298898, at *1 (A.S.B.C.A. Jul. 30, 1993) ........ 26

Matter of Digital Technologies, Inc., No. B-291657.3, 2004 CPD ¶ 235, 2004 WL 2625035, at *1 (Comp. Gen. 2004) ........ 23

Matter of Electro-Voice, Inc., Nos. B-278319, B-278319.2, 98-1 CPD 23,1998 WL 14952 (Comp. Gen. Jan. 15, 1998) ........ 9

SOS Interpreting, LTD., Nos. B-293026, B-293026.2, B-293026.3, 2005 WL 357422, at *1 (Comp. Gen. Jan. 20, 2004) ........ 26

**FEDERAL STATUTES and REGULATIONS**

Administrative Procedure Act, 5 U.S.C. § 706 ........ 1, 10, 27

10 U.S.C. § 2305(b)(1) ........ 11, 12, 13, 14, 16, 17, 18, 24

28 U.S.C. § 1491(b) ........ 1, 10

Federal Acquisition Regulations, 48 C.F.R. § 15.206 ........ 13, 23

Federal Acquisition Regulations, 48 C.F.R. § 15.304 ........ 12, 18, 19, 24

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | | |
|---|---|---|
| OTI AMERICA, INC., Plaintiff, v. UNITED STATES, Defendant. | : | Civil Action No. 06-571-C (Judge Lettow) |

**MEMORANDUM IN SUPPORT OF PLAINTIFF OTI AMERICA, INC.'S**
**MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiff OTI America, Inc. ("OTI"), by its undersigned counsel, respectfully submits this Memorandum in Support of its Motion for Judgment on the Administrative Record ("Motion"). OTI makes its motion pursuant to RCFC 52.1 of the Rules of the Court of Federal Claims, and 28 U.S.C. § 1491(b), which grants this Court jurisdiction over this matter, and permits the Court to "award any relief that the court considers proper, including injunctive relief." Id. § 1491(b)(2).[1]

OTI claims that the United States, acting through the Government Printing Office ("GPO"),[2] violated the standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by: (1) failing to comply with the terms of the Solicitation and thus applying the Solicitation requirements in an arbitrary, capricious, and unreasonable fashion; (2) arbitrarily and

[1] Pursuant to Rule of the Court of Federal Claim 5.2(4)(b)(3), OTI attaches hereto the Transcript of the Deposition of Albertha Broadnax, dated September 11, 2006 ("Broadnax Dep."), as Appendix A, and the Comparison Chart of Solicitation Requirements, ICAO Testing and NIST Testing ("Comparison Chart"), as Appendix B.

[2] The GPO is defined herein to include actions by and through the National Institute of Standards and Technology ("NIST").

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

capriciously failing to disclose relevant evaluation criteria in violation of binding procurement regulations; (3) arbitrarily performing an incorrect technical evaluation; (4) eliminating OTI without using any independent judgment; and (5) arbitrarily treating OTI differently from other contractors. Accordingly, OTI asks this Court to: (1) declare that the Defendant, the United States, by and through the GPO, acted unreasonably and contrary to law and regulations and lacked a rational basis when it eliminated OTI as the GPO's action (a) did not abide by the disclosed evaluation criteria in the Solicitation, (b) relied upon undisclosed evaluation criteria, (c) was based on an incorrect technical evaluation, (d) was not based on the contracting officer's independent judgment; and (e) was the result of unequal treatment; (2) issue an injunction requiring GPO to reinstate OTI into the selection process in such a manner as to permit OTI to have a fair chance to receive a meaningful portion of the "production" portion of the procurement; and (3) award OTI its bid preparation and proposal costs. OTI is confident that a fair evaluation will result in the GPO awarding a production contract to OTI.

## I. STATEMENT OF THE QUESTIONS INVOLVED

Whether the GPO arbitrarily and capriciously eliminated OTI with no reasonable or rational basis as the GPO: (1) violated the applicable procurement regulations by not abiding by the disclosed evaluation criteria in the Solicitation; (2) violated the applicable procurement regulations by failing to disclose certain evaluation criteria to OTI; (3) performed an incorrect technical evaluation; (4) was not based on the contracting officer's independent judgment; and (5) treated OTI differently from the other contractors.

## II. STATEMENT OF THE CASE

### A. Background

Section 303 of the Enhanced Border Security and Visa Entry Reform Act of 2002 (the "Act") imposes a new electronic-passport requirement on foreign countries participating in the

United States' Visa Waiver Program ("VWP") . Specifically, foreign countries must use electronic (i.e. integrated-circuit embedded) passports if their citizens are to be permitted to travel to the United States without a visa. Statement of Facts ("SOF") ¶ 2. By October 26, 2004, all VWP participant states must adopt electronic passports as the Act requires. SOF ¶ 3. In 2004, the administration asked Congress to extend the deadline from October 26, 2004 to October 26, 2005 and Congress granted the request. SOF ¶ 3. While the Act does not require the United States itself to implement an electronic-passport program, the United States government (the "Government") has chosen to comply with the same requirements that the Act imposes on Visa Waiver Program countries. SOF ¶ 3. Subsequently, in 2005, the European Union requested another extension. The Department of Homeland Security responded that all VWP passports must have digital photographs by October of 2005 and must submit an "acceptable plan" for introducing electronic passports by October of 2006. OTI Am. v. United States, No. 05-904C, Order of Judge Lettow, (Fed. Cl. Oct. 14, 2005) (unpublished opinion with attached press release).

The GPO issued Solicitation for Offers EP-2004 (the "Solicitation") in June 2004. SOF ¶ 1. The Solicitation called for proposals to provide electronic passport covers that will eventually be used in the Department of State's ("DoS") electronic passport system. Id. In August 2004, OTI submitted a proposal in response to the Solicitation. SOF ¶ 6. In October 2004, the GPO eliminated OTI from the competition. SOF ¶ 7. OTI then filed a protest at the Government Accountability Office ("GAO"). On December 20, 2004, after OTI protested at the GAO, Contracting Officer ("CO") Albertha Broadnax ("Broadnax") notified OTI that the GPO had reversed its earlier decision and now intended to award a contract to OTI. SOF ¶ 8. After re-insertion into the competition, OTI was again eliminated in 2005. On August 30, 2005, OTI

filed a bid protest in this Court. SOF ¶ 9. This Court found errors in GPO's procurement process, that the GPO used undisclosed evaluation criteria and that the GPO applied those criteria inconsistently with regard to OTI; accordingly, OTI was again reinstated into the competition. SOF ¶¶ 10-13.

**B. Disclosed Evaluation Criteria**

Section M.2 of the Solicitation (Bases for Award and Ordering) set forth the process and evaluation criteria for the stages of the procurement following the initial contract award to the eight vendors. SOF ¶ 14. According to this provision, the products of those vendors to whom the GPO had granted initial contracts would be put through a battery of multi-agency laboratory and field tests. Id. The GPO would obtain the vendors' samples for each stage of testing by issuing orders under the contracts, or, in the language of the procurement, by exercising a series of contract line items ("CLINs"). SOF ¶ 18. CLINs 1 through 5 are various test-and-evaluation CLINS, while CLIN 6 is the multi-million unit production order. Id. According to Section C7.2.3 (EP Book Cover Testing & Inspection), the process as a whole was supposed to be cooperative, with the bidders and the GPO working together to solve problems that arose as the procurement progressed. SOF ¶ 20.

The Solicitation requires that the contactless Integrated Circuit (IC)/antenna assembly (the "ePassport") be compliant with standards set by the International Civil Aviation Organization ("ICAO") which incorporates the standards set by the International Standards Organization for Standardization ("ISO").[3] SOF ¶ 21. These international standards allow interoperability among all types of electronic passports. Id. According to the Solicitation, the

[3] OTI has not attached these ICAO and ISO standards to this Memorandum. Pursuant to the Government's request, on September 11, 2006, counsel for OTI provided the Government with the ICAO and ISO standards set forth in the Solicitation. To date the Government has not filed those standards, despite the Court's request to do so. OTI will gladly provide these standards to the Court upon request as it is essential for the Court's analysis.

Department of State, by and through NIST, tests the ePassport in accordance with internationally recognized ICAO standards. SOF ¶ 21. The latest version of the standards is available at a particular website (set forth in the Solicitation) and the GPO was to provide the nonpublic versions to contractors. Id. These ICAO standards were the evaluation criteria for this procurement. SOF ¶ 23. [

]

## C. The Undisclosed NIST Testing Criteria

[

]

## D. International Testing Criteria[5]

ICAO set the standards for Impact Testing in the Durability of Machine Readable Passports, at 15-17, ICAO TF4 Doc. N0156 (Feb 9, 2006) ("ICAO Durability Technical Report"). SOF ¶ 34. This document also details the ICAO standards for Bend Testing. SOF ¶ 35. International Electrotechnical Commission ("IEC") and ISO set the international standards for Electromagnetic/Static Electricity Testing in ISO/IEC 61000-4-2. SOF ¶ 36. ICAO

---

[4] As the GPO and NIST categorize Load Modulation as a subset of Electromagnetic/Static Electricity Testing, OTI conforms to this categorization.

[5] The two documents mentioned below are ICAO international standards that are available through members of Working Group 3 of the Joint Task Committee, Subcommittee 17 of the ICAO. The United States is a member of the Working Group. These two documents are part of the standards OTI recently provided to the Government. See supra at n. 3.

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

standards for Load Modulation Testing are set forth in RF Protocol and Application Test Standard for E-Passport – Part 2, Tests for Air Interface, Initialisation, Anticollision and Transport Protocol, at 12-14, ICAO TF4 Doc. WG3TF4_SDXX_RF protocol and application test standard ePP Part 2.doc (Feb. 10, 2006) ("ICAO RF Test Standard"). SOF ¶ 37. These are objective, written standards, providing the "target" against which offerors would naturally design their products.

## E. GPO Eliminates OTI From Competition Although Other Vendors' Products Suffered from Much More Serious Problems.

[

]

However, [

] The record

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

is silent as to why the Contracting Officer found one failure to be disqualifying, while the other failure was not, particularly because the solicitation requires contractors to meet the evaluation criteria.

**F. <u>The Contracting Officer's Reliance on Others and Lack of Independent Judgment.</u>**

[

[6] As discussed further below, the TEMP is apparently the evaluation criteria the DoS gave NIST.

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

]

## III. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1491(b) because the competition by and among contractors is "in connection with a procurement or proposed procurement." 28 U.S.C. § 1491 (b)(1); see also OTI Am., Inc. v. United States, 68 Fed. Cl. 108, 117 (2005); Hosp. Klean of Tex., Inc. v. United States, 65 Fed. Cl. 618, 620 (2005). The statute provides that in bid protest cases, this Court "may award any relief that [it] considers proper, including declaratory and injunctive relief." United Payors & United Providers Health Servs. V. United States, 55 Fed. Cl. 323, 328 (2002), quoting 28 U.S.C. § 1491(b)(2).

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

The Court has jurisdiction to hear bid protests regarding this specific type of competition which results in "downselection" of offerors. See OTI Am., 68 Fed. Cl. at 117. The Federal Acquisition Streamlining Act of 1994 did not deprive the Court of jurisdiction in this type of "downselect" case. Id. ("In light of the broad language of Subsection 1491(b) and Congress's expressed intent that the Subsection encompass the entire procurement process, ***the court holds that it has subject matter jurisdiction to consider OTI's claim***.") (internal citations omitted) (emphasis added); see also Matter of Electro-Voice, Inc., B-278319, B-278319.2, 98-1 CPD 23, 1998 WL 14952 (Comp. Gen. Jan 15, 1998).[7]

Even post-award government actions, if having the effect of making the ultimate procurement decision, are protestable. Here, by notifying OTI that it would not receive orders for further CLINs, the GPO downselected OTI from the competition for CLIN 6, the production contract CLIN. This Court has adopted Electro-Voice's reasoning and held that in downselect cases, the Court has jurisdiction to hear such bid protests. OTI Am., 68 Fed. Cl. at 117.

## IV. STANDARD OF REVIEW

Motions for judgment based upon the administrative record ("AR") are governed by RCFC 52.1(b) and are generally reviewed under the same standard as motions for summary judgment. See RCFC 52.1(b); Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005). However, a motion for judgment on the administrative record differs from a motion for summary judgment, in that the existence of genuine issues of material fact does not preclude granting such a motion. Id. A motion for judgment on the administrative record examines whether the administrative body, here the GPO, given all the disputed and undisputed facts

[7] "Although GAO decisions are persuasive on this Court, they are not binding." Univ. Research Co. v. United States, 65 Fed. Cl. 500, 503 (2005) (citing Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728 (2000) and CACI Field Servs. v. United States, 13 Cl. Ct. 718 (1987), aff'd, 854 F.2d 464 (Fed. Cir. 1988)).

appearing in the record, acted arbitrarily, capriciously, or contrary to law. See Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 388 (2005) (granting declaratory judgment on the administrative record regarding the exclusion of certain costs from the price evaluation methodology).

This Court "shall review the agency's decision pursuant to the standards set forth in section 706 of title 5 of the [APA]." 28 U.S.C. § 1491(b)(4); see also Univ. Research Co., LLC, 65 Fed. Cl. at 504. Under the pertinent part of the APA, the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706 (2005); see also OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 652 (2005).

The GPO's action should be set aside as arbitrary and capricious if: (1) the procurement official's decision lacked a rational (reasonable) basis; or (2) the procurement procedure involved a violation of regulation or procedure. See United Payors, 55 Fed. Cl. at 328. The burden rests upon the Plaintiff to show by a preponderance of the evidence that the agency acted without a rational basis. Gentex Corp v. United States, 58 Fed. Cl. 634, 648 (2003); see also Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 269 (2004) ("The protestor must show by a preponderance of the evidence that the agency's actions were either without a reasonable basis or in violation of applicable procurement law or procedure"). The "test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." United Payors, 55 Fed. Cl. at 329 (emphasis added) (internal quotation marks omitted); see also Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1333 (Fed. Cir. 2001); OTI Am., 68 Fed. Cl. at 653. "An agency's decision can lack a rational basis where it entirely failed to consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." OTI Am., 68 Fed. Cl. at 653 (internal quotations omitted). Alternatively, the protestor must show that there was a clear and prejudicial violation of the applicable statutes or regulations. See Gentex, 58 Fed. Cl. at 636; Hunt Bldg. Co., 61 Fed. Cl. at 269.

The protestor must also demonstrate that the error in the procurement process prejudiced it, meaning that "there was a 'substantial chance' it would have received the contract award but for that error." United Payors, 55 Fed. Cl. at 329 (internal quotations omitted); Hawaiian Dredging Constr. Co. v. United States, 59 Fed. Cl. 305, 309 (2004) (granting, in a post-award bid protest, permanent injunctive relief). Here, OTI has sustained its burden of proof.

## V. ARGUMENT

OTI delivered products that exceeded the contract specifications, yield rates and performance of the other contractors remaining in the competition. According to the Solicitation's evaluation criteria, OTI deserved to remain in the competition. However, the GPO strayed from the disclosed evaluation criteria in the Solicitation and conducted undisclosed testing, many tests for which the standard is unknown. This mechanical use of undisclosed and arbitrary evaluation criteria, applied differently to different contractors with no reasonable or rational basis (or any analysis) constitutes arbitrary and irrational conduct by the GPO and resulted in an incorrect technical evaluation of OTI's product.

### A. GPO Violated the Applicable Procurement Regulations by Not Abiding by the Disclosed Evaluation Criteria as Set Forth in the Solicitation and by Relying on Undisclosed Evaluation Criteria.

Federal agencies are required by law to evaluate proposals according to the criteria established within the Solicitation. See 10 U.S.C. § 2305(b)(1) (West 2005) ("[A]n agency shall . . . make an award based solely on the factors specified in the solicitation."). Furthermore, the

Federal Circuit holds that "[i]t is hornbook law that agencies must evaluate proposals and make awards based on the criteria stated in the solicitation." OTI Am., Inc., 68 Fed. Cl. at 655 (emphasis added), quoting Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 386 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004); see also Gentex, 58 Fed. Cl. at 652 (making offerors aware of rules of the game is "fundamental to fairness and open competition"); Gulf Group, Inc. v. United States, 56 Fed. Cl. 391, 397 (2003), citing 10 U.S.C. §§ 2305(a)(2)(A), 2305(a)(3)(A) (2000). Therefore, if the GPO deviated or used undisclosed evaluation criteria, the GPO violated statutory law.

To determine whether the GPO violated statutory law by deviating from the criteria in the Solicitation, the Court examines whether: "i) the procuring agency used a significantly different basis in evaluating the proposals than was disclosed and ii) the protester was prejudiced as a result -- that it had a substantial chance to receive the contract award but for that error." See Banknote Corp. of Am., 56 Fed. Cl. at 386-87; Gulf Group, 56 Fed. Cl. at 397, citing Bean Stuyvesant, L.L.C. v. United States, 48 Fed. Cl. 303 (2000). Here, the evidence demonstrates that the GPO deviated from the Solicitation criteria,[8] did not apply the standards set forth by the International Standards Organization ("ISO") or the International Civil Aviation Organization ("ICAO") as set forth in the Solicitation, used undisclosed evaluation criteria, and that OTI was prejudiced as a result.

*1. **GPO Deviated from the Solicitation Requirements.***

The Federal Acquisition Regulation ("FAR") requires that, "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation". FAR Part 15.304(d) (West 2005); see also 10 U.S.C. § 2305. If the

[8] In fact, according to the CO, Broadnax, the GPO did not have to disclose evaluation criteria and did not have to follow the criteria set forth in the Solicitation. According to Broadnax, the GPO could utilize tests that were not specified in the Solicitation to evaluate products. Broadnax Dep. at 30:12-16.

Government wishes to deviate from the Solicitation or relax the evaluation factors, the agency must notify the bidders. See Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365 (Fed. Cir. 1999) (holding that the agency's deviation from the solicitation was arbitrary and capricious and resulted in prejudicial error). If the agency deviates from evaluation factors set forth in the Solicitation, the agency violates statutory law. See 10 U.S.C. § 2305(b)(1).

Although the Solicitation states that the offered product must meet ICAO standards and recommendations (which incorporates the standards set by ISO),[9] stand-alone testing criteria is not specified. See AR 2005 Tab A1 (Solicitation § C2), at 67. As a result, OTI researched and designed a product to comply with ICAO standards as set forth in the Solicitation. OTI provided this product to the GPO. As the Solicitation did not specify other standards, OTI could not have known that the GPO—in this instance acting through NIST-- would use a different standard from the standards set forth by ICAO. (NIST's status as an "independent" agency of the government does not give it leeway to abandon the solicitation's stated evaluation criteria.) See FAR 15.206. ICAO standards exist dictating the required durability of the ePassport. However, the GPO, through NIST, did not apply the relevant durability standard regarding Impact Testing, Bend Testing, and Electromagnetic/Static Electricity Testing.

(a) Impact Testing

Rather than follow the disclosed evaluation criteria in the Solicitation, NIST evaluated the ePassports based from a Test and Evaluation Master Plan ("TEMP"), criteria given by GPO to NIST.[10] See AR Tab 9 at 190 ("Included in [the results section] are cross references to

---

[9] ICAO adopted and adapted several ISO standards, in particular ISO 14443 and ISO 10373. As the ISO standards originally addressed needs in the credit card industry, ICAO adapted and built from these standards in order to develop a standard applicable to ePassports. Thus, inherent in ICAO standards are ISO standards; however, ICAO's adaptations of certain ISO standards supercede the baseline ISO standard.

[10] The AR does not contain the TEMP. Accordingly, OTI filed a Renewed Motion to Supplement the Administrative Record on September 12, 2006.

pertinent sections of the Test and Evaluation Master Plan (TEMP) that was drawn up by the U.S. Department of State."); <u>compare</u> AR Tab 9 at 226-30 (NIST test report) <u>with</u> AR 2005 Tab A1 (Solicitation § C7.2.3). The Solicitation states:

> *Impact Testing*: to assess the ability of the submittals (IC readability) to survive the stamping process. One possibility will be to strike the IC/antenna direction on the cover page a certain number of times at a force level that can be expected in actual usage. Loading is envisioned to be imparted by a falling weight testing machine. One question that will be addressed is: 'Can the IC/antenna survive the full number of strikes, and if not, then when do they fail?'

<u>Id.</u> (emphasis in original). Moreover, the Solicitation refers to durability testing and requires compliance with ICAO standards. Given this description in the Solicitation, a prospective bidder could reasonably rely, as OTI did, upon NIST's compliance with the evaluation criteria (the general ICAO standards) in the Solicitation.

[ ] AR Tab 9, at 203-04, 227-30. [ ] AR Tab 9, at 203.

In contrast, the ICAO standards (as referenced in the Solicitation) specify the use of <u>one</u> test and do not specify tests in any way similar to the edge steel stamp and point steel stamp,[11] but require a different testing procedure. <u>See</u> Comparison Chart, at 1-2. ICAO standards dictate that the IC/antenna should be tested using a flat steel stamp, dropped from a given height that stamps in concentric circles around the IC/antenna. <u>See</u> ICAO Durability Technical Report, at

[11] Indeed, ICAO testing standards only require compliance with a flat steel stamp. ICAO Durability Technical Report, at 15-17.

15-17.[12] NIST did not conduct this test, but rather conducted four different undisclosed tests. NIST did not test in accordance with the Solicitation or ICAO standards in violation of FAR Part 15.304 and other applicable law. Had OTI known what tests were actually to be performed on its product, it would have designed the product to meet those standards, rather than the standards set forth in the solicitation. It is to avoid precisely this situation that black letter procurement law requires evaluation criteria to be both disclosed, and used.

(b) Bend Testing

Likewise, for Bend Testing, NIST again deviated from the disclosed evaluation criteria. The Solicitation only specified Bend Testing. The Solicitation states: "*Bend Testing*: to determine if the IC/antenna can continue to be read if the book is subject to bending forces." AR (2005) Tab A1 (Solicitation § C7.2.3) at 43 (lines 922-23) (emphasis in original). [

] See AR Tab 9 at 179, 205, 207. However, relevant ICAO standards detail a "back pocket test" that differs considerably from the NIST tests. Compare AR Tab 9, at 179, 205, 207, with ICAO Durability Technical Report, at 18-21; see Comparison Chart, at 3-4.

[

[12] This Solicitation involves evolving and changing technology requirements ICAO's Working Group first published this document in February of 2006. Broadnax testified at her September 11, 2006 deposition that the Solicitation referenced a website whereby the actual ICAO and ISO standards are listed and updated. Broadnax Dep. at 24:4-17; AR (2005) Tab A1, at 36.

][13]

ICAO, on the other hand, details two different types of bend testing: 1) Book Bend Stress Method (Back Pocket) and 2) the Dynamic Bend Stress Method. See Comparison Chart, at 3-4; ICAO Durability Technical Report, at 18-19. Neither NIST test directly corresponds to the ICAO tests, the evaluation criteria required by the Solicitation. The Book Bend Stress Method details pressing a rounded "anvil" to the ePassport as it rests on a cushion with pressure of 50 Newtons for a total of 1000 times. Id. at 18-19, 55. The ICAO Dynamic Bend Stress Method employs a continuous varying sinusoidal deformation to determine "fatigue due to imposed bending". Id. at 20. The Dynamic Bend Stress Method clips the passport at one end and bends the passport back and forth 1000 times, 2 times per second. Id. at 20, 55.

The GPO deselected OTI from the competition based in part on [ ] As described by NIST, [ ] does not correspond to either ICAO test and is not required by ICAO. As such, the GPO used testing criteria that deviated from ICAO standards. Had OTI known what tests were to be performed, it would have designed its product to meet those standards, rather than the evaluation criteria it was provided by the GPO.

(c) Load Modulation[14]

The Solicitation does not explicitly mention Load Modulation ("LM") testing; but does identify "Electromagnetic/Static Electricity Testing". See AR 2005 Tab A1 (Solicitation Section C7.2.3) at 43 (line 925) ("*Electromagnetic/Static Electricity Testing*: to identify vulnerabilities in

---

[13] A "continuously varying sinusoidal deformation" describes bending back and forth, while NIST's testing required a bend and hold for 2.5 minutes and then another bend and hold.

[14] The Load Modulation test is a subset of the Electromagnetic Tests. See AR Tab 9, at 212.

those areas."). Even the NIST report does not set forth the specific testing procedure or what constitutes a pass or fail for LM. AR Tab 9 at 180, 213-14. NIST testing does not correspond with the ICAO standards. See Comparison Chart, at 5-7.

The numerous international standards referenced in the Solicitation set forth the specific ICAO testing procedures for load modulation. See ICAO RF Test Standard at 12-14. The ICAO standard requires testing of the ePassport at three points, 1.5 A/m, 4.5 A/m and 7.5 A/m, for load modulation amplitude. Id. [

] AR Tab 9, at 180, 213-14. The GPO used these testing results based on evaluation criteria not set forth in the Solicitation as one of the grounds for OTI's elimination. See AR Tab 6 at 38 (July 26, 2006 Broadnax elimination letter).

(d) ICAO Standards Contemplate Additional Durability Tests Not Conducted By NIST

The ICAO standards require additional durability tests that NIST did not conduct. NIST's failure to conduct these tests evidence the deviation and nonconformity with the Solicitation requirements. For example, ICAO requires passing a "Pen Test" which simulates writing on an ePassport chip. ICAO Durability Technical Report, at 22. Furthermore, ICAO requires an X-Ray test "to determine any adverse effects to the ePassport by X-rays levels that might be encountered during border control screening." Id. at 29. Additionally, ICAO requires an Artificial Daylight Exposure test that exposes the sample to illumination from an artificial light source that represents natural daylight in the visible and near UV (UV A) spectral region. The aim of this test is to assess the resistance of the ePassports to fading. Id. at 25. ISO 14443 Parts 3 and 4 also require a number of evaluations to test timing, initialization and anticollision of the chips as well as transmission protocols. See AR (2005) Tab A1, at 36 (Solicitation §

C7.2.2.1). These examples are only a sampling of the tests that ICAO requires that NIST did not conduct. As a result, the GPO did not test for, nor obtain the results of these ICAO standards, as required by the Solicitation.

2. ***GPO Relied on Undisclosed and Still Unknown Evaluation Criteria.***

The Government relied upon undisclosed and unknown evaluation criteria to deselect OTI from the procurement in violation of applicable procurement law. The Government "is not permitted to rely upon undisclosed evaluation criteria when evaluating proposals." ACRA, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999) (internal citations omitted); see also Dubinsky v. United States, 43 Fed. Cl. 243 (1999) (holding that improper evaluations rendered the award arbitrary and capricious).

If a given factor is essential to the contract award and failure of that factor gives rise to termination, in the interest of fairness and competition, the bidders must have knowledge of the importance of that factor. Isratex, Inc. v United States, 25 Cl. Ct. 223, 229 (1992); see also Gentex Corp. v. United States, 58 Fed. Cl. 634, 652 (2003) (holding that the procurement process was unfair and prejudicial to the protester and stating " 'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open competition' "). The FAR likewise holds that, "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation". 48 C.F.R. § 15.304(d) (West 2005); see also 10 U.S.C. § 2305 (West 2005).

When failure of a given factor may terminate the offeror, the Government must disclose those specific factors. See Isratex, 25 Cl. Ct. at 228-29. In Isratex, as here, the agency eliminated the bidder due to a failed test. The contracting officer considered the test to be a " 'very important' subfactor, so important, in fact, that failure of the test caused offerors' proposals to be rejected." Isratex, 25 Cl. Ct. at 229. The Court determined that the agency failed

to disclose relevant information to the bidders in the Solicitation and as such, the agency violated the procurement regulations. See Isratex, 25 Cl. Ct. at 228-29 ("[10 U.S.C.] Section 2305(a)(2) requires that a solicitation set forth the relative importance of subfactors").

In six specific instances, each prejudicial to OTI, the GPO utilized undisclosed evaluation criterion, in violation of FAR Part 15.304 and other applicable law, and contradicted a disclosed evaluation procedure upon which OTI relied. Both the existence and the relative weight of evaluation factors must be disclosed to offerors. See 48 C.F.R. § 15.304. They were not here. (In fact, no weighting scheme seems to exist at all.) The reason for this requirement is so an offeror to know which factors lead to elimination, versus factors that can be corrected during testing. This knowledge is relevant to how an offeror prepares for and performs during a long evaluation process. The Contracting Officer, Broadnax, testified that she is not required to evaluate the contractor's submission against disclosed evaluation criteria. Broadnax Dep. at 51:6-9. Additionally, no written standards exist that detail how many required tests a contractor must pass before they move onto the next CLIN stage. See id. at 15:20-16:2. Here, the Solicitation did not disclose: (a) additional written standards; (b) TEMP standards; (c) the four sub-tests that together comprised the Impact Testing; (d) the two sub-tests that comprised the Bend Testing to offerors; and (e) the load modulation test that comprised the Electromagnetic/Static Electricity Test.

As in Isratex, OTI "would have to have been clairvoyant to anticipate that failing [undisclosed tests] would automatically disqualify its proposal, while exhibiting other deficiencies would allow the offeror to be given a second chance at contract award." Isratex 25 Cl. Ct. at 230. If the Government is to be changing its evaluation criteria during testing, a rational reading of the Solicitation is that OTI "shall work with the Government in solving

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

problems that might be identified in Government testing." AR (2005) Tab A1, Solicitation § 7.2.3, at 40 (lines 813-14). Any other interpretation of this would be irrational and arbitrary. See Asia Pacific Airlines v. United States, No. 05-711C (Fed. Cl. Oct. 14, 2005).[15]

(a) No Written Standards

[

] Id. [ ]

Nothing in the AR (nor did Broadnax state a reference) states that GPO may rely upon undisclosed evaluation criteria. Nevertheless, [

] Id. [ ]

(b) TEMP Standards

[

[15] OTI is mindful that a Solicitation does not need to identify each element which the agency considers if that element is intrinsic to the stated factors. Banknote, 56 Fed. Cl. at 387. Here, however, each of the unlisted, unspecified tests is not intrinsic to the stated factors. The stated factors are so broad and general that a prospective bidder has no guidance in preparing the product other than compliance with ICAO standards; unfortunately, the GPO did not feel similarly bound.

]

(c) Impact Testing

NIST used [ ] AR Tab 9, at 203-04, 227-30. The Impact Testing section in the Solicitation does not call out the [ ] impact testing. See Comparison Chart, at 1-2. The Solicitation merely gives a limited example:

> Impact Testing: to assess the ability of the submittals (IC readability) to survive the stamping process. One possibility will be to strike the IC/antenna direction on the cover page a certain number of times at a force level that can be expected in actual usage. Loading is envisioned to be imparted by a falling weight testing machine. One question that will be addressed is: "Can the IC/antenna survive the full number of strikes, and if not, then when do they fail?"

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

AR (2005) Tab A1, Solicitation § C7.2.3, at 42.

(d) Bend Testing

The Solicitation provides very little context for the conducted Bend Testing and did not specify the two types of testing that [ ] Compare AR (2005) Tab A1, Solicitation § C7.2.3, at 42 ("*Bend Testing*: to determine if the IC/antenna can continue to be read if the book is subjected to bending forces"), with AR Tab 9 at 179, 205, 207. NIST used two tests not set forth in the Solicitation that amounts to undisclosed evaluation criteria. See Comparison Chart, at 3-4. Had OTI known what Bend Tests were to be performed, it would have designed its product around those tests, rather than the evaluation criteria GPO specified.

(e) Load Modulation

The Solicitation makes two general statements potentially regarding Load Modulation ("LM") testing; however, nothing explicitly set forth the testing scheme. See AR (2005) Tab 1, Solicitation § C 7.2.3, at 43 ("Electromagnetic/Static Electricity Testing: to identify vulnerabilities in these areas"); Solicitation § C 7.2.2.1, at 36 (specifying that the products must comply with the relevant international standards of ISO and ICAO); see also Comparison Chart, at 5-7. However, neither statement indicates that LM is an essential element of Electromagnetic/Static Electricity Testing, failure of which would result in deselection, as apparently it did for OTI.

*3. GPO Changed Evaluation Criteria During the Evaluation Process Without Notice to OTI.*

In addition to straying from the disclosed evaluation intent and relying upon undisclosed evaluation criteria, GPO failed to notify OTI of its changes. GPO violated procurement law by failing to issue an amendment to the Solicitation to notify the offeror (OTI) after the

requirements of the Solicitation changed. It is axiomatic that when "the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." Federal Acquisition Regulation ("FAR") 15.206(a). See MVM, Inc. v. United States, 46 Fed. Cl. 126, 131-132 (1999) (concluding agency violated FAR Part 15.206 when it failed to amend solicitation after changing the terms of the solicitation). When the agency's requirements change after the proposals have been submitted, up until the time of the award, the agency shall issue an amendment to the solicitation to all offerors that have not been eliminated from the competition. See FAR Part 15.206(b); Matter of Digital Technologies, Inc., B-291657.3, 2004 CPD ¶ 235, 2004 WL 2625035, *2 (Comp. Gen. 2004). See supra. at fn. 6. The purpose of the rule is to encourage award decisions based on the agency's most current view of its needs. Id.

Broadnax's deposition testimony evidences that GPO did not follow the technical requirements of the Solicitation. In fact, Broadnax testified that she did not know what evaluation criteria NIST used to test the products. SOF ¶¶ 54-56. Despite the changes in the evaluation criteria, GPO never issued a revised Solicitation—a blatant violation of its obligations under FAR. Consequently, GPO eliminated OTI based on different evaluation criteria than that in the Solicitation.

*4. The Testing was Arbitrary and Capricious.*

As the Government did not include the TEMP in the AR, the AR is silent as to what specifications the GPO instructed NIST to use to conduct the testing. See supra, Section V(A)(2)(b). As the Government represented numerous times, NIST is an independent governmental agency that conducted blind testing. OTI does not disparage NIST's testing results; however, as the GPO did not abide by the evaluation criteria as set forth in the Solicitation, reliance on results from undisclosed testing criteria (that deviated from the Solicitation) is arbitrary and capricious. See Alfa Laval, 175 F.3d at 1365 (holding that the

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

agency's deviation from the solicitation was arbitrary and capricious); see also Isratex, 25 Cl. Ct. at 229 (failing to disclose relevant information to the bidders in the Solicitation violated the procurement regulation). Expertise is irrelevant if the expert uses evaluation criteria that differ from what the solicitation specified.

*5. **OTI Was Prejudiced.***

The GPO's deviation from the Solicitation criteria and use of its undisclosed criteria in evaluating OTI's product prejudiced OTI as the deviations eliminated OTI from further competition. The Court should find that the GPO deviated from the stated Solicitation criteria, did not apply the tests as specified by ICAO standards, used undisclosed, arbitrary evaluation criteria in eliminating OTI, and did not disclose to OTI the relative importance of any criteria. Had the GPO followed its own Solicitation criteria or disclosed the actual evaluation criteria being used, OTI's product would have been compliant or OTI could have submitted a product that would have been compliant with the undisclosed criteria.

Thus, the disqualification of OTI was prejudicial. Undisclosed criteria violates both the FAR and the Competition in Contracting Act. See 48 C.F.R. § 15.304(d) (West 2005); 10 U.S.C. § 2305 (West 2005). The use of these undisclosed criteria in this instance is arbitrary and capricious, OTI was prejudiced by their use, and the Court should find in favor of the Plaintiff.

**B. GPO's Elimination of OTI Was Arbitrary and Capricious Due to the Reliance on the Results from Incorrect Technical Evaluations.**

OTI's claim of an incorrect technical evaluation is not a mere "naked claim" of disagreement with GPO's technical evaluation of the proposals with which it has been presented. Banknote, 56 Fed. Cl. at 384 (determining that "naked claims" of disagreement with evaluations "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the

findings in question were the product of an irrational process and hence were arbitrary and capricious."). The GPO acted arbitrarily, capriciously, and illegally in its technical evaluations.

Courts generally defer to the government's discretionary procurement decisions, particularly those based on a product's excellence or quality. See Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (sustaining protest where the technical evaluation was arbitrary and capricious); see also supra Section V(A)(1). However, where the protester demonstrates that that the agency's (here, NIST's) technical evaluation(s) of the product at issue was/were inconsistent with the agency's evaluation criteria (as is the case here) a protest is sustained. Here, given the lack of detail in the NIST report, several plausible explanations exist for OTI's product "failures" in the load modulation testing.

Several factors impact whether a reading from a load modulation test is valid. First, LM testing is extremely sensitive to calibration of the equipment as well as environment. A metal object in the field of testing would result in a unreadable ePassport. See International Civil Aviation Organization [ICAO], Use of Contactless Integrated Circuits In Machine Readable Travel Documents, at 11 (Apr. 16, 2003) ("However, the radio waves are sensitive to the presence of metal parts. Encasing the contactless IC in a metal jacket eg aluminium (sic) foil, will prevent reading. Care must be taken in the placement of the machine (RF) reader relative to adjacent metal parts.") (emphasis added). Second, the distance between the ePassport and the reader impacts the strength of the signal. NIST states that OTI's ePassport could only be read with a steady modulation at 2.5 A/m. A slightly different distance placing the ePassport near the reader could cause the reader to fail to read a steady modulation at 1.5 A/m. Neither the pictures nor the textual description in the AR evidence the distance between OTI's ePassport and the

reader. GPO's conclusion, based on its technical evaluation, that OTI failed [

] lacked any reasonable, rational basis.

## C. The GPO Contracting Officer Did Not Act with Independent Judgment

In government procurement, contracting officers must act with independent judgment and may not solely rely upon the evaluation team or a subordinate's recommendation in eliminating a bidder from the competition.[16] See Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002) (holding that because the "contracting officer relied on the technical evaluation board's recommendation without making any independent inquiries" the decision was not reasonable and violated the statute.); see also CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005) (holding that failure of the contracting officer to "'put his own mind to the problems,' and to take ownership of all determinations" constituted unreasonable behavior and a lack of independent judgment) (internal citations omitted); SOS Interpreting, LTD., Nos. B-293026, B-293026.2, B-293026.3, 2005 WL 357422, at *5 (Comp. Gen. Jan. 20, 2004) (holding that officials handling source selection are "bound by the fundamental requirement that their own independent judgments be reasonable" even when relying on lower-level evaluators), citing Johnson Controls World Servs., Inc., Nos. B-289942, B-289942.2, 2002 WL 1162912 (Comp.

---

[16] The lack of independent judgment on the part of a contracting officer constitutes an abuse of discretion. See, e.g., In re ABS Baumaschinenvertrieb GmbH, No. DAJA02-94-0023, 2000 WL 1279906, at *29-30 (A.S.B.C.A. Aug. 29, 2000) (holding that a contracting officer did not consider all of the required factors, and thus did not use his independent judgment); Appeal of Kora and Williams Corp., No. 0680-AA-02-0-03-KA, 1994 WL 750301, at *119-20 (D.C.C.A.B. Mar. 7, 1994), aff'd, 743 A.2d 682 (D.C. 1999) (holding that that it was an abuse of discretion for a contracting officer to simply carry out a termination directive of his superior when there was no evidence that his superior weighed (or even had knowledge of) the factors required under the procurement regulations); Appeal of Jamco Constructors, Inc., No. V501C-339, 1993 WL 393670, at *19-21 (V.A.B.C.A. Oct. 5, 1993) (holding that the veterans administration abused it's discretion by substituting its judgment for that of the contracting officer who acted reasonably in light of what was known at the time the termination decision was made and further holding that the contracting officer abused his discretion by failing to make an adequate inquiry prior to the termination decision); Appeal of Walsky Constr. Co., No. F65503-90-C-0021, 1993 WL 298898, at *11-13 (A.S.B.C.A. Jul. 30, 1993) (holding that a contracting officer's "marching orders" from a superior officer not to "stand for the slightest glitch" in appellant's performance did not substitute for her independent judgment and was thus an abuse of discretion).

Gen. May 24, 2002) (sustaining the bid protest where the official failed to exercise independent judgment). "A court must 'determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' with the protesting party bearing the burden to show that the decision by the agency had no rational basis." OTI Am., 68 Fed. Cl. at 657 (holding that contracting officer Broadnax "did not exercise her discretion, but rather she applied the determinations and conclusions reached by her technical evaluation team"); id. at 658.

In this case, the AR is devoid of any evidence that contracting officer, Broadnax, used any independent judgment. In fact, the AR demonstrates that she solely relied upon the evaluation team or a subordinate's recommendation in determining to eliminate OTI from the competition and lacked knowledge as to the technical aspects of the evaluation. See Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. at 421. Similarly, in Impresa, the contracting officer admitted having knowledge of outstanding issues that might directly contradict the findings of the board, but chose not to explore those issues or verify the board's findings. Rather, the contracting officer relied solely on the findings of a evaluation board. Because the officer did not independently decide the issue, as in this case, the Court held that the findings violated Section 706 of Title 5 of the United States code, and that the procurement decision was not reasonable. Such is the case here.

*1.* ***Broadnax Did Not Exercise Independent Judgment and Relied Solely Upon Her Subordinate's Recommendations.***

While Broadnax littered her deposition with the phrase "my own judgment", her testimony evidences that she solely relied upon others, particularly Grasso's, interpretation of the NIST results (which was not even an interpretation, but rather a summary of the NIST report). AR Tab 9, at 129-32. Broadnax did not personally observe any of the test results or any of the testing, but was informed of the results by Grasso. Broadnax Dep. at 8:2-10. While claiming to

have reviewed Grasso's report which had the NIST report attached to it and "evaluated" it to employ her "independent judgment", Broadnax never read the evaluation criteria—the applicable international standards – the ICAO and ISO standards – with which the testing should have conformed as indicated in the Solicitation. Id. at 16:8-17:12; 46:2-11 ("[

]"); 47:11-19 ([

]).

Most importantly, Broadnax admitted that she did not confirm that NIST performed any or all of the required tests pursuant to the ICAO standards. Id. at 17:18-18:18; see also id. at 37:13-38:18 (Broadnax did not compare NIST's description of the bend testing with the ICAO bend testing standard). Broadnax did not know whether the GPO or the DoS directed NIST to conform with ICAO standards when conducting its testing. Id. at 28:9-14. Surprisingly, Broadnax did not know if the TEMP document was given to NIST or if it corresponded to the ICAO and ISO standards. Id. at 55:1-22. Broadnax solely relied upon the NIST report as to what evaluation criteria they used without independently evaluating that the evaluation criteria comported with the criteria set forth in the Solicitation. Id. at 20:5-16. (Of course, to independently evaluate that the testing conformed to the criteria, reading the criteria is mandatory.) Nevertheless, she admitted that she was required to evaluate proposals for product based on criteria set forth in the Solicitation. Id. at 45:4-7. She also testified, however, that she does not believe that she is required to revaluate the contractor's submission against the disclosed evaluation criteria. Id. at 51:6-9. Broadnax was "satisfied" if NIST only used a

portion of the evaluation criteria set forth in the Solicitation and ICAO standards as "they are the experts". Id. at 54:1-9.

Broadnax purported to exercise her independent judgment in eliminating OTI from this procurement based on reported failures to comply with evaluation criteria she had not read. Her deposition testimony revealed her lack of technical knowledge regarding the NIST testing and the evaluation criteria. However, Broadnax did not independently judge the import of these reported failures. Broadnax did not receive nor review a list of evaluation criteria NIST used to conduct the test results to familiarize herself with the stated criteria. Id. at 9:7-10:3. In fact, Broadnax did not provide NIST with a copy of the Solicitation and seemed to be unclear as to what evaluation criteria standards NIST had before it when conducting testing. Broadnax frequently answered questions at her deposition regarding the stated evaluation criteria with "I do not know". Id. at 10:12-18; 12:3-13:1. Broadnax "did not interface with NIST during the testing," (Id. at 13:12-13) and also did not know whether NIST was ever directed to conform to ICAO and ISO standards in conducting its testing. Id. at 28:9-14. Moreover, when asked about impact testing procedure as set forth in the NIST report which provides [

] Id. at 27:10-28:8; see also id. at 28:19-30:7 (no knowledge or understanding as to 100 flat steel impacts). Broadnax was not even aware that NIST did not test load modulation at 4.5 A/m when the ICAO standard required testing at 1.5, 4.5 and 7.5 A/m. Id. at 40:6-43:6. She then stated that since the three frequency levels for load modulation (the ICAO standard) was not noted in the NIST report or the Solicitation, she "cannot give an opinion on that". Id. at 46:12-22. Broadnax's testimony

evidences a lack of knowledge of the evaluation criteria sufficient for her to exercise independent judgment.

2. ***OTI Was Prejudiced.***

Here, Broadnax did not use her independent judgment. Broadnax did not know what the ICAO standards required nor whether NIST actually conducted testing based on ICAO standards. In fact, Broadnax had never even seen the ICAO standards. Broadnax based her decision entirely on her subordinate's recommendations and did not exercise independent judgment. As the CO, Broadnax should have had knowledge of the relative importance of various tests. In order to decide the effect a failure of a given test has in real world application and whether that failure should eliminate a competitor, Broadnax needed to have the technical knowledge of the impact or effect of such failure, or at least have read the evaluation criteria. Broadnax did not. Broadnax had insufficient familiarity with the evaluation criteria, much less the actual technical issues, to effectively evaluate test results and thus failed to exercise independent judgment. Broadnax blindly followed the (arbitrary and capricious) findings of other individuals involved in the procurement, did not weigh each factor with her own judgment, and as such, the GPO acted without a rational basis in deselecting OTI from further competition.

**D. The GPO's Disparate Treatment of OTI.**

OTI's elimination was arbitrary and capricious because the GPO treated contractors differently. For example, [

] Furthermore, NIST itself acknowledged that a high likelihood of a static discharge exists. See AR Tab 9 at 215 ("[

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

] (emphasis added). However, OTI's product unquestionably passed the ESD test. In fact, OTI's product is the only ePassport that successfully passed the ESD test at 15 kV. Compare AR Tab 9 at 193 (OTI's ESD results), with AR Tab 9 at 191, 192 ([ ] and [ ] results).

This type of disparate treatment is not permitted under the law. "A fundamental principle of government procurement is that [the agency] treat all offerors equally and consistently apply . . . evaluation factors." TLT Constr. Corp. v. United States, 50 Fed. Cl. 212, 216 (2001) (holding that the government was arbitrary and capricious in evaluation); see also Banknote, 56 Fed. Cl. at 383 (noting that "it is beyond peradventure that a contracting agency must treat all offerors equally, evaluating proposals evenhandedly against common requirements and evaluation criteria.") (emphasis added). Furthermore, "[w]hen procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion." Doty v. United States, 53 F.3d 1244, 1251 (Fed. Cir. 1995) (holding that the government was arbitrary and capricious in it's determination that a dairy farmer acted in bad faith in violation of a 'Dairy Termination Program' contract).

The burden rests on OTI to prove that the GPO acted "unfairly or irrationally in evaluating the [protestor's] offer" and that OTI was prejudiced as a result of the disparate treatment. See Banknote, 56 Fed. Cl. at 383. The lack of clarity in the Solicitation "skew[ed] the playing field" and resulted in disparate treatment. See Gentex, 58 Fed. Cl. at 652-53. Ambiguity in the Solicitation and the failure to correct the protestor's understanding of the

ambiguity are enough to reach the threshold level of disparate treatment. Gentex, 58 Fed. Cl. at 654.

Similarly, in PGBA, LLC v. United States this Court held that lack of clarity in a Solicitation demands the government ask for the same level of performance from each bidder. See PGBA, LLC v. United States, 60 Fed. Cl. 196, 207, aff'd, 389 F.3d 1219 (Fed. Cir. 2004). In its holding, the Court noted that because of the lack of clarity in the Solicitation the government could not "demand both clairvoyance and specificity" on the part of one bidder and not on the others. Id. The Court noted that "[s]uch uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." Id. It is precisely this type of "uneven treatment" that the GPO afforded to OTI and that eventually led to OTI's unwarranted elimination. This is particularly true because the record is silent as to the weighting of the various criteria, and the Contracting Officer could not have rationally done that weighting, absent her failure to even read the evaluation criteria or the TEMP.

1. ***The GPO Applied the NIST Criteria (Some of Which Was Not Disclosed) Differently to Different Bidders.***

Disparate treatment is improper under both the regulations and this Court's precedent. See OTI Am., Inc., 68 Fed. Cl. at 646; PGBA, LLC, 60 Fed. Cl. at 207 (unequal treatment is arbitrary and capricious conduct); Banknote, 56 Fed. Cl. at 383; TLT Constr., 50 Fed. Cl. at 215. In addition to arbitrarily applying the ICAO and ISO standards, there is evidence that GPO applied the undisclosed evaluation criteria differently to different contractors. While the GPO eliminated OTI for purportedly [

] product did not pass the Electrostatic Discharge test ("ESD"). At 6 kV, 5 out of 5 ePassports could be read;

however, at 15 kV, none of [ ] ePassports could be read (0 out of 5). AR Tab 9 at 191. In fact, [ ] failure at the 15 kV level results in a completely dead chip, unreadable at the border. However, the GPO awarded [ ] a CLIN 5 production contract while OTI was deselected.

*2.* ***GPO's Arbitrary and Capricious Conduct Prejudiced OTI.***

OTI was prejudiced as a result of this disparate treatment. OTI was prejudiced as it was "in the zone of active consideration and had a reasonable likelihood of securing the award", however, the GPO treated OTI differently from other contractors. Gentex, 58 Fed. Cl. at 653-54; see also PGBA, LLC, 60 Fed. Cl. at 207. Given the stark contrast of treatment toward OTI as compared with the other contractors, it is evident that the GPO acted unreasonably, arbitrarily and capriciously. OTI had at least as much a likelihood as any other bidder of securing the contract, particularly as OTI did not have the serious technical problems with its passports that other contractors had. Eliminating OTI from the process, while keeping other contractors was unreasonable. In other words, OTI was eliminated from the electronic passport business as a result of the disparate treatment on the part of the GPO. Thus, the GPO's decision prejudiced OTI.

**E. The GPO's Improper Actions Require the Imposition of Injunctive Relief.**[17]

A bid protest "is an injunctive action to prevent a competitor from securing the fruits of a government contract." A plaintiff is entitled to a permanent injunctive relief if: (1) the plaintiff is successful on the merits of its challenge; (2) the plaintiff would suffer immediate and

---

[17] The court regularly allows live testimony regarding the appropriateness of equitable relief, not the procurement itself. This testimony is procedurally improper as supplementation of the record, but the court has considered this type of testimony to determine the proper injunctive relief. See Asia Pacific Airlines v. United States, 68 Fed. Cl. 8 (2005) (allowing testimony to show harm); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005) (holding that the trial court must make factual findings on prejudice from the record evidence); PGBA, 60 Fed. Cl. at 221 n.28 (allowing supplemental affidavit regarding potential injury).

irreparable harm if relief were not awarded; (3) the harm to plaintiff if injunctive relief is not granted would outweigh the harm to the government and third parties if the injunction were issued; and (3) granting the injunction would serve the pubic interest. Asia Pac. Airlines v. United States, 68 Fed. Cl. 8 (2005) (granting injunctive relief); see also Rotech Healthcare v. United States, 71 Fed. Cl. 393 (2006) (granting permanent injunctive relief).

The standard for a permanent injunction is essentially the same for a preliminary injunction, except actual success replaces the need to show likelihood of success on the merits. Hawaiian Dredging Const. Co. v. United States, 59 Fed. Cl. 305, 317 (2004) (citing Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 546 n.12 (1987)). As such, case law in which the Court has granted a preliminary injunction is persuasive. See United Payors & United Providers Health Servs. v. United States, 55 Fed. Cl. 323 (2002) (the parties agreed to merge the court's consideration of preliminary and permanent injunctions; once the court established that the agency's awarding of the contract was arbitrary and capricious, the Court granted permanent injunctive relief and awarded plaintiff bid preparation and proposal costs as well as other costs); see also Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243 (2004) (granting plaintiff's request for permanent injunction); DeMat Air, Inc. v. United States, 2 Cl. Ct. 197 (1983) (granting permanent injunction after Court granted temporary restraining order as defendant could not maintain the status quo pending a hearing).

1. ***Absent Permanent Injunctive Relief, OTI Will Suffer Immediate and Irreparable Injury.***

Without injunctive relief, OTI will suffer immediate and irreparable injury as a protestor is limited to recovery of preparation costs and may not recover anticipated profits at law. Hawaiian Dredging, 59 Fed. Cl. at 317. Lost profits due to an uneven playing field constitutes irreparable harm. See Gentex, 58 Fed. Cl. at 654, citing United Payors, 55 Fed. Cl. at 333;

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

("[t]his type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm") (internal citations omitted); see also OTI Am., 68 Fed. Cl. at 659.

In fact, it is well settled law that when a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the Government's improper conduct, or the plaintiff loses the opportunity to compete on a level playing field with other bidders, the plaintiff has satisfied the requirement for irreparable harm. Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004); see also Hunt Bldg. Co., 61 Fed. Cl. at 280; United Payors, 55 Fed. Cl. at 333. A "disappointed contractor suffers irreparable harm because it is deprived of lost profits under the contract at issue." Al Ghanim Combined Group Co. Gen. Trade & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 520 (2003) (internal quotations omitted). Thus, the loss of anticipated profits can only be remedied solely through an injunction. Hawaiian Dredging, 59 Fed. Cl. at 317.

OTI will suffer a loss in revenues, a lost opportunity to compete for full agency deployment, a loss of the expenses it incurred in developing the product as well as damage to its reputation as a prospective manufacturer of passports for other countries. At the hearing on the Motions for Judgment on the Administrative Record in the previous protest before this Court in 2005, OTI's President, Ohad Bashan, testified [

] This Court found Mr. Bashan's testimony as credible and recognized this type of harm as irreparable harm. See

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

OTI Am., 68 Fed. Cl. at 659. The situation now is exactly the same as Mr. Bashan testified last year with the equivalent, if not greater level of irreparable harm, now that OTI has invested an additional year of time, effort and money into the ePassport program.

Because OTI seeks the ultimate award of the contract and thus seeks to be reinstated into this procurement, if the Court does not reinstate OTI into the competition, its only available remedy will be for recovery of proposal preparation costs. This limited recovery creates an immediate and irreparable injury to OTI.

2. ***The Harm to OTI Outweighs the Harm to the GPO.***

In determining whether to grant injunctive relief the court must determine, by a preponderance of the evidence, that "the harm to plaintiff if an injunction is not granted outweighs the harm to the Government and third parties if an injunction is granted." See Cardinal Maint. Servs., 63 Fed. Cl. at 110. The harm to OTI if injunctive relief is not granted far outweighs any harm to the GPO. Unless an injunction allowing OTI back into the bidding process is granted, OTI will be removed from any meaningful opportunity to compete for this contract and will be effectively eliminated. See Hawaiian Dredging, 59 Fed. Cl. at 318 (enjoining the government from proceeding with performance of a Navy contract until the bid protestor's bid was reviewed further by the contracting agency); Hunt Bldg. Co., 61 Fed. Cl. at 281 (enjoining the Air Force from awarding a military housing contract and requiring a resubmission of proposals); DeMat Air, Inc., 2 Cl. Ct. at 206 (enjoining the government from considering any proposal or awarding a contract under a Defense Fuel Supply Center request for proposal until the protestor's bid had been fully and fairly reconsidered and reviewed by the government).

In contrast, the GPO will not suffer any harm if such an injunction is granted. Allowing OTI to re-enter the bidding process will not create any undue delays or other meaningful

disruption in the procurement process. Hr'g. Tr. 17:10-14 (Aug. 9, 2006). In fact, an injunction allowing OTI to re-enter the bidding process, unless and until it is legitimately eliminated, can only help serve the GPO's interests by increasing the level and quality of competition for this contract, and maintaining the integrity of the government procurement process. See Cardinal Maint. Servs., Inc., 63 Fed. Cl. at 111 (holding that when an injunction is granted and "the contracts are competitively bid, the government might receive a better offer than it now has due to full and open competition"). In other words, no harm to the GPO will result from granting permanent injunctive relief in OTI's favor.

*3.* ***Granting OTI Injunctive Relief Serves the Public Interest.***

It "is well-established that the public interest is well-served by ensuring that the government procurement process is fair," Asia Pac., 68 Fed. Cl. at 26 (granting an injunction for postal service to discard the results of the existing solicitation and to initiate a new solicitation). The public interest is likewise served by ensuring the procurement process conforms to applicable procurement regulations. See Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1152 (Fed. Cir. 1994) (holding that injunction was proper and that injunction did not award contract to protestor, but rather restored posture of process before illegal cancellation). Public interest is further served by ensuring the procurement process "conforms with regulatory authority and the solicitation's evaluation criteria." Al Ghanim Combined Group, 56 Fed. Cl. at 521. In fact, the public interest is not served when a government contract is arbitrarily awarded. See Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 515 (2005) (in granting a preliminary injunction the court held that "[t]he public interest is not served when a government contract that is subject to competitive bidding is arbitrarily awarded."). "There is no question that '[t]he public has a strong interest in insuring that public officials treat contractors fairly and generally obey procurement laws and regulations.'" Rotech Healthcare, 71 Fed. Cl. at 431

**AGREED-UPON REDACTED COPY
- MAY BE MADE PUBLIC**

(granting permanent injunction), quoting Transatlantic Lines LLC v. United States, 68 Fed Cl. 48, 57 (2005). By granting injunctive relief, public confidence in the competitive process will be preserved by "protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions." See United Payors, 55 Fed. Cl. at 334 (internal quotation marks omitted).

Furthermore, OTI recognizes that the GPO and the Department of State face a deadline within which to rollout a new electronic passport and that this program is an important aim and security interest of the United States. However, the most important aspect of national security is rolling out a product that works and is capable of providing the necessary level of security. If the GPO bends the rules for various vendors or accepts non-compliant products from those vendors, the rollout will not benefit national security but rather cause more security issues and delays. OTI merely asks that the GPO be held to the standards explicitly set forth in the Solicitation. Only through compliance with the material technical requirements of the Solicitation will the United States achieve its security goals.

By granting injunctive relief, public confidence in the competitive process will be preserved. See id. Granting injunctive relief further serves the public interest by "protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions." See United Payors, 55 Fed. Cl. at 334 (internal quotation marks omitted).

Furthermore, in light of the government's stated national security interest in the most secure and sound technology available, the public's interest in a fair and competitive procurement process is particularly important.

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

## VI. CONCLUSION

For the aforementioned reasons, OTI respectfully requests that this Court grant OTI's Motion for Judgment on the Administrative Record and grant OTI Permanent Injunctive Relief. More specifically, OTI respectfully requests that the Court enter an order:

(1) Declaring that (1) the Defendant, the United States, by and through the Government Printing Office ("GPO"), acted unreasonably and contrary to law and regulations and lacked a rational basis when it eliminated OTI as the GPO's action: (a) did not abide by the disclosed evaluation criteria in the Solicitation, (b) relied upon undisclosed evaluation criteria, (c) was based on an incorrect technical evaluation, (d) was not based on the contracting officer's independent judgment; and (e) was the result of unequal treatment;

(2) issuing an injunction requiring GPO to reinstate OTI into the selection process in such a manner as to provide OTI with a fair opportunity to compete for a production contract;

(3) awarding OTI its bid preparation and proposal costs; and

(4) enjoining GPO from granting any further production portions of the contract unless and until OTI is permitted to participate in this procurement and is fully and fairly evaluated on a level playing field with other contractors.

Respectfully submitted,

OTI AMERICA, INC.

By its attorneys,

Electronically filed
October 11, 2006

/s/ William M. Weisberg
William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

**AGREED-UPON REDACTED COPY**
**- MAY BE MADE PUBLIC**

Beth L. Jacobson
Joyce L. Tong
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*