**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| OTI AMERICA, INC., Plaintiff, v. UNITED STATES, Defendant. | Civil Action No. 06-571-C (Judge Lettow) |

# PLAINTIFF OTI AMERICA, INC.'S RESPONSE TO DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Electronically filed on
October 13, 2006

William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

Beth L. Jacobson
Joyce L. Tong
Lisa M. Hodes
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2872
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

I. STATEMENT OF THE CASE ..... 1

A. Counter-Statement Of Facts ..... 1

II. STANDARD OF REVIEW ..... 5

III. ARGUMENT ..... 6

A. The GPO Acted Arbitrarily Or Capriciously And Violated Applicable Procurement Statutes And Regulations. ..... 6

1. The CO's Determination That OTI's Product Failed To Meet Specifications Was Not Based On Her Independent Judgment And Lacked A Rational Basis ..... 7

(a) Broadnax Did Not Exercise Independent Judgment and Relied Solely Upon Her Subordinate's Recommendations. ..... 9

(b) OTI Was Prejudiced. ..... 11

2. GPO Relied Upon Undisclosed Selection Criteria. ..... 12

(a) No Written Standards ..... 15

(b) TEMP Standards ..... 15

(c) Impact Testing ..... 16

(d) Bend Testing ..... 17

(e) Load Modulation ..... 17

3. OTI Has Demonstrated Disparate Treatment. ..... 19

4. The GPO Performed an Incorrect Technical Evaluation. ..... 21

B. The Government Erroneously Argues that OTI is Not Entitled to an Injunction. ..... 23

1. OTI Has Demonstrated Actual Success on the Merits ..... 23

2. The Government Ignores this Court's Prior Findings When It Argues That OTI Will Not Suffer Irreparable Harm if an Injunction is Not Issued ..... 24

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**TABLE OF CONTENTS**

Page

3. The Balance of the Harms Weighs In Favor of OTI. ....27

4. Because GPO Violated Procurement Laws, Issuing OTI an Injunction Serves the Public Interest. ....28

5. OTI is Entitled to the Relief Requested. ....29

IV. CONCLUSION ....30

AGREED-UPON REDACTED COPY
-MAY BE MADE PUBLIC

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page

ACRA, Inc. v. United States, 44 Fed. Cl. 288 (1999) ....12

Al Ghanim Combined Group Co. General Trade & Cont. W.L.L. v. United States, 56 Fed. Cl. 502 (2003) ....25, 28

Arch Chemicals, Inc. v. United States, 64 Fed. Cl. 380 (2005)....6

Asia Pacific Airlines v. United States, 68 Fed. Cl. 8 (2005) ....23

Banknote Corp. of America v. United States, 56 Fed. Cl. 377 (2003) ....14, 20, 21, 28

Bannum, Inc. v. United States, 404 F.3d 1346 (Fed. Cir. 2005) ....6, 23

Beta Analytics International, Inc. v. United States, 67 Fed. Cl. 384 (2005) ....21

CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005)....7

CRC Marine Services, Inc. v. United States, 41 Fed. Cl. 66 (1998) ....5

Cardinal Maintenance Serv., Inc. v. United States, 63 Fed. Cl. 98 (2004)....25, 27

Concept Automation, Inc. v. United States, 41 Fed. Cl. 361 (1998)....26

DeMat Air, Inc. v. United States, 2 Cl. Ct. 197, 206 (1983) ....27

Doty v. United States, 53 F.3d 1244 (Fed. Cir. 1995)....20

Dubinsky v. United States, 43 Fed. Cl. 243 (1999)....12

Eli Lilly & Co. v. America Cyanamid Co., 82 F.3d 1568 (Fed. Cir. 1996) ....24

Foundation Health Federal Services v. United States, No. 93-1717, 1993 WL 738426 (D.D.C. 1993)....24, 25, 26

Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003)....12, 20, 24

Gulf Group, Inc. v. United States, 61 Fed. Cl. 338 (2004)....6

AGREED-UPON REDACTED COPY
-MAY BE MADE PUBLIC

Hawaiian Dredging Construction Co. v. United States, 59 Fed. Cl. 305 (2004).............23, 25, 26, 27

Hunt Building Co. v. United States, 61 Fed. Cl. 243 (2004)..........................................25, 27, 28

Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421 (2002).....7, 8, 9

Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324 (Fed. Cir. 2001)..........................................................................................5

Isratex, Inc. v United States, 25 Cl. Ct. 223, 229 (1992)................................................12, 13, 14

Minor Metals, Inc. v. United States, 38 Fed. Cl. 379 (1997)........................................................24

Murphy v. United States, 993 F.2d 871 (Fed. Cir. 1993) ..............................................................28

Norfolk Dredging Co. v. United States, 58 Fed. Cl. 167 (2003) ..................................................24

North Dakota v. United States, 495 U.S. 423 (1990) ....................................................................28

OTI America, Inc. v. United States, 68 Fed. Cl. 646 (2005) ................................................2, 3, 4, 8, 23, 26

PGBA, LLC v. United States, 60 Fed. Cl. 196 (Fed. Cir. 2004) ....................................20, 21, 23

Parcel 49C Ltd. Partnership v. United States, 31 F.3d 1147 (Fed. Cir. 1994).............................28

TLT Construction Corp. v. United States, 50 Fed. Cl. 212 (2001)..............................................20

United Payors & United Providers Health Servs., 55 Fed. Cl. 323 (2002) ......................25, 27, 28

University Research Co., LLC v. United States, 65 Fed. Cl. 500 (2005).....................................28

Voge v. United States, 844 F.2d 776 (Fed. Cir. 1988) ..................................................................28

Wisconsin Gas. Co. v. FERC, 758 F.2d 669 (1985)......................................................................24

**ADMINISTRATIVE PROCEEDINGS**

In re ABS Baumaschinenvertrieb GmbH, No. DAJA02-94-0023, 2000 WL 1279906 (A.S.B.C.A. Aug 29, 2000) ............................................................8

Appeal of Jamco Constructors, Inc., No. V501C-339, 1993 WL 393670 (V.A.B.C.A Oct 5, 1993).................................................................8

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

Appeal of Kora and Williams Corp., No. 0680-AA-02-0-03-KA,
1994 WL 750301 (D.C.C.A.B. Mar. 7, 1994) ....................8

SOS Interpreting, LTD., Nos. B-293026, B- 293026.2, B-293026.3,
2005 WL 357422 (Comp. Gen. Jan 20, 2004) ....................7

**FEDERAL STATUTES**

48 C.F.R. § 15.304(d) ....................12, 14

Competition in Contracting Act, 10 U.S.C. § 2305(a)(2)(A)(i)....................12

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| OTI AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Civil Action No. 06-571-C<br>(Judge Lettow) |

**PLAINTIFF OTI AMERICA, INC.'S RESPONSE TO DEFENDANT'S**
**MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Plaintiff OTI America, Inc. ("OTI"), by its undersigned counsel, respectfully submits this Response in Opposition to Defendant's Motion for Judgment Upon the Administrative Record ("Mot."), requests that the Court deny the Motion and enter judgment upon the Administrative Record ("AR") in favor of OTI.[1]

## I. STATEMENT OF THE CASE

### A. Counter-Statement Of Facts

OTI does not dispute the Government's recitation of the facts related to the Visa Waiver Program ("VWP"); however, two statements seem facially inconsistent. First, the Government states that all VWP countries are required to produce passports with digital photographs by October 26, 2005 and must present an acceptable plan to issue passports with integrated chips by October 26, 2006.[2] Mot. at 4. Subsequently, the Government then asserts that the ePassport

[1] Pursuant to Rule of the Court of Federal Claims 5.2(4)(b)(3), OTI attaches hereto the Comparison Chart of Solicitation Requirements, ICAO Testing and NIST Testing ("Comparison Chart") as Appendix A and the September 11, 2006 Deposition of Albertha Broadnax ("Broadnax Dep.") as Appendix B.

[2] Although not bound by requirements of Section 303 of the Enhanced Border Security and Visa Entry Reform Act of 2002 ("EBSVERA"), the United States intends to comply with the imposed deadlines. Mot. at 5-6.

program must be "fully operational" by October 2006 and requires "full implementation." Mot. at 5-6.

The Government omits several key facts related to the Solicitation. First, the procurement was a "full and open competition." Administrative Record 2005[3] ("AR 2005") at 25, 272. Although the Government Printing Office ("GPO")[4] reimbursed the contractors for their sample products, the purpose of the Solicitation was to elicit proposals from several vendors to facilitate a competitive procurement process that would result in the most technologically sound and secure product for the GPO and eventually the Department of State ("DoS"). Second, Section C7.2.3 of the Solicitation called for a cooperative procurement process where the GPO would work with the vendors to solve problems as the procurement progressed. AR 2005 at 40.

Third, the Government fails to mention that the Solicitation requires the ePassports to be compliant with standards set by the International Civil Aviation Organization ("ICAO"),[5] which incorporates the standards set by the International Standards Organization for Standardization ("ISO").[6] AR 2005 at 67; Broadnax Dep. 15:20-16:2. These international standards were the technical evaluation criteria against which the offerors' products were to be evaluated. Broadnax

---

[3] The Administrative Record from OTI Am., Inc. v. United States, 68 Fed. Cl. 646 (2005) has been incorporated into the AR of this current bid protest per order of this Court.

[4] The GPO is defined herein to include actions by and through the National Institute of Standards and Technology ("NIST").

[5] The Government acknowledges that Section 303 of the EBSVERA requires passports based upon standards established by ICAO, Mot. at 3, but makes no mention of ICAO or ISO when discussing the Solicitation standards. Mot. at 6-7.

[6] Pursuant to the Government's request, on September 11, 2006, counsel for OTI provided the Government with the relevant ICAO and ISO standards including amendments and updates. On September 19, 2006, the Government filed a portion of the standards, but not the updates, which are Durability of Machine Readable Passports, ICAO TF4 Doc. N0156 (Feb 9, 2006) and RF Protocol and Application Test Standard for E-Passport – Part 2, Tests for Air Interface, Initialisation, Anticollision and Transport Protocol, ICAO TF4 Doc. WG3TF4_SDXX_RF protocol and application test standard ePP Part 2.doc (Feb. 10, 2006).

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

Dep. 50:10-51:5. Alarmingly, the Contracting Officer ("CO"), Albertha Broadnax ("Broadnax"), [ ] Id. at 16:8-17:12; 17:18-18:18; 37:13-38:18; 46:2-11; 47:11-19. [ ] [ ] Id. at 55:1-22. In fact, Broadnax [ ] Id. at 13:12-13. As a result, Broadnax [ ] Id. at 28:9-14. (In fact, even beyond the CO not having read the evaluation criteria, subsequent correspondence and conversations with Government counsel indicate that the Government appears to have trouble even finding the evaluation criteria. See supra note 6.). Finally, [ ]

The Government focuses on OTI's "repeated failures" and the protests OTI has filed. Mot. at 7-8, 10. OTI's "repeated failures" and protests are irrelevant to the substantive issues in this bid protest, particularly as the Government either settled the protests by taking corrective action prior to a decision on the protest, or lost. The Government fails to acknowledge that had the GPO followed applicable procurement law throughout this procurement, OTI would not have filed protests. The relevant fact is not whether OTI had "repeated failures," but rather that the

---

[7] [ ]

**AGREED-UPON REDACTED COPY
-MAY BE MADE PUBLIC**

GPO repeatedly disregarded applicable procurement law. See OTI Am., 68 Fed. Cl. at 646. In the prior action, this Court found errors in GPO's procurement process, that the GPO used undisclosed evaluation criteria, and that the GPO applied those criteria inconsistently with regard to OTI; accordingly, OTI was reinstated into the competition. Id. at 647, 655-57; AR at 1-2, 304-06, 312-13; see also Compl. ¶¶ 22-25.

Also irrelevant is the representation that NIST is an independent third party that conducted blind testing. As Michael Emery testified in the prior action that the forms, created by a State Department contractor, are not accurate and are a "waste of time and effort," any testing by a Government agency does not *per se* guarantee accuracy. OTI Am., 68 Fed. Cl. at 650 n.10. NIST did not notify "the GPO that only one of the three contractor's passport covers successfully passed the required testing," as the Government represented. Mot. at 9. NIST merely reported the test results for the three contractors: OTI, [ ] and [ ]. AR at 191-193. GPO determined who passed and failed based on a set of unknown standards. For example, [

]The AR is silent as to why the GPO found one failure to be disqualifying for OTI, while [ ] failure was not, particularly

[8] [

]

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

because the Solicitation requires contractors to meet the evaluation criteria. NIST may be an independent, government agency that conducted blind testing, but NIST's report describes how it substantially deviated from the standards set forth in the Solicitation. Compare AR 205-208 (Bend Testing); 213-214 (Load Modulation Test); 226-30 (Impact Testing) with AR 2005 at 35-36, 42-43 (Solicitation requirements).

The Government likewise misrepresents the results of OTI's performance in the NIST tests. Although the Government states that OTI failed ten out of ten of the required tests for load modulation, in fact, NIST performed more than 10 tests for load modulation. NIST performed tests at 1.5 A/m on 40 ePassports, none at the required 4.5 A/m, and then only tested 10 ePassports at 7.5 A/m. AR at 289. OTI passed all ten tests at 7.5 A/m. Id. OTI's ePassports returned a "steady, measurable" LM at 2.5 A/m. Id. However, the NIST report does not describe the difference between a "steady, measurable" LM and any readings it could or could not take from OTI's ePassports at 1.5 A/m. Id. Similarly, the Government states that OTI's product did not perform "adequately" – an undefined term – when subjected to the NIST durability tests.[9] Mot. at 10. The Government does not mention that the specific durability tests NIST performed were not part of the evaluation criteria from the Solicitation. Compare Mot. at 10 with AR 2005 at 42-43. The Government does not show where the Solicitation defines "adequate" performance (i.e., standards for weighing test results).

## II. STANDARD OF REVIEW

The Court cannot substitute its judgment for that of the agency. CRC Marine Servs., Inc. v. United States, 41 Fed. Cl. 66, 83 (1998). Where the protestor demonstrates that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure

[9] According to the Solicitation, all the tests conducted by NIST (including the Electromagnetic/Static Electricity testing) constitutes durability testing. AR 2005 42-43.

involved a violation of regulation or procedure," the protest is sustained. Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). OTI has shown that the violations of regulations and procedures prejudiced OTI. There is no dispute regarding the standard upon which this Court reviews bid protest actions except for the impact of traditional summary judgment standards.

Contrary to the Government's assertion, summary judgment standards are pertinent to judicial review upon an AR. Mot. at 12. Motions for judgment based upon the AR are generally reviewed under the same standard as motions for summary judgment. Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005). The existence of genuine issues of material fact do not preclude a motion for judgment on the AR because this motion examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted arbitrarily, capriciously, or contrary to law. Id. at 1356; see also Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 388 (2005); Gulf Group, Inc. v. United States, 61 Fed. Cl. 338, 350 (2004). Where the Court finds arbitrary action, it then decides the factual question of whether the action was prejudicial to the bid protestor. Bannum, 404 F.3d at 1351-54.

## III. ARGUMENT[10]

As the GPO's decisions were arbitrary and capricious and unsupported by the AR, the United States is not entitled to judgment upon the AR pursuant to RCFC 52.1 and this Court should deny its Motion and grant OTI's Motion for Judgment on the Administrative Record ("OTI's Motion").

### A. The GPO Acted Arbitrarily Or Capriciously And Violated Applicable Procurement Statutes And Regulations.

[10] In its Motion, the Government cites only one case in support of its entire Argument section.

OTI has shown that: (1) the CO's decision lacked a rational basis and was not based on her independent judgment; (2) the GPO relied upon undisclosed evaluation criteria and deviated from the stated evaluation criteria; (3) the GPO treated offerors disparately; (4) the GPO performed an incorrect technical evaluation; and (5) the GPO's decision prejudiced OTI. Therefore, this Court should deny the Government's Motion, sustain OTI's protest and reinsert OTI into the procurement competition.

1. The CO's Determination That OTI's Product Failed To Meet Specifications Was Not Based On Her Independent Judgment And Lacked A Rational Basis

The Government alleges that OTI has failed to show that the deselection of OTI lacked a rational basis. However, the Government bases this argument solely on OTI's Complaint and fails to account for the multitude of glaring inaccuracies, silences, and contradictions that exist in the AR. See Mot. at 13 ("Indeed, [OTI's] complaint is silent as to the alleged irrationality of the GPO's decision.") (emphasis added). The Government admittedly appears to have performed a mere "cursory review of the administrative record," Mot. at 13, and failed to acknowledge or address, in any form, Broadnax's deposition or the inconsistencies in the AR that evidence the irrationality of the GPO's decision.

Broadnax could not have made a rational independent decision because [

] In government procurement, contracting officers must act with independent judgment and may not solely rely upon a subordinate's recommendation in eliminating a bidder from the competition. See Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002) (holding that because the "contracting officer relied on the technical evaluation board's recommendation without making any independent inquiries" the decision was

**AGREED-UPON REDACTED COPY
-MAY BE MADE PUBLIC**

not reasonable and violated the statute.); see also CEMS, Inc. v. United States, 65 Fed. Cl. 473 (2005) (holding that failure of the contracting officer to " 'put his own mind to the problems, and to take ownership of all determinations" constituted unreasonable behavior and a lack of independent judgment) (internal citations omitted); SOS Interpreting, LTD., Nos. B-293026, B-293026.2, B-293026.3, 2005 WL 357422, at *5 (Comp. Gen. Jan. 20, 2004) (holding that officials handling source selection are "bound by the fundamental requirement that their independent judgments be reasonable" even when relying on lower-level evaluators), citing Johnson Controls World Servs., Inc., Nos. B-289942, B-289942.2, 2002 WL 1162912 (Comp. Gen. May 24, 2002) (sustaining the bid protest where the official failed to exercise independent judgment).[11] "A court must 'determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion,' with the protesting party bearing the burden to show that the decision by the agency had no rational basis." OTI Am., 68 Fed. Cl. at 657 (holding that CO Broadnax "did not exercise her discretion, but rather she applied the determinations and conclusions reached by her technical evaluation team"); see also id. at 658.

As in OTI's prior protest, here, no evidence in the AR indicates that Broadnax exercised independent judgment. In fact, the Government ignores the AR which verifies that Broadnax solely relied upon the recommendation from an evaluation team or a subordinate to eliminate OTI from the competition and lacked knowledge of either the evaluation criteria or the technical

[11] Other administrative agencies also hold that the lack of independent judgment on the part of a contracting officer constitutes an abuse of discretion. See, e.g., In re ABS Baumaschinenvertrieb GmbH, No. DAJA02-94-0023, 2000 WL 1279906, at *29-30 (A.S.B.C.A. Aug. 29, 2000) (holding that a CO did not use his independent judgment because he did not consider all required factors); Appeal of Kora and Williams Corp., No. 0680-AA-02-0-03-KA, 1994 WL 750301, at *119-20 (D.C.C.A.B. Mar. 7, 1994), aff'd, 743 A.2d 682 (D.C. 1999) (holding that a CO who simply carried out a termination directive of his superior constituted a violation of discretion when no evidence existed that his superior weighed (or even had knowledge of) the factors required under the procurement); Appeal of Jamco Constructors, Inc., No. V501C-339, 1993 WL 393670, at *19-21 (V.A.B.C.A. Oct. 5, 1993) (holding that the veterans administration abused its discretion by substituting its judgment for that of the CO who acted reasonably in light of what was known at the time of the termination decision; further holding that the CO abused his discretion by failing to make an adequate inquiry prior to the termination decision).

aspects of the evaluation. Broadnax Dep. 16:8-17:12; 17:18-18:18; 37:13-38:18; 46:2-11; 47:11-19. Pertinent case law specifically holds Broadnax's actions as inappropriate and in violation of procurement law. See Impresa, 52 Fed. Cl. at 421.

In Impresa, the CO admitted having knowledge of outstanding issues that might directly contradict the findings of the board, but chose not to explore those issues or verify the board's findings. Id. Rather, the CO relied solely on the findings of a evaluation board. Because the CO did not independently decide the issue (as is the case here), the Court held that the findings violated Section 706 of Title 5 of the United States Code, and that the procurement decision was not reasonable. Id.

**(a)** *Broadnax Did Not Exercise Independent Judgment and Relied Solely Upon Her Subordinate's Recommendations.*

[

] Without the help of others, Broadnax would not have known how to interpret the NIST report. Broadnax's testimony evidences [

] Broadnax Dep. 8:2-10. Even if Broadnax had observed the testing, [

] Id. at 16:8-17:12; 46:2-11 (["

"); 47:11-19

([

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

]). Broadnax did not receive or review a list of evaluation criteria NIST used to conduct the test results to familiarize herself with the stated criteria. Id. at 9:7-10:3.

Broadnax's testimony shows a lack of knowledge of the evaluation criteria sufficient for her to exercise independent judgment and [ ][12] [ ] was apparent when asked about impact testing procedure as set forth in the NIST report. NIST tests used an impact force of 1800 Newtons. [ ] Id. at 27:10-28:8; see also id. at 28:19-30:7 (no knowledge or understanding as to 100 flat steel impacts). Broadnax was not aware [ ] Id. at 40:6-43:6. She stated [ ], she "[ ]". Id. at 46:12-22. Broadnax simply implemented Grasso's suggestions regarding the NIST report rather than independently judging the impact of each purported failure on the ePassport program.

Additionally, Broadnax [ ] Id. at 17:18-18:18; see also id. at 37:13-38:18 ([ ]). Broadnax [ ] and [

[12] As a distraction from the real issues – Broadnax's lack of independent judgment – the Government emphasizes in its Motion that the CO apparently informed OTI that it would have no further opportunity "to remedy any defects in this (sic) products should they again fail testing." Mot. at 14. Notification is irrelevant because OTI does not ask to resubmit products to remedy alleged defects or to correct any purported mistakes. OTI asks this Court to order GPO to conduct testing and evaluations pursuant to the stated criteria in the Solicitation, rather than pursuant to undisclosed criteria that deviate from the Solicitation requirements.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

] Id. at 13:12-13, 28:9-14. In fact, [

] Id. at [ ] The CO did not know [

] Id. at [ ], 55:1-22. Broadnax solely [

]

Broadnax purported to exercise her independent judgment in eliminating OTI from this procurement based on reported failures to comply with evaluation criteria she had not read. [

] Because Broadnax did not have the technical knowledge – nor did she attempt to remedy that lack by reading the international standards as set forth in the Solicitation – Broadnax did not exercise independent judgment when evaluating the NIST report.

**(b)** *OTI Was Prejudiced.*

Broadnax did not use her independent judgment. The CO did not know what the ICAO standards required nor whether NIST actually conducted testing based on ICAO standards. In fact, Broadnax had never even seen the ICAO standards. She based her decision entirely on her subordinate's recommendations and did not exercise independent judgment. As the CO,

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

Broadnax should have had knowledge of the relative importance of the various tests. In order to evaluate each test in real world application and whether a failure should eliminate a competitor, the CO needed to have the technical knowledge of the impact or effect of such a failure. She did not. Broadnax had insufficient familiarity with the stated evaluation criteria, much less the actual technical issues, to effectively evaluate test results and thus failed to exercise independent judgment. The CO blindly followed the (arbitrary and capricious) findings of other individuals involved in the procurement, did not weigh each factor with her own judgment, and as such, the GPO acted without a rational basis in deselecting OTI from further competition. As a result of Broadnax's lack of knowledge, OTI was not fairly evaluated and was prejudiced.

2. GPO Relied Upon Undisclosed Selection Criteria.

The Government fails to address the well-settled applicable procurement law that prohibits the use of undisclosed and unknown evaluation criteria in a procurement, again simply "ignoring" both the AR and Broadnax's testimony. The Government "is not permitted to rely upon undisclosed evaluation criteria when evaluating proposals." ACRA, Inc. v. United States, 44 Fed. Cl. 288, 293 (1999) (internal citations omitted); see also Dubinsky v. United States, 43 Fed. Cl. 243 (1999) (holding that improper evaluations rendered the award arbitrary and capricious).

If a given factor is essential to the contract award and failure of that factor gives rise to termination, in the interest of fairness and competition, the bidders must have knowledge of the importance of that factor. Isratex, Inc. v United States, 25 Cl. Ct. 223, 229 (1992); see also Gentex Corp. v. United States, 58 Fed. Cl. 634, 652 (2003) (holding that the procurement process was unfair and prejudicial to the protester and stating " 'making offerors aware of the rules of the game in which they seek to participate is fundamental to fairness and open

competition' "). The Federal Acquisition Regulation ("FAR") likewise holds that, "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation." 48 C.F.R. § 15.304(d) (West 2005); see also Competition in Contracting Act, 10 U.S.C. § 2305(a)(2)(A)(i) (West 2005).

When failure of a given factor may terminate the offeror, the Government must disclose those specific factors. See Isratex, 25 Cl. Ct. at 228-29. The Government's entire argument that it did not rely upon undisclosed evaluation criteria results on a sentence in the Solicitation that states: "These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1." AR at 41 (emphasis added). The Government is stating, in effect, that the Solicitation put offeror's on notice that undisclosed evaluation criteria might be used, notwithstanding the inclusion of extremely detailed evaluation criteria, identified as such, in the Solicitation. This litigation-driven Government interpretation is directly at odds with binding procurement laws. The more logical interpretation, consistent with applicable law, is that the Government may add additional evaluation criteria to those referenced in the Solicitation if it notifies the offerors. The Government is well aware of this requirement as on January 13, 2006 it provided OTI with an updated Solicitation.[13]

The Government's interpretation of this sentence referenced above directly contradicts Isratex, which requires that where a " 'very important' subfactor, so important, in fact, that failure of the test caused offerors' proposals to be rejected" that subfactor must be disclosed to the bidders. Isratex, 25 Cl. Ct. at 229. Here, every subfactor appears to be a "very important subfactor," capable of causing the proposal to be rejected. Of course, as her deposition showed, Broadnax herself did not know what criteria were being used. See Broadnax Dep. 55:1-22. In

[13] The Government did not include this in the AR. Upon request, OTI will provide it to the Court.

Isratex, as here, the agency eliminated the bidder due to a failed test. The contracting officer considered the test to be a " 'very important' subfactor, so important, in fact, that failure of the test caused offerors' proposals to be rejected." Isratex, 25 Cl. Ct. at 229. The Court determined that the agency failed to disclose relevant information to the bidders in the Solicitation and as such, the agency violated the procurement regulations. See Isratex, 25 Cl. Ct. at 228-29 ("[10 U.S.C.] Section 2305(a)(2) requires that a solicitation set forth the relative importance of subfactors"). Here, OTI has shown six specific instances, detailed below, each prejudicial to OTI, where GPO utilized undisclosed evaluation criterion and contradicted a disclosed evaluation procedure upon which OTI relied.

Both the existence and the relative weight of evaluation factors must be disclosed to offerors. See 48 C.F.R. § 15.304. In this procurement, they were not. (In fact, no weighting scheme seems to exist at all.) This requirement allows an offeror to know which factors lead to elimination, versus factors that can be corrected during testing. This knowledge is relevant to how an offeror prepares for and performs during a long evaluation process. In direct contrast to the regulations, here, the CO testified that she is not required to evaluate the contractor's submission against disclosed evaluation criteria. Broadnax Dep. 51:6-9. Additionally, no written standards exist that detail the required pass rate of tests before the contractor moves to the next CLIN stage. See id. at 15:20-16:2. The Solicitation did not disclose that NIST would use: (a) additional written standards; (b) TEMP standards; (c) the four sub-tests that together comprised the Impact Testing; (d) the two sub-tests that comprised the Bend Testing to offerors; and (e) the load modulation test that comprised the Electromagnetic/Static Electricity Test. As in Isratex, OTI "would have to have been clairvoyant to anticipate that failing [undisclosed tests]

would automatically disqualify its proposal, while exhibiting other deficiencies would allow the offeror to be given a second chance at contract award." Isratex, 25 Cl. Ct. at 230.[14]

**(a)** *No Written Standards*

[

]

**(b)** *TEMP Standards*

[

[14] OTI is mindful that a Solicitation does not need to identify each element which the agency considers if that element is intrinsic to the stated factors. Banknote Corp. of Am. v. United States, 56 Fed. Cl. 377, 387 (2003), aff'd, 365 F.3d 1345 (Fed. Cir. 2004). Here, however, each of the unlisted, unspecified tests is not intrinsic to the stated factors – the specific tests are not obvious to the bidder. The stated factors are so broad and general that a prospective bidder has no guidance in preparing the product other than compliance with available ICAO standards (directly referenced in the Solicitation). Unfortunately, the GPO did not feel similarly bound.

[15] The Government acknowledges that the TEMP "was not considered by the contracting officer in determining that OTI had failed to submit a product that met the Solicitation's requirements." Government's Resp. to Pl.'s Emergency Renewed Mot. for Leave of Ct. to Supplement the Administrative Record at 4.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

]

**(c)** *Impact Testing*

NIST used [ ] AR at 203-04, 227-30.

The Solicitation does not detail the [ ] impact testing. See Comparison Chart, at 1-2. The Solicitation merely gives the following statement:

> *Impact Testing*: to assess the ability of the submittals (IC readability) to survive the stamping process. One possibility will be to strike the IC/antenna direction on the cover page a certain number of times at a force level that can be expected in actual usage. Loading is envisioned to be imparted by a falling weight testing machine. One question that will be addressed is: "Can the IC/antenna survive the full number of strikes, and if not, then when do they fail?"

AR 2005 at 42 (emphasis in original).

**(d)** *Bend Testing*

The Solicitation provides very little context for the conducted Bend Testing and did not specify the two types of testing that [ ] Compare AR 2005 at 42 ("*Bend Testing*: to determine if the IC/antenna can continue to be read if the book is subjected to bending forces"), with AR at 179, 205, 207. NIST used two tests not set forth in the Solicitation that amount to undisclosed evaluation criteria. See Comparison Chart, at 3-4. Had GPO disclosed what Bend Tests were to be performed as part of the evaluation, OTI would have designed its product around those tests, rather than the evaluation criteria GPO specified in the Solicitation.

**(e)** *Load Modulation*

The Solicitation makes two general statements regarding Load Modulation ("LM") testing; however, nothing explicitly set forth the testing scheme. See AR 2005 at 43 ("*Electromagnetic/Static Electricity Testing*: to identify vulnerabilities in these areas"), 36 (specifying that the products must comply with the relevant international standards of ISO and ICAO); see also Comparison Chart, at 5-7. Neither LM reference indicates that LM is an essential element of Electromagnetic/Static Electricity Testing, failure of which would result in deselection, as apparently it did for OTI.

The Government raises the question of OTI's internationally recognized lab results[16] and argues that no final ICAO standards for ePassport durability have been promulgated. The Solicitation identified ICAO standards as the evaluation criteria for award. Thus, in the absence of other guidance in the Solicitation, the only standard by which a bidder has to evaluate its product are by the ICAO standards. Broadnax Dep. 23:20-24:17, 47:19-48:3. OTI had been keeping abreast of developments to ICAO standards, as the Solicitation required, and submitted a product compliant with current international testing standards – the only criteria available to OTI at the time.[17] See supra note 6.

The Government asserts that "OTI as well as the other contract participants had a meeting with GPO to discuss the testing and could have inquired about the anticipated durability testing at NIST, yet it chose not to do so." Mot. at 16. The Government accedes that NIST performed testing that was not disclosed in the Solicitation. Broadnax confirmed that evaluations should be conducted pursuant to certain criteria set forth in the Solicitation. Broadnax Dep. 45:4-7. Why would OTI ask about the evaluation criteria for durability testing at NIST if the Solicitation contained all the criteria necessary for evaluation? This burden is an inappropriate, arbitrary, and unreasonable one to place on bidders. Only if OTI knew that the testing criteria would be different from the Solicitation, would it inquire about the actual criteria for durability testing. OTI had no idea that the GPO and NIST were going to test based on the undisclosed criteria not

---

[16] OTI acknowledges and respects this Court's decision not to consider these reports (reserving all rights to appeal), which is why OTI has not and is not relying upon them in the AR Motions. See Hr'g Tr. 62:25-63:16 (Sept. 6, 2006). Because this Court has already ruled that it will not consider such independent lab results, this argument should be stricken from the Government's Motion as irrelevant.

[17] ICAO, through a Working Group, is developing and setting forth a testing standard for durability. In February of 2006, version 1 of the testing standards were promulgated to the members of the Working Group (the US is a member) for comment. Allegedly by this same time, NIST had developed a testing scheme to determine the durability of an ePassport. However, the international standard differs greatly from the NIST tests. A logical conclusion is that the international community, if the NIST test was before it, consciously chose to deviate from the criteria set by NIST and the NIST test did not form the basis for the international standard.

set forth in the Solicitation and no burden should be placed on it to read the minds of GPO and NIST.

The Government's argument that all of the contract participant's products were subjected to the same durability testing by NIST is both inaccurate[18] and irrelevant. If NIST or the GPO used undisclosed evaluation criteria, as OTI has shown above, this use is a per se violation of established procurement law. Even if this undisclosed criteria were used against all participants, disqualification of bidders (of which two occurred) based on this undisclosed criteria is unlawful.

3. OTI Has Demonstrated Disparate Treatment.

The Government states that "the only relevant inquiry regarding alleged unequal treatment in this case would be: 'Did GPO treat any of the three participants who just completed testing, OTI, [ ], and [ ], differently from each other?' . . . There is no indication anywhere in the administrative record of any disparate treatment as to either [ ] or [ ] nor has OTI made such a claim." Mot. at 15.

However, record evidence does exist in the AR which shows unequal treatment at least between OTI and [ ].[19] OTI did not discover this unequal treatment until after filing its Complaint and after the Government assembled the AR. The [ ] and the Load Modulation ("LM") test are sub-tests under the heading "[ ]" Specifically, [

---

[18] OTI has no way of determining whether the NIST testing of [ ] product is similar to the NIST testing of OTI, [ ] and [ ] as [ ] test results are not part of the AR.

[19] The Government argues that the Berlin Conference and Infineon's passport is the sole basis for OTI's unequal treatment claim. However, the Government again fails to recall that this Court ruled that it will not consider the Berlin Conference and Infineon's test results. OTI maintains that both the Berlin Conference testing results and Infineon's testing results are appropriate and relevant to this proceeding. However, as the Court has already ruled, OTI will not argue the point here. However, OTI respectfully reserves its rights regarding Berlin and Infineon.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

] Furthermore, NIST itself acknowledged that a high likelihood of a static discharge exists. <u>See</u> AR at 215 ("[

] (emphasis added). On the other hand, OTI's product unquestionably passed the ESD test. In fact, OTI's product is the only ePassport that successfully passed the ESD test at 15 kV. <u>Compare</u> AR at 193 (OTI's ESD results), <u>with</u> AR at 191, 192 ([ ] and [ ] results).

If failure of the Electromagnetic/Static Electricity Tests constituted grounds for deselection, the GPO did not treat all offerors equally. Products from both [ ] and [ ] purportedly failed an Electromagnetic/Static Electricity Test; however, the treatment of the two bidders is vastly different. OTI's [ ,] while [ ] product failed the ESD test, but instead, the GPO awarded it a CLIN 0005 production order. Failure of the LM test at 1.5 A/m does not prevent the ePassport from being functional at higher levels. However, failure of the ESD test renders that ePassport completely unreadable and not functional.

Procurement law does not permit disparate treatment. "A fundamental principle of government procurement is that [the agency] treat all offerors equally and consistently apply . . . evaluation factors." <u>TLT Constr. Corp. v. United States</u>, 50 Fed. Cl. 212, 216 (2001) (holding that the government's evaluation was arbitrary and capricious); <u>see also</u> <u>Banknote</u>, 56 Fed. Cl. at 383 ("it is beyond peradventure that a <u>contracting agency must treat all offerors equally</u>, evaluating proposals evenhandedly against common requirements and evaluation criteria.")

(emphasis added). Furthermore, "[w]hen procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion." Doty v. United States, 53 F.3d 1244, 1251 (Fed. Cir. 1995) (holding that the government was arbitrary and capricious in its determination that a dairy farmer acted in bad faith in violation of a 'Dairy Termination Program' contract).

The lack of clarity and/or ambiguity in the Solicitation "skew[ed] the playing field" and resulted in disparate treatment. See Gentex, 58 Fed. Cl. at 652-54. Similarly, in PGBA, LLC v. United States, this Court held that because of the lack of clarity in the Solicitation the government could not "demand both clairvoyance and specificity" on the part of one bidder and not on the others. 60 Fed. Cl. 196, 207, aff'd, 389 F.3d 1219 (Fed. Cir. 2004). The Court noted that "[s]uch uneven treatment goes against the standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process and amounts to an abuse of the agency's discretion." Id. The GPO afforded this type of "uneven treatment" to OTI and resulted in OTI's unwarranted ultimate elimination.

4. The GPO Performed an Incorrect Technical Evaluation.

The Government fails to consider evidence in the AR, focusing instead on evidence outside the AR, namely, OTI's independent laboratory results. See supra note 16. OTI's claim of an incorrect technical evaluation is not a mere "naked claim" of disagreement with GPO's technical evaluation of the proposals with which it has been presented. Banknote, 56 Fed. Cl. at 384 (determining that "naked claims" of disagreement with evaluations "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious.").

The evidence establishes that the GPO acted arbitrarily, capriciously, and illegally in its technical evaluations.

OTI notes that Courts generally defer to the government's discretionary procurement decisions, particularly those based on a product's excellence or quality. See Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) (sustaining protest where the technical evaluation was arbitrary and capricious). However, where the protester demonstrates that the agency's (here, NIST's) technical evaluation(s) of the product at issue was inconsistent with the agency's evaluation criteria (as is the case here), a protest is sustained. Here, given the lack of detail in the NIST report, several plausible explanations exist for OTI's product "failures" in the LM testing.

Testing for LM is highly sensitive and several factors can impact a correct reading. First, OTI did not have a "100 percent failure rate" as the Government represents. Mot. at 18. The LM test consisted of testing 40 ePassports at 1.5 A/m and 10 ePassports at 7.5 A/m. The Government conveniently ignores that all 10 of OTI's ePassports performed well at the 7.5 A/m level. See AR at 101 ("LM tests were also performed at 7.5 A/m on ten ePassports from each vendor, all vendors met the requirement."). The NIST report further states that "a magnetic field strength of 2.5 A/m was required for the ePassports of [OTI] to respond with a steady, measurable LM." NIST does not state that OTI's ePassports did not respond at all at 1.5 A/m. This response rate could be the result of several factors because LM testing is extremely sensitive to calibration of the equipment, as well as the environment. A metal object in the field of testing would result in a unreadable ePassport. See International Civil Aviation Organization [ICAO], Use of Contactless Integrated Circuits In Machine Readable Travel Documents, at 11 (Apr. 16, 2003) ("However, the radio waves are sensitive to the presence of metal parts.

Encasing the contactless IC in a metal jacket eg aluminum (sic) foil, will prevent reading. Care must be taken in the placement of the machine (RF) reader relative to adjacent metal parts.") (emphasis added). The distance between the ePassport and the reader impacts the strength of the signal. A slight distance between the ePassport and the reader could cause the reader to fail to read a steady modulation at 1.5 A/m. Neither the pictures nor the textual description in the AR evidence the distance between OTI's ePassport and the reader. GPO's conclusion that OTI failed [ ], based solely on NIST's technical evaluation with no further explanation, lacked any reasonable, rational basis.

### B. The Government Erroneously Argues that OTI is Not Entitled to an Injunction.[20]

Contrary to the Government's argument, OTI has demonstrated that it is entitled to injunctive relief. OTI has met the requisite standard to obtain a permanent injunction. Specifically, OTI has demonstrated: (1) actual success on the merits of its claim; (2) irreparable harm if an injunction is not issued; (3) that the balance of the hardships weighs heavily in OTI's favor; and (4) an injunction will serve the public interest. See Hawaiian Dredging Constr. Co. v. United States, 59 Fed. Cl. 305, 317 (2004) (granting, in a post-award bid protest, permanent injunctive relief). Accordingly, this Court should issue a permanent injunction enjoining the GPO from granting any further production portions of the contract unless and until OTI is permitted to re-enter the procurement process.

#### 1. OTI Has Demonstrated Actual Success on the Merits.

[20] The court regularly allows live testimony regarding the appropriateness of equitable relief, not the procurement itself. This testimony is procedurally improper as supplementation of the record, but the court has considered this type of testimony to determine the proper injunctive relief. See OTI Am., 68 Fed. Cl. at 659; see also Asia Pacific Airlines v. United States, 68 Fed. Cl. 8 (2005) (allowing testimony to show harm); Bannum, Inc. v. United States, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005) (holding that the trial court must make factual findings on prejudice from the record evidence); PGBA, 60 Fed. Cl. at 221 n.28 (allowing supplemental affidavit regarding potential injury). Mr. Ohad Bashan is available to testify regarding injunctive relief on September 28, 2006.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

The Government cannot escape the insurmountable evidence that it acted in an arbitrary, capricious and unreasonable manner when it eliminated OTI from the competition. See supra § II. The Government has not demonstrated otherwise. OTI has established that: (1) Broadnax failed to use her independent judgment when she decided to eliminate OTI; (2) GPO failed to comply with the terms of the Solicitation and relied upon undisclosed evaluation criteria (Broadnax Dep. 30:12-16 (testifying that GPO did not have to disclose evaluation criteria, did not have to follow the criteria as set forth in the Solicitation and could utilize tests that were not specified in the Solicitation)); (3) GPO treated OTI differently than other contractors; and (4) GPO unreasonably relied on the results of an incorrect technical evaluation.

In arguing that OTI cannot prove actual success on the merits (Gov. Mot. at 26-28), the Government repeatedly refers to OTI's alleged failure of the NIST "blind testing." However, OTI submitted a product in compliance with the ICAO standards as required by the Solicitation—standards that were not followed by NIST. GPO's numerous deviations from the Solicitation criteria, its failure to apply the ICAO standards as described in the Solicitation and its use of undisclosed evaluation criteria make NIST's testing results irrelevant.

2. The Government Ignores this Court's Prior Findings When It Argues That OTI Will Not Suffer Irreparable Harm if an Injunction is Not Issued.

The Government contends that economic harm does not constitute irreparable harm. Gov. Mot. 19-21, citing Found. Health Fed. Servs. v. United States, No. 93-1717, 1993 WL 738426 (D.D.C. Sep. 23, 1993); Minor Metals, Inc. v. United States, 38 Fed. Cl. 379 (1997); Wis. Gas. Co. v. FERC, 758 F.2d 669 (1985) (not a bid protest); Eli Lilly & Co. v. Am. Cyanamid Co., 82 F.3d 1568 (Fed. Cir. 1996) (not a bid protest). However, the general rule that pure economic harm is too speculative to rise to the level of irreparable harm for the purpose of injunctive relief is explicitly inapplicable to a bid protest. In fact, Norfolk Dredging Co. v.

United States, 58 Fed. Cl. 167 (2003) (reversed on other grounds), both distinguishes Minor Metals and questions its fundamental premise that economic harm may never rise to the level of irreparable injury.

In a bid protest, if lost profits may not constitute irreparable harm, "then protestors who are seeking to displace a putative awardee automatically fail to meet one of the four requirements for injunctive relief." Norfolk, 58 Fed. Cl. at 184. The Government ignores the established case law that lost profits due to an uneven playing field constitutes irreparable harm. See Gentex, 58 Fed. Cl. at 654, citing United Payors & United Providers Health Servs., 55 Fed. Cl. 323, 333 (2002); ("[t]his type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, has been found sufficient to prove irreparable harm") (internal citations omitted); see also OTI Am., 68 Fed. Cl. at 659. Since a bid protest is, by definition, an "injunctive action to prevent a competitor from securing the fruits of a government contract," Hawaiian Dredging, 59 Fed. Cl. at 317, it would be inapposite to apply the general rule against economic harm to an action involving a bid protest.

In fact, it is well settled law that when a plaintiff shows that it was excluded from the bidding process, perhaps solely because of the Government's improper conduct, or the plaintiff loses the opportunity to compete on a level playing field with other bidders, the plaintiff has satisfied the requirement for irreparable harm. Cardinal Maint. Serv., Inc. v. United States, 63 Fed. Cl. 98, 110 (2004); see also Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 280 (2004); United Payors, 55 Fed. Cl. at 333. A "disappointed contractor" suffers irreparable harm because it is deprived of lost profits under the contract at issue." Al Ghanim Combined Group Co. Gen. Trade & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 520 (2003) (internal quotations omitted). Thus, loss of anticipated profits with respect to bid protests "can be remedied solely by

injunctive relief." Norfolk, 58 Fed. Cl at 184-85; see also Hawaiian Dredging, 59 Fed. Cl. at 317.

To support its argument that a loss in revenues or damage to reputation does not constitute irreparable harm, the Government relies upon Foundation Health Federal Services v. United States, No. 93-1717, 1993 WL 738426 (D.D.C. 1993), a case distinguishable from OTI's protest. In Foundation Health, the plaintiffs challenged the agency's override of the GAO stay and sought a preliminary injunction. 1993 WL 738426, at *1-2. The district court denied the plaintiffs injunctive relief because, *inter alia*, the plaintiffs only alleged loss of a valuable contract and some of their employees, which the court determined did not rise to the level of irreparable harm. Id. Here, OTI's claims extend well beyond the loss of a valuable contract. OTI will suffer a loss in revenues, a lost opportunity to compete for full agency deployment, a loss of the expenses it incurred in developing the product as well as damage to its reputation as a prospective manufacturer of passports for other countries. At the hearing on the Motions for Judgment on the Administrative Record in the previous protest before this Court in 2005, OTI's President, Ohad Bashan, testified that [

] This Court found Mr. Bashan's testimony as credible and recognized this type of harm as irreparable harm. See OTI Am., 68 Fed. Cl. at 659. The harm is identical, if not greater, today as when Mr. Bashan testified last year, now that OTI has invested an additional year of time, effort and money into the ePassport program.

Because OTI seeks to compete for the award of the ultimate production contract and to be reinstated into this procurement, if the Court does not reinstate OTI into the competition, OTI's only available remedies will be for recovery of proposal preparation costs and attorneys fees. See Concept Automation, Inc. v. United States, 41 Fed. Cl. 361, 370 (1998) (awarding bid proposal and preparation costs and attorneys' fees). Without injunctive relief, OTI will suffer immediate and irreparable injury because a protestor is limited to recovery of preparation costs and may not recover anticipated profits at law. Hawaiian Dredging, 59 Fed. Cl. at 317; see also United Payors, 55 Fed. Cl. at 333; Hunt Bldg. Co., 61 Fed. Cl. at 280. Given the well-settled case law, OTI has established irreparable harm and need not prove anything more "specific" than this as the Government claims. Mot. 19-20.

3. The Balance of the Harms Weighs In Favor of OTI.

If relief is not granted, the harm to OTI far outweighs any harm to the GPO. Unless the Court halts further production orders and allows OTI back into the bidding process for re-evaluation, OTI will be removed from any meaningful opportunity to compete for this contract and will be effectively eliminated. See Hawaiian Dredging, 59 Fed. Cl. at 318 (granting permanent injunctive relief); Hunt Bldg. Co., 61 Fed. Cl. at 281 (enjoining Government from awarding the contract and requiring a resubmission of proposals); DeMat Air, Inc. v. United States, 2 Cl. Ct. 197, 206 (1983) (enjoining the Government from considering any proposal or awarding a contract until the protestor's bid had been fully and fairly reconsidered and reviewed).

In contrast, the GPO will not suffer any harm if such an injunction is granted. Allowing OTI to re-enter the bidding process will not create any undue delays or other meaningful disruption in the procurement process. See Hr'g Tr. 17:10-14 (Aug. 9, 2006). An injunction

allowing OTI to re-enter the bidding process, unless and until it is legitimately eliminated, can only help serve the GPO's interests by increasing the level and quality of competition for this contract, and maintaining the integrity of the Government procurement process. See Cardinal Maint. Servs., 63 Fed. Cl. at 111 (holding that when an injunction is granted and "the contracts are competitively bid, the government might receive a better offer than it now has due to full and open competition").

4. Because GPO Violated Procurement Laws, Issuing OTI an Injunction Serves the Public Interest.

The Government's argument that the issuance of an injunction is not in the public interest rests solely on the erroneous assumption that OTI seeks a complete halt of the ePassport program. The public interest is served by ensuring the procurement process conforms to applicable procurement regulations, is fair, and "conforms with regulatory authority and the solicitation's evaluation criteria". Al Ghanim, 56 Fed. Cl. at 521; see also Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1152 (Fed. Cir. 1994) (injunctive relief was proper); Hunt Bldg. Co., 61 Fed. Cl. at 280. In fact, the public interest is not served—and national security is harmed—when the Government does not conform to the standards in the Solicitation and the contract is arbitrarily awarded. See Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 515 (2005). By granting OTI injunctive relief, public confidence in the competitive process will be preserved by "protecting the integrity of the procurement system from unreasonable or irrational conduct and in ensuring that contracting agencies provide sufficient documentation to permit proper review of their actions." See United Payors, 55 Fed. Cl. at 334 (internal quotation marks omitted).

The Government claims that granting OTI injunctive relief is not in the public's interest because it would cause delay and "would likely affect national security and possibly subject

**AGREED-UPON REDACTED COPY -MAY BE MADE PUBLIC**

United States citizens to increased visa restrictions and expenses when traveling abroad."[21] Mot. at 24. As discussed above, no undue delay would result from allowing OTI to re-enter the competition. OTI recognizes that the GPO and the DoS face a deadline within which to rollout a new electronic passport and that this program is an important aim and security interest of the United States. However, the most important aspect of national security is rolling out a excellent product, capable of providing the necessary level of security. If the GPO bends the rules for various vendors or accepts non-compliant products from those vendors, the rollout will not benefit national security, but rather cause more security issues and delays.

The Government effectively asks this Court to rubber stamp its illegal and unlawful conduct based upon a conclusory national security argument. The Government does not and cannot explain how national security would be harmed by reinstating OTI in the competition, particularly in light of the fact that OTI does not request that GPO halt the ePassport program. On the contrary, both the public's interest and national security will be served by a fair and competitive procurement process that provides the most secure and sound technology available. This requires that the Court grant OTI its requested permanent injunctive relief.

5. OTI is Entitled to the Relief Requested.

OTI does not request that this Court award it a contract. As the Government represents, OTI already has a contract under which to compete in this procurement. Mot. at 6. OTI

[21] The Government cites cases related to judicial deference in matters related to military affairs and national security. Instead, the Government asserts conclusory statements with citations to only general blackletter law, inapplicable to the instant case. See Voge v. United States, 844 F.2d 776 (Fed. Cir. 1988) (dealing with the justiciability of a naval medical officer's entitlement to Additional Special Pay when Congress vested the military with express authority to make such determinations); North Dakota v. United States, 495 U.S. 423, 426 (1990) (weighing the Government's challenge to North Dakota regulations regarding liquor distribution to two military bases that implicated military discipline or military operations); Murphy v. United States, 993 F.2d 871, 872 (Fed. Cir. 1993) (involving a former reserve officer who sought corrections to alleged errors in his military records, as well as reinstatement to active duty where the Federal Circuit acknowledged that the court should exercise caution in examining military matters because "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian.").

similarly does not request that this Court determine the quality or technical ability of its product. OTI asks this Court to enforce procurement law and the stated Solicitation requirement of a full and open competition. Enforcing procurement law and ensuring a level playing field fits squarely within this Court's bid protest jurisdiction. Use of undisclosed criteria, deviation from the Solicitation, disparate treatment, incorrect technical evaluations and the lack of independent judgment, on the other hand, prevent OTI from competing on an even playing field with the other competitors.

## IV. CONCLUSION

For the aforementioned reasons, OTI respectfully requests that this Court grant OTI's Motion for Judgment on the Administrative Record, grant OTI Permanent Injunctive Relief and deny the Government's Motion. More specifically, OTI respectfully requests that the Court enter an order:

(1) Declaring that (1) the Defendant, the United States, by and through the Government Printing Office ("GPO"), acted unreasonably and contrary to law and regulations and lacked a rational basis when it eliminated OTI as the GPO's action: (a) did not abide by the disclosed evaluation criteria in the Solicitation, (b) relied upon undisclosed evaluation criteria, (c) was based on an incorrect technical evaluation, (d) was not based on the contracting officer's independent judgment; and (e) was the result of unequal treatment;

(2) issuing an injunction requiring GPO to reinstate OTI into the selection process in such a manner as to provide OTI with a fair opportunity to compete for a production contract;

(3) awarding OTI its bid preparation and proposal costs; and

(4) enjoining GPO from granting any further production portions of the contract unless and until OTI is permitted to participate in this procurement and is fully and fairly evaluated on a level playing field with other contractors.

Respectfully submitted,

OTI AMERICA, INC.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

By its attorneys,

Electronically filed on
October 13, 2006

/s/ William M. Weisberg
William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

Beth L. Jacobson
Joyce L. Tong
Lisa M. Hodes
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*