**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| OTI AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant. | Civil Action No. 06-571-C<br>(Judge Lettow) |

**PLAINTIFF OTI AMERICA, INC.'S REPLY TO THE DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Electronically filed on
October 13, 2006

William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

Beth L. Jacobson
Joyce L. Tong
Lisa M. Hodes
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2872
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ..... ii

I. STATEMENT OF THE CASE ..... 2

A. The Government Claims the GPO Could Use Testing Criteria Not Set Forth in the Solicitation. ..... 2

B. Broadnax's Undisputed Testimony Is Fatal to the Government's Case. ..... 2

C. The Government Misrepresents the Technical Aspects of OTI's Facts of Disparate Treatment. ..... 3

II. ARGUMENT ..... 4

A. OTI's Claims of Disparate Treatment Are Based Upon Evidence in the AR and Case Law that the Government Does Not Dispute. ..... 5

B. Incorrect Technical Evaluation ..... 8

C. GPO Offers No Evidence to Support That It Purportedly Abided by the Disclosed Evaluation Criteria in the Solicitation. ..... 8

1. Deviation from the Solicitation ..... 9

2. The GPO used undisclosed evaluation criteria ..... 12

D. GPO Did Not Act With Independent Judgment ..... 12

III. OTI IS ENTITLED TO INJUNCTIVE RELIEF. ..... 15

A. The Harm to OTI Outweighs the Harm to the GPO. ..... 15

B. OTI will Suffer Immediate and Irreparable Injury Absent Permanent Injunctive Relief. ..... 16

C. Granting OTI Injunctive Relief Serves the Public Interest. ..... 17

IV. CONCLUSION ..... 18

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

**THE UNITED STATES COURT OF FEDERAL CLAIMS**
**BID PROTEST**

| | |
|---|---|
| OTI AMERICA, INC., Plaintiff, v. UNITED STATES, Defendant. | Civil Action No. 06-571-C (Judge Lettow) |

**PLAINTIFF OTI AMERICA, INC.'S REPLY TO THE DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

Plaintiff OTI America, Inc. ("OTI"), by its undersigned counsel, respectfully submits this Reply ("Reply") to the Defendant's Response to Plaintiff's Motion for Judgment on the Administrative Record ("Gov. Resp."). The United States, acting through the Government Printing Office ("GPO"),[1] does not submit any evidence disputing its violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, by: (1) arbitrarily treating OTI differently from other contractors; (2) arbitrarily performing an incorrect technical evaluation; (3) failing to comply with the terms of the Solicitation and thus applying the Solicitation requirements in an arbitrary, capricious, and unreasonable fashion; (4) arbitrarily and capriciously failing to disclose relevant evaluation criteria in violation of binding procurement regulations; and (5) eliminating OTI without using any independent judgment. Rather than responding to OTI's specific allegations of the GPO's numerous violations, the Government simply ignores many of OTI's arguments and attempts to categorize them as irrelevant.

[1] The GPO is defined herein to include actions by and through the National Institute of Standards and Technology ("NIST"). NIST, a Federal agency separate from the GPO, acted on behalf of and for the GPO in this procurement.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

## I. STATEMENT OF THE CASE

The Government does not dispute—and thus concedes—several material and dispositive facts. Moreover, the Government's counter-statement of the facts inappropriately includes legal argument,[2] often without any citation to the Administrative Record ("AR").[3]

### A. The Government Claims the GPO Could Use Testing Criteria Not Set Forth in the Solicitation.

The Government persists that the Solicitation authorizes testing beyond that identified in the Solicitation. See Gov. Resp. at 3. It is undisputed that the GPO never amended the Solicitation to inform contractors of new standards or tests. The Government also concedes that the GPO did not use the most updated standards from the International Civil Aviation Organization ("ICAO") and the International Organization for Standardization ("ISO"), despite the fact that the Solicitation requires compliance with updated international standards. Administrative Record 2005[4] ("AR 2005") at 36 n. 1 (stating that the latest versions of the ICAO and ISO standards are available at http://www.icao.int/mrtd/Home/index.cfm and the government would provide those not yet publicly available); see also Deposition of Albertha Broadnax ("Broadnax Dep.") 24:1-17 (Sept. 11, 2006) .

### B. Broadnax's Undisputed Testimony Is Fatal to the Government's Case.

Several key facts that Broadnax admitted in her deposition remain undisputed. First, the Government makes no effort to dispute that the GPO failed to promulgate standards regarding how many required tests a contractor must pass for the GPO to award the subsequent CLIN 5.

---

[2] The Government argues in its counter-statement of facts that OTI's reliance on draft technical reports for durability and load modulation is misplaced. Rather than include legal argument in the response to the Government's counter-statement of facts, OTI's response to this erroneous argument is set forth infra at § II.C.1.

[3] The Government claims that the Department of State ("DoS") provided NIST with the Solicitation, however, the Government fails to cite to the AR, or any other source, for this fact. The Government's claim that NIST received the Testing and Evaluation Master Plan ("TEMP") from DoS is equally unsupported.

[4] The Administrative Record ("AR") from OTI Am., Inc. v. United States, 68 Fed. Cl. 646 (2005) has been incorporated into the AR of this current bid protest per order of this Court.

See Broadnax Dep. at 15:20-16:2; Gov. Resp. at 1-5. Second, the Government admits that Broadnax, the contracting officer ("CO"), lacked technical expertise and experience.[5] See Broadnax Dep. at 26:18-27:9; Gov. Mot. at 4-5 (Government contends that Broadnax was not "expected" to become "technically proficient" in the Solicitation's requirements, namely, the ICAO and ISO standards). Third, the Government does not dispute that Broadnax never [ ]. See Broadnax Dep. at 16:8-17:12; 17:18-18:18; Gov. Resp. at 4-5. Fourth, the Government simply ignores the fact that Broadnax never [ ] (see Broadnax Dep. at 37:13-38:18; 46:2-11; 47:11-19; Gov. Resp. at 4-5) or whether NIST received any directions to conform with those standards. See Broadnax Dep. at 28:9-14; Gov. Resp. at 4-5. The Government's inability to dispute these facts confirms not only GPO's deviation from the Solicitation and use of undisclosed evaluation criteria, but also the CO's lack of independent judgment.

### C. The Government Misrepresents the Technical Aspects of OTI's Facts of Disparate Treatment.

The Government states that "the 6 kV test is the only one required under the applicable standard." Gov. Resp. at 4, citing AR at 212. However, the Government fails to quote from the remainder of that paragraph which states, "15 kV is the typical test level representing a human ESD in certain environments." AR at 212; see also AR at 215 ("15 kV is a common upper test level in EMC (Electromagnetic Compatibility) standards (e.g., IEC 61000-4-2:2001)") (emphasis added). Thus, the NIST report contradicts the Government's statement that 6 kV is the only test the standard required. See id.

[5] It is alarming that the CO of a federal procurement that, as alleged by the Government, heavily implicates national security is admittedly ignorant of the required technology and standards.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

Additionally, the Government cites to Annex K of ICAO NTWG Biometrics Deployment Technical Report erroneously stating that "[c]hanging the existing specification eg to 4.5 A/m would introduce numerous incompatibility issues and should be avoided even if applied only to e-passports." Gov. Resp. at 4, citing AR 671. However, the Government misinterprets this comment. First, Annex K is a compilation of discussion notes from the committee with recommendations at the end of the comments. The Government's quotation comes from a committee member expressing concerns over use of 4.5 A/m in the comments section – which the committee ultimately rejected because chips in Japanese passports only work above 4.0 A/m. AR at 671. In fact, the committee recommends that "[r]eader manufacturers need to be aware that some chips will require above the ISO 14443 minimum operating magnetic field strength of 1.5 A/m to operate, and may require as much as 4.5 A/m." AR at 673. The key fact that the Government missed is that in order to read any Japanese passports (Japan being a Visa Waiver Program country), readers must provide a field strength of over 4.0 A/m. The ICAO Technical Report, RF Protocol and Application Test Standard for E-Passport – Part 2, Tests for Air Interface, Initialisation, Anticollision and Transport Protocol (which the Government refuses to include in the AR), illustrates the evolution of this standard to compensate for one country's need for a high power reader; showing, in fact, the Government's misstatement of the applicable standard.

## II. ARGUMENT

OTI has sustained its burden to demonstrate that GPO arbitrarily and capriciously and with no rational basis deselected OTI. As fully set forth in its Motion for Judgment on the Administrative Record ("OTI Mot." or "Motion"), OTI's arguments are supported by: (1) uncontroverted evidence in the AR; (2) deposition testimony; and (3) undistinguishable and

unrebutted case law. Although the Government's Response contains rhetoric and sweeping allegations that the AR does not support OTI's assertions, when carefully reviewed, it becomes apparent that it is the Government that lacks (a) any support for its position and (b) evidence to rebut the solid evidence presented by OTI.

### A. OTI's Claims of Disparate Treatment Are Based Upon Evidence in the AR and Case Law that the Government Does Not Dispute.[6]

The Government asserts that NIST conducted "blind testing" in an attempt to shift the focus from the GPO to NIST. According to the Government, since all competitors were anonymous to NIST, NIST could not have disparately treated OTI when it eliminated OTI. (This is a different issue than whether NIST followed the Solicitation's test requirements in conducting its blind testing.) The Government also argues that the CO, Broadnax, did not just merely implement the suggestions by her subordinates, but rather exercised her independent judgment and deselected OTI. As OTI has shown, the disparate treatment did not occur at the NIST testing level but rather at the GPO level. Furthermore, the Government misconstrues OTI's argument. OTI does not allege that other competitors were given different tests at NIST, but that the GPO's still undisclosed evaluation criteria (determining elimination) varied for each competitor. This the Government cannot and has not disputed.

The Government concedes that the Solicitation lacked clarity. See Gov. Resp. at 8 ("OTI cites [PGBA] for the proposition 'that lack of clarity in a Solicitation demands the government ask for the same level of performance from each bidder.' . . . This is exactly what transpired in this case.") (emphasis added, citations omitted). Contrary to the Government's assertion, while

---

[6] The Government raises OTI's allegations in its Complaint of disparate treatment as it pertains to the Berlin Conference. OTI did not raise that issue in its Motion as this Court previously ruled that it would not consider such evidence. Hr'g. Tr. 62:25-63:16 (Sept. 6, 2006). OTI reserves all rights with respect to this issue. The other evidence supporting OTI's claim of disparate treatment was not discovered until after OTI filed its Complaint and the Government filed the AR with the Court.

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

NIST tested blind, the GPO required differing "levels of performance" from each competitor. If the GPO did not understand the technical report, and was not required to understand the technical aspects as the Government alleges (see Gov. Resp. at 13 n.3), then all failures on tests that NIST performed should have eliminated competitors. [ ]

To contest OTI's claim of disparate treatment, the Government ironically now attempts to refer to the international standard for the Electromagnetic/Static Electricity Tests that it alleges only required testing at 6 kV. See supra at § I.C. The Government tries to rely on the international standard to prove [ ].[8] First, the Government has not given the requisite international standard for Electromagnetic/Static Electricity Tests (ISO/IEC 61000-4-2) to the Court for it to compare with the NIST testing. Second, although the Solicitation does not require compliance with ISO/IEC 61000-4-2 (although OTI did test its product based on the ISO/IEC standard with the general understanding that international standards regarding Electrostatic Discharge would be used), [ ]. Third, ISO/IEC 61000-4-2 requires testing at 2 kV, 4 kV, 6 kV, 8 kV and provides for a "special" level. The standard does not explicitly state that 15 kV is not

[7] Electromagnetic/Static Electricity testing at NIST consisted of five types of testing, two of which are Electrostatic Discharge and Load Modulation.

[8] The Government argues that OTI states "incorrectly" that Axalto's failure results in a dead chip, unreadable at the border but provides not support for its assertion. Gov. Resp. at 8. First, the NIST testing explicitly states that the Axalto chip is unreadable after the 15 kV test. See AR at 292. Second, if the Government truly understood how the ESD test works (by reading the international standard ISO/IEC 61000-4-2 and reading the description of how NIST conducted the test), it would realize that failure of this particular ESD test does result in a dead chip.

required, however 15 kV is "special" because any point above 8 kV is a "special" level for which a laboratory may test. NIST tested at 6kV and 15 kV. If the Government's statement is correct, that the "standard ISO test is 6 kV" (which is actually incorrect and not the standard NIST used, see AR at 215; ISO/IEC 61000-4-2 at 17) and that only the 6 kV test is important, [

]

Finally, Government asserts that "all remaining contract participants had the opportunity to ask for clarification if they thought it necessary." Gov. Resp. at 8-9. Again, unless OTI knew that undisclosed evaluation criteria would be used at NIST in deviation from the Solicitation, OTI would have no reason to inquire about such evaluation criteria. OTI, like any reasonable bidder, relied upon the evaluation criteria set forth in the Solicitation. Broadnax herself

[

]. Broadnax Dep. 45:4-7. It would be highly burdensome, inappropriate, arbitrary and unreasonable to mandate that each bidder seek clarification before testing (to somehow ensure that the criteria set forth in the Solicitation are the only evaluation criteria being used). Such is not the requirements nor the intent of Government procurements.

### B. <u>Incorrect Technical Evaluation</u>

The Government does not dispute the well-settled law cited by OTI that the Court will sustain a bid protect where the technical evaluation was arbitrary and capricious. <u>See</u> <u>Beta Analytics Int'l, Inc. v. United States</u>, 67 Fed. Cl. 384, 395 (2005). The Government likewise offers no evidence to dispute that [ ]. OTI's claim alleges that NIST's undocumented testing procedures were arbitrary and resulted in an incorrect technical evaluation. Although the Government claims there is no direct evidence of incorrect technical evaluation, as [ ]. This lack of specificity, however, leads to the inference that the GPO acted arbitrarily. Thus, OTI has provided the Court with a handful of factors that could have impacted the load modulation testing: [ ].

Specifically, neither the images nor the textual description in the AR evidence the distance between OTI's ePassport and the reader. A slight distance between the ePassport and the reader could cause the reader to fail to read a steady load modulation at 1.5 A/m. Thus, GPO's conclusion, based on its technical evaluation, that OTI failed the load-modulation test lacked any reasonable, rational basis.

### C. <u>GPO Offers No Evidence to Support That It Purportedly Abided by the Disclosed Evaluation Criteria in the Solicitation.</u>

OTI presented two arguments that GPO utilized undisclosed criteria: (1) the GPO deviated from the Solicitation because it stated one set of evaluation criteria to be used (current international ICAO standards), but the GPO/NIST applied a different undisclosed criteria (NIST's own testing standards); and (2) the Government used undisclosed evaluation criteria because: (a) NIST employed tests that were undisclosed in the Solicitation and (b) the GPO used

an undisclosed weighing standard to deselect OTI. The Government fails to fully address either argument.

*1.* ***Deviation from the Solicitation***

The Government solely relies upon the fact that the Technical Reports OTI relies upon are "Drafts". Gov. Resp. at 10.[9] The Solicitation required competitors to comply with the "latest versions" of the standard. AR 2005 at 36 n.1 ("Latest versions of most of these [standards] are available at http://www.icao.int/mrtd/Home/Index.cfm. Those not yet publicly available will be provided."); see also Broadnax Dep. 24:1-17. As international standards are constantly developing as technology changes, drafts are constantly circulated in the international community to educate vendors and countries as to the direction the standard is taking so that impacted parties may take these changes into account when designing new products. OTI has kept abreast of these standards (as required by the Solicitation) and is regularly updated (as are most vendors producing ePassports) by the standards committees. Thus, in the absence of explicit Solicitation requirements regarding durability, OTI relied upon the international standards it could acquire – whether in draft form or through participation in the international standard setting committees. Unlike the Government, OTI read the evaluation criteria.

The Government then argues that if NIST employed these documents published in 2006, it would have constituted a change in the testing used. Gov. Resp. at 11. Changes in testing used is not prohibited. In fact, procurement law explicitly allows for changes to testing (particularly with ever-changing technology); the only prerequisite is that the competitors be

[9] The Government also alleges that the GPO, as an agency of the legislative branch, is not subject to the FAR. However, this Court has held that FAR regulations "can be persuasive guides to the fundamental standards that should govern GPO's procurement actions." OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 655 n.17 (2005).

notified of the change.[10] When the agency's requirements change after the proposals have been submitted, up until the time of the award, the agency shall issue an amendment to the Solicitation to all offerors that have not been eliminated from the competition. See FAR Part 15.206(b); Digital Tech., Inc., B-291657.3, 2004 WL 2625035, at *2 (Comp. Gen., Nov. 18, 2004). Furthermore, the Government itself stated that it would abide by international standards and would provide those standards that were not available. AR 2005 at 36 n.1. Given this language, OTI reasonably relied upon the Solicitation and the international standards it could acquire – whether in draft form or through participation in the international standard setting committees.

The Government relies extensively on the fact that the GPO did not utilize undisclosed criteria because of a sentence in the Solicitation stating: "These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1." AR at 41 (emphasis added). First, the Government argues that the Solicitation put offerors on notice that undisclosed evaluation criteria might be used, notwithstanding the inclusion of extremely detailed evaluation criteria, identified as such, in the Solicitation. This litigation-driven Government interpretation is directly at odds with binding procurement laws. The more logical interpretation, consistent with applicable law, is that the Government may add additional evaluation criteria to those referenced in the Solicitation if it notifies the offerors. See supra at 8. Second, the Government's interpretation of the aforementioned sentence directly contradicts governing procurement law. See Isratex, Inc. v. United States, 25 Cl. Ct. 223, 229 (1992) (holding that the Government must disclose " 'very important' subfactor[s], so important, in fact, that failure of the test caused offerors' proposals to be rejected."); see also Gentex Corp. v. United States, 58 Fed. Cl. 634, 652 (2003); 48 C.F.R. § 15.304(d) (West 2005); Competition in Contracting Act,

[10] Furthermore, in this specific procurement, the Government is well aware of this requirement as on January 13, 2006, it provided OTI with an amendment to the Solicitation. This amendment is not included in the AR, but upon request, OTI can provide a copy for the Court.

10 U.S.C. § 2305(a)(2)(A)(i) (West 2005). Accordingly, this attempt to evade the requirement of the international standards set forth in the Solicitation are to no avail.

Finally, the Government argues that if a "patent ambiguity" exists in the Solicitation, the time to protest is before the time that bids are due. Gov. Resp. at 12. However, from the face of the Solicitation, no such "patent ambiguity" exists here. A "patent ambiguity" is one that is so "obvious, gross, glaring, so that plaintiff contractor had a duty to inquire about it at the start." See H & M Moving, Inc. v. United States, 204 Ct. Cl. 938 (1974); see also Ace Constructors, Inc. v. United States, 70 Fed. Cl. 253, 288 n.40 (2006) ("Unless the nondrafting party knew or should have known of an ambiguity (i.e., the ambiguity was patent), the risk of ambiguities in contract language is generally allocated to the drafting party").[11] (Furthermore, "patent ambiguity" is a claim, not a protest, legal issue.)

The Government itself details the testing that will consist of "Impact Testing, Torsion/Flexure Testing,[12] Chemical Resistance Testing, Band (sic) Testing, Electromagnetic/Static Electricity Testing, and Environmental Exposure/Cycling Testing." Gov. Resp. at 12. Nothing from the Solicitation is so "obvious, gross or glaring" that OTI had a duty to inquire about it from the start. In fact, the Solicitation laid out a requirement to comply with international standards and specific areas of durability that would be tested. AR 2005 at 29 ("This procurement will lead to the introduction of a new U.S. Passport, *an international interoperable EP compliant with the recommendations of the International Civil Aviation Organization (ICAO).*") (emphasis added); see generally AR 2005 at 35-36. Not until 2006,

---

[11] In fact, even the cases that the Government cites recognize that a "contractor is not normally required to seek clarification of 'any and all ambiguities, doubts, or possible differences in interpretation.' " Allied Tech. Group v. United States, 39 Fed. Cl. 125, 138 (1997); see also NVT Tech., Inc. v. United States, 370 F. 3d 1153, 1162 (Fed. Cir. 2004) ("A patent ambiguity is one that is 'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.' "), citing H & M Moving, Inc., 204 Ct. Cl. at 938.

[12] OTI cannot find the NIST test results for this type of testing in the AR; thus it is unclear whether this testing actually occurred.

after the tests were performed, did OTI discover through a written debriefing (AR at 44-128) that: (1) Impact Testing actually consisted of four individual sub-tests and failure of the sub-tests would result in elimination; (2) Bend Testing actually consisted of two individual sub-tests and failure of the sub-tests would result in elimination; and (3) Electromagnetic/Static Electricity Testing actually consisted of five individual sub-tests and that failure of only one particular sub-test (Load Modulation) would result in elimination. The Solicitation did not specify that elimination would be arbitrary depending on an undisclosed weighing criteria of the factors. Prior to the submission of the products, OTI had no standing to protest any ambiguities in the Solicitation, as from the face of the Solicitation no obvious, gross or glaring ambiguities existed. Thus, if the Court finds that an ambiguity exists, pursuant to procurement law, such ambiguity should be construed against the Government – the drafting party.

2. ***The GPO used undisclosed evaluation criteria.***

The Government completely fails to address any of OTI's arguments regarding: (a) the different sub-tests that NIST used for Impact, Bend and Electromagnetic/Static Electricity testing (e.g., undisclosed evaluation criteria) that the Solicitation did not specify and (b) the undisclosed weighing standard GPO used to deselect OTI (e.g., undisclosed evaluation criteria).

Therefore, the Government's arguments regarding undisclosed evaluation criteria fail to rebut the substantial evidence put forth by OTI evidencing the GPO's deviation from the Solicitation and use of undisclosed evaluation criteria. Accordingly, this Court should grant OTI's Motion.

**D. GPO Did Not Act With Independent Judgment.**

The Government misconstrues the cases OTI cites and claims they are "inapposite because the factual predicate for theses (sic) cases – that the contracting officer simply carried out a termination directive of a superior – is not present in this case." Gov. Resp. at 13.

However, a careful reading of these cases reveals that all the cases OTI relies upon in the body of its Motion[13] are factually similar to this case; the contracting officer solely relied upon the evaluation team or a subordinate's recommendation in eliminating the protester from the competition. See Impresa Construzioni Geom. Domenico Garufi v. United States, 52 Fed. Cl. 421, 427 (2002) (holding that because the "contracting officer relied on the technical evaluation board's recommendation without making any independent inquiries" the decision was not reasonable and violated the statute.); see also CEMS, Inc. v. United States, 65 Fed. Cl. 473, 479 (2005) (holding that failure of the contracting officer to " 'put his own mind to the problems,' and to take ownership of all determinations" constituted unreasonable behavior and a lack of independent judgment) (internal citations omitted); SOS Interpreting, LTD., Nos. B-293026, B-293026.2, B-293026.3, 2005 WL 357422, at *5 (Comp. Gen., Jan. 20, 2004) (holding that officials handling source selection are "bound by the fundamental requirement that their independent judgments be reasonable" even when relying on lower-level evaluators), citing Johnson Controls World Servs., Inc., Nos. B-289942, B-289942.2, 2002 WL 1162912 (Comp. Gen. May 24, 2002) (sustaining the bid protest where the official failed to exercise independent judgment).

The Government is similarly incorrect to inform this Court that its only relevant inquiry is whether there is a rational basis for GPO's decision not to award any further contracts to OTI. Gov. Resp. at 15. In evaluating whether the CO exercised independent judgment, the relevant inquiry is set forth in the case law cited above and does extend to the analysis employed by the CO. The Government acknowledges that Broadnax solely relied upon her technical representative, Richard Grasso's (the Chief Technical Evaluation Officer and contracting officer

[13] OTI cited GAO cases to demonstrate the history of lack of independent judgment as an abuse of discretion. Motion at 27 n. 17.

Technical Representative) recommendation, (thus relying solely on a subordinate). Gov. Resp. at 13 n. 3. The Government alleges that it is “not the law” that Broadnax could never have exercised her independent judgment because she lacks technical knowledge and relied upon a subordinate; however, provides no authority for this assertion which is directly contradicted by the law cited by OTI in its Motion. This is the Government’s not so discreet attempt to get around Broadnax’s detrimental deposition testimony that confirms her lack of independent judgment. The Government’s best evidence it puts forth in its Response is that Broadnax reiterated and testified she exercised her “independent judgment”. Simply repeating a phrase does not suddenly convert her reliance into independent judgment. Her opinion on this issue of independent judgment has been previously determined to be incorrect. <u>OTI Am., Inc. v. United States</u>, 68 Fed. Cl. 646 (2005). Moreover, there is nothing in the AR – as the Government alludes to without citation – that “further support[s] this testimony”. Gov. Resp. at 14. A CO’s “review” of the NIST report and Grasso’s report does not demonstrate independent judgment, particularly as Broadnax did not even understand or review the evaluation criteria. That is a per se arbitrary and unreasonable determination to eliminate OTI.

Questioning of Broadnax revealed her unfamiliarity with the updated – in truth, any – standards as required by the Solicitation. Although the Government’s argument rests solely with her unfamiliarity with the “Draft standards,” Broadnax’s knowledge as to all international standards, the Solicitation, and the actual evaluation criteria employed by NIST are relevant. Broadnax confirmed at her deposition that “[

].

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

The Government's reference to "time was of the essence" is of no import because whether the GPO felt "rushed" should not impact the CO's independent judgment. Moreover, the Government once again misconstrues OTI's argument. OTI does not seek to "remedy any defect" as OTI does not believe there was any defect in its product. OTI seeks to remedy the GPO's arbitrary and capricious elimination of it from the procurement.

## III. OTI IS ENTITLED TO INJUNCTIVE RELIEF.[14]

Contrary to the Government's assertions, OTI has demonstrated that it is entitled to an injunction ordering its reinstatement into the procurement process.

### A. The Harm to OTI Outweighs the Harm to the GPO.[15]

The Government alleges "potential harm" to national security if OTI receives its requested injunctive relief; however, the Government makes no argument as to how national security would be affected by permitting OTI back into the procurement process and the cases it relies upon are unpersuasive and irrelevant.[16] Testing is ongoing—it continues even today—and, thus, injecting OTI back into the process should not affect deadlines and can only help serve

[14] The court regularly allows live testimony regarding the appropriateness of equitable relief, not the procurement itself. This testimony is procedurally improper as supplementation of the record, but the court has considered this type of testimony to determine the proper injunctive relief. See Asia Pac. Airlines v. United States, 68 Fed. Cl. 8 (2005) (allowing testimony to show harm); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005) (holding that the trial court must make factual findings on prejudice from the record evidence); PGBA, LLC v. United States, 60 Fed. Cl. 196, 221 n.28 (Fed. Cir. 2004) (allowing supplemental affidavit regarding potential injury).

[15] In asserting OTI's burden is to prove harm by "clear and convincing evidence," the Government states that "[u]nsupported assertions that harm will or will not occur cannot meet that standard." Gov. Resp. at 17, citing Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). However, that principle is noticeably absent in the Barmag Barmer decision. In fact, Barmag Barmer is not even an injunctive relief case; rather, it is a patent infringement case where the Federal Circuit examined whether the district court erred in holding that there was no genuine issue of material fact for trial. Barmag Barmer, 731 F.2d at 835.

[16] To support its national security argument, the Government cites several cases that are factually distinguishable from this case and are, therefore, unpersuasive. See Overstreet Elec. Co. v. United States, 59 Fed. Cl. 99 (2003) (national security was a reasonable concern in awarding a contract for an electrical switching station to power a major pilot training center); Yakus v. United States, 321 U.S. 414, 441 (1944) (the disruptive influences of inflation during World War II was important enough to the public interest to postpone temporary injunctions against congressionally passed price regulations); Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537 (2005) (legitimate interests of national defense and national security were invoked in a contract related to the procurement of fuel for military use during a time of war).

national security by increasing the level and quality of competition in this process. GPO will not be harmed if OTI's requested relief is granted. In contrast, unless this Court allows OTI back into the bidding process, OTI will be effectively eliminated and stripped of any meaningful opportunity to compete. See Hawaiian Dredging Constr. Co. v. United States, 59 Fed. Cl. 305, 318 (2004) (granting permanent injunctive relief).

### B. OTI will Suffer Immediate and Irreparable Injury Absent Permanent Injunctive Relief.[17]

In arguing that OTI has neither identified nor stated harm that amounts to irreparable harm, the Government ignores (and thus concedes) all of OTI's pleadings and well-settled law that a plaintiff satisfies the irreparable harm requirement by establishing a lost opportunity to compete on a level playing field with other bidders or elimination from the bidding process due to the Government's improper conduct. See Cardinal Maint. Serv. v. United States, 63 Fed. Cl. 98, 110 (2004); see also Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 280 (2004), amended by Hunt Bldg. Co. v. United States, 63 Fed. Cl. 141 (2004) (granting permanent injunction). OTI has established both a lost opportunity to compete on a level playing field and elimination from the procurement due to the GPO's improper conduct. Contrary to the Government's claims, OTI identified this harm in its Motion and this Court previously held OTI's alleged harm constitutes irreparable harm.[18] OTI Am., 68 Fed. Cl. at 659. Accordingly, OTI has established irreparable harm.

---

[17] The Government relies upon non-bid protest cases to support the purported standard for irreparable harm for a bid protest case. See Railway Labor Executives' Ass'n v. Gibbons, 448 US 1301 (1980) (bankruptcy case); O'Shea v. Littleton, 414 U.S. 488, 501-03 (1974) (civil rights case where Court discusses standard for injunctive relief in context of civil rights cases); Reebok Int'l v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994) (patent infringement case).

[18] The Government continues to cite and rely upon non-bid protest cases in support of its erroneous argument that economic harm with nothing more does not rise the level of irreperable injury for a permanent injunction. See Minor Metals v. United States, 38 Fed. Cl. 379 (1997); Wisconsin Gas Co. v. FERC, 758 F.2d 669 (1985) (not a bid protest); ); Eli Lilly & Co. v. American Cyanamid Co., 82 F.3d 1568 (Fed. Cir. 1996) (not a bid protest).

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

### C. Granting OTI Injunctive Relief Serves the Public Interest.

The Government has repeatedly claimed that granting OTI injunctive relief is not in the public's interest because of national security interests, however, it does not explain why or how. First, it has not demonstrated any delay because testing is ongoing. Second, the Government fails to acknowledge that the public interest is served by ensuring the procurement process conforms to applicable procurement regulations, is fair, and "conforms with regulatory authority and the solicitation's evaluation criteria." Al Ghanim Combined Group Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 521 (2003); see also Parcel 49C Ltd. P'ship v. United States, 31 F.3d 1147, 1152 (Fed. Cir. 1994) (injunctive relief was proper). In fact, the public interest is not served when a Government contract is arbitrarily awarded. See Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 515 (2005). Third, the cases the Government relies upon for its "national security" argument deal with urgent military preparedness or an ongoing war, factors not present here, and are therefore distinguishable.[19] In actuality, given the Government's stated national security interest in the most secure and sound technology available, the public's interest in a fair and competitive procurement process resulting in the most secure technology is particularly important. This requires that the Court grant OTI its requested injunctive relief.

[19] See, e.g., Aero Corp., S.A. v. United States, 38 Fed. Cl. 237 (1997) (a solicitation addressing military preparedness related to the privatization of an Air Force depot implicated the interests of national defense); Gentex, 58 Fed. Cl. 634 (considerations of national security precluded grant of injunctive relief on a contract for masks to provide chemical or biological protection for Air Force flight crews currently flying sorties in enemy territory); Al Ghanim, 56 Fed. Cl. 502 (denying injunctive relief on national security grounds where the contract involved housing construction for U.S. combat personnel in Kuwait during or in preparation for war).

**AGREED-UPON REDACTED COPY**
**-MAY BE MADE PUBLIC**

## IV. CONCLUSION

For the aforementioned reasons as well as those set forth in OTI's Motion, OTI respectfully requests that this Court grant OTI's Motion, its request for Permanent Injunctive Relief and all other requested relief set forth in its Motion.

Respectfully submitted,

OTI AMERICA, INC.

By its attorneys,

Electronically filed on
October 13, 2006

/s/ William M. Weisberg
William M. Weisberg
SULLIVAN & WORCESTER LLP
1666 K Street, NW
Washington, DC 20006
(202) 775-1200
(202) 293-2275 (fax)

*Counsel of Record for Plaintiff OTI America, Inc.*

Beth L. Jacobson
Joyce L. Tong
Lisa M. Hodes
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800
(617) 338-2880 (fax)

*Of Counsel for Plaintiff OTI America, Inc.*