**Agreed-Upon Redacted Copy –
May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 06-571C (Bid Protest)
(Judge Lettow)

---

OTI AMERICA, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MOTION FOR JUDGMENT
UPON THE ADMINISTRATIVE RECORD**

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

OF COUNSEL:

JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

September 14, 2006

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGE(S)**


STATEMENT OF THE ISSUES .......... 1

STATEMENT OF THE CASE .......... 2

I. Nature Of The Case .......... 2

II. Course Of Proceedings .......... 2

III. Statement Of Facts .......... 3

A. The Visa Waiver Program .......... 3

B. The Solicitation .......... 6

C. OTI's Repeated Testing Failures .......... 7

SUMMARY OF THE ARGUMENT .......... 10

ARGUMENT .......... 11

I. The United States Is Entitled To Judgment Upon The Administrative Record ... 11

II. The GPO Has Not Acted Arbitrarily Or Capriciously And Has Not Violated Any Applicable Procurement Statue Or Regulation .......... 12

A. The Contracting Officer's Determination That OTI's Product Failed To Meet Specifications Did Not Lack A Rational Basis .......... 13

B. GPO Did Not Rely Upon Undisclosed Selection Criteria .......... 15

C. OTI Has Failed To Demonstrate Unequal Treatment .......... 16

D. OTI's Claim Of An Incorrect Technical Evaluation Is Unfounded .......... 17

III. OTI Has Failed To Establish That It Is Entitled To An Injunction .......... 18

A. OTI Will Not Suffer Irreparable Harm If An Injunction Is Not Issued .......... 19

B. Any Harm Which Denial Of Injunctive Relief Would Cause To OTI Would Not Outweigh The Harm To The United States .......... 21

C. Issuance Of An Injunction Would Not Be In The Public Interest ........... 24

D. OTI Cannot Demonstrate Actual Success Upon The Merits ................... 25

1. Standard Of Review ..................................................................... 25

2. The GPO's Determination That OTI's Product Failed To Meet Specifications Did Not Lack A Rational Basis ............. 26

IV. OTI Is Not Entitled To The Relief Requested .................................................... 28

CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

AT&T Technologies, Inc. v. United States,
18 Cl. Ct. 315 (1989) .......... 29

Bannum v. United States,
404 F.3d 1346 (Fed. Cir. 2005) .......... 12

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) .......... 18

Bean Stuyvesant, LLC v. United States,
48 Fed. Cl. 303 (2000) .......... 19

CACI Field Services, Inc. v. United States,
13 Cl. Ct. 718 (1987), aff'd, 854 F.2d 464 (Fed. Cir. 1988) .......... 25

CRC Marine Servs., Inc. v. United States,
41 Fed. Cl. 66 (1998) .......... 12, 15

Data Gen. Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir. 1996) .......... 12

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755 (1985) .......... 12

E.W. Bliss Co. v. United States,
77 F.3d 445 (Fed. Cir. 1996) .......... 29

Farwell Co. v. United States,
137 Ct. Cl. 832 (1957) .......... 27

Foundation Health Fed'l Servs. v. United States,
1993 WL 738426 (D.D.C. 1993) .......... 21

Gentex Corporation v. United States,
58 Fed. Cl. 634 (2003) .......... 18

Hawpe Constr., Inc. v. United States,
46 Fed. Cl. 571 (2000), aff'd, 10 Fed.Appx. 957 (Fed. Cir.2001) .......... 19

Hydro Eng'g, Inc. v. United States,
37 Fed. Cl. 448 (1997) .......... 28

Illinois Tool Works, Inc. v. Grip-Pak, Inc.,
906 F.2d 679 (Fed. Cir. 1990) .......... 19

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 11, 12

Jet Constr. Co. v. United States,
209 Ct. Cl. 200 (1976) .......... 26

Kentron Hawaii, Ltd. v. Warner,
480 F.2d 1166 (D.C. Cir. 1973) .......... 12

Latecoere Int'l, Inc. v. United States Dep't of Navy,
19 F.3d 1342 (11th Cir. 1994) .......... 12

Lilly and Co. v. American Cyanamid Co.,
82 F.3d 1568 (Fed. Cir.1996) .......... 20

Lions Raisins, Inc. v. United States,
51 Fed. Cl. 238 (2001) .......... 29

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) .......... 20, 21

Murphy v. United States,
993 F.2d 871 (Fed. Cir. 1993) .......... 25

North Dakota v. United States,
495 U.S. 423 (1990) .......... 25

O'Shea v. Littleton,
414 U.S. 488 (1974) .......... 19

OTI America, Inc. v. United States,
68 Fed. Cl. 108 (2005) .......... 3

OTI America, Inc. v. United States,
68 Fed. Cl. 646 (2005) .......... 3, 23, 24

Overstreet Elec. Co. v. United States,
47 Fed. Cl. 728 (2000) .......... 19

Railway Labor Executives' Ass'n v. Gibbons,
448 U.S. 1301 (1980) .......... 19

Reebok Int'l Ltd. v. J. Baker, Inc.,
32 F.3d 1552 (Fed. Cir. 1994) .......... 19

Scanwell Lab., Incl. v. Shaffer,
424 F.2d 859 (D.C. Cir. 1970) .......... 28

Statistica, Inc. v. Christopher,
102 F.3d 1577 (Fed. Cir. 1996) .......... 12

Tenacre Foundation v. INS,
78 F.3d 693 (D.C. Cir. 1996) .......... 19

United Int'l Investig. Servs., Inc. v. United States,
41 Fed. Cl. 312 (1998) .......... 28

Voge v. United States,
844 F.2d 776 (Fed. Cir. 1988) .......... 25

Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,
559 F.2d 841 (D.C. Cir.1977) .......... 20

Wisconsin Gas Co. v. FERC,
758 F.2d 669 (D.C. Cir. 1985) .......... 19, 20

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983) .......... 21

## STATUTES

5 U.S.C. § 504 .......... 29

5 U.S.C. § 706 .......... 11

8 U.S.C. § 1187 .......... 5

8 U.S.C. § 1732 .......... 4

28 U.S.C. § 1491(b) .......... 25

28 U.S.C. § 1491(b)(2) .......... 29

28 U.S.C. § 1491(b)(3) .......... 26

28 U.S.C. § 1491(b)(4) .......... 11, 29

28 U.S.C. § 2412(d)(1)(A) .......... 29

107 P. L. 173, 116 Stat. 543 (2002) .......... 4

## MISCELLANEOUS

11 C. Wright and A. Miller Federal Practice and Procedure § 2948 at 431 (1973) .......... 19

150 Cong. Rec. H 3908, H3910 .......... 4

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**(BID PROTEST)**

| | |
|---|---|
| OTI AMERICA, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 06-571C<br>(Judge Lettow)<br><br>**Agreed-Upon Redacted Copy – May Be Made Public** |

**DEFENDANT'S MOTION FOR JUDGMENT**
**UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's order dated August 14, 2006, defendant, the United States, respectfully requests that the Court enter judgment upon the administrative record in favor of the United States, deny the motion of OTI America, Inc. ("OTI") for a permanent injunction, and dismiss OTI's complaint. In support of this motion, we rely upon the complaint ("Compl."), the administrative record ("AR") filed with the Court on August 18, 2006, the AR filed with the Court during OTI's 2005 protest ("2005AR"), the deposition of Albertha Broadnax taken on September 11, 2006, defendant's statement of facts, filed contemporaneously with this motion, and the following brief.

**STATEMENT OF THE ISSUES**

1. Whether the decision of the Government Printing Office ("GPO") to issue a no further procurement letter to OTI was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

2. Whether OTI has failed to establish that it is entitled to injunctive relief.

## STATEMENT OF THE CASE

### I. Nature Of The Case

OTI, a contract participant, filed this protest seeking to overturn the decision by the GPO not to award OTI further orders for evaluation and testing under Solicitation EP-2004. In 2005, OTI protested this procurement and was granted limited injunctive relief returning it to the testing process. OTI's product was retested along with two other contract participant's products. OTI's product failed the requisite testing. Again, OTI seeks an order from this Court that: 1) suspends production trials and all other activities of the United States related to the Solicitation and procurement; 2) declares that GPO's elimination of OTI from further procurement lacked a rational basis, relied upon undisclosed selection criterion, was the result of unequal treatment, and was based upon an incorrect technical evaluation, which was contrary to law, was arbitrary, capricious, and an abuse of discretion; 3) orders GPO to award OTI another contract or reinstate it into the procurement process; and 4) awards its reasonable costs, attorney fees, and proposal costs. Compl. at 9-11.

### II. Course Of Proceedings

Pursuant to the Solicitation, GPO made an initial award to OTI effective January 12, 2005. OTI failed to produce a conforming product during formal testing on two occasions during the same phase of testing, and, as a result, was notified by letter that GPO would not purchase any more product from OTI for testing and evaluation. OTI filed a protest with the GAO on May 28, 2005, alleging that the GPO acted unreasonably in downselecting OTI from further competition under EP-2004. GAO considered OTI's protest and on August 10, 2005, the GAO denied OTI's protest in full. 2005 AR 566-74. OTI then filed a bid protest in this Court in

August 2005, which resulted in two published opinions by the Court, the second of which found in favor of OTI and directed the GPO to readmit OTI back into the testing process. OTI America, Inc. v. United States, 68 Fed. Cl. 108 (2005) ("OTI 1"); OTI America, Inc. v. United States, 68 Fed. Cl. 646 (2005) ("OTI 2").

Pursuant to the Court's decision in OTI 2, GPO reinstated OTI and two other contract participants into the testing process. In January 2006, OTI resubmitted its product for retesting under the Solicitation. OTI's product passed the initial phases of testing by GPO, the Department of State ("DoS"), and APTISS and was forwarded to the National Institute For Standards and Technology ("NIST") for further testing required by the Solicitation. OTI failed this testing and was notified by GPO that it would no longer be considered for further contract awards under the Solicitation. OTI filed this bid protest on August 4, 2006.

## III. Statement Of Facts

### A. The Visa Waiver Program

GPO issued Solicitation EP-2004 for the purpose of procuring electronic, integrated circuit-embedded passport book covers that GPO, in cooperation with the State Department, would use to create a new, electronic, version of the United States passport. The need for a new passport is driven by Section 303 of the Enhanced Boarder Security and Visa Entry Reform Act of 2002 ("EBSVERA"). 2005AR 24; see also OTI 2, 68 Fed. Cl. at 647-48. As originally enacted, Section 303 of the EBSVERA required that passports issued after October 26, 2004, and used for Visa Waiver Program ("VWP") travel include a biometric identifier based upon standards established by the International Civil Aviation Organization ("ICAO"). 107 P. L. 173, 116 Stat. 543 (2002); see also 8 U.S.C. § 1732 (2005).

After its enactment, the Administration began working with ICAO and VWP countries to develop biometric specifications that could be adopted by ICAO and complied with by VWP participants. The United States – whose citizens are allowed, reciprocally, to travel without visas to all participating countries – also made clear its intention to comply with the same biometric standards that it expected the VWP countries to comply with.

In the spring of 2004 it was apparent that VWP countries would be unable to incorporate biometrics into their passports by October 2004. Section 303 was amended to extend the October 26, 2004, deadline by one year, to October 26, 2005, in Public Law 108-299 (August 9, 2004). In connection with this extension, Secretaries of State and Homeland Security testified before the United States House of Representatives' Committee on the Judiciary in April 2004 in support of an extension even to October 2006. 150 Cong. Rec. H 3908, H3910. The Administration also made clear that the Department of State was working to develop a similar biometric passport on the same time-line.

Subsequently, it became evident that few if any VWP nations would be able to produce e-Passports in sufficient quantities by October 26, 2005. In addition, ICAO adopted the biometric requirements as a technical specification, not as a formal standard, whereas Section 303 speaks only in terms of adopting ICAO "standards." ICAO's approach in proceeding via specifications rather than standards is consistent with the fact that a formal standard, once adopted, would be binding upon far more countries than just the United States and the VWP countries. After consultation with ICAO about the status of its efforts to develop biometric requirements and with Congress, DHS announced on June 15, 2005, that, by October 26, 2005, VWP countries will be required to produce passports with digital photographs, and must present an acceptable plan to issue passports with integrated chips by October 26, 2006. These

requirements were established pursuant to Section 217 of the Immigration and Nationality Act, 8 U.S.C. § 1187, under which the Secretary of DHS must determine that a country's participation in VWP will not compromise United States law enforcement and security interests – and may therefore establish conditions to protect United States law enforcement and security interests. They were also established with a view toward achieving the goals of Section 303 of the EBSVERA notwithstanding the formal status of ICAO's efforts, and to further the Administration's long-standing goals for enhancing United States border security.

While no statute mandates that the United States meet the same October 2006 deadline imposed upon VWP countries for full implementation of the e-Passport program, it would be untenable for the United not to do so. Participation in VWP presumes reciprocal privileges for visa-free travel, and relations with VWP countries could be severely strained were the United States to insist that their nationals have e-Passports for visa-free travel to the United States without also ensuring that United States citizens will present e-Passports for visa-free travel to VWP countries.

The United States e-Passport program was undertaken with the intention of meeting the same deadlines as the United States imposes upon VWP countries. Although Congress' statutory mandate that VWP countries develop a biometrically-enabled national passport was not similarly placed upon the United States government, there are compelling reasons why the United States has been working since 2002 to match the deadlines imposed upon the VWP countries.

The United States has placed the VWP countries under pressure to make significant investments in their own e-Passport programs. As a result, the United States would be in an

untenable position if it could not comply with the same standards it has imposed upon VWP countries. It will be difficult to excuse the United States from the deadlines it imposes for e-Passport compliance upon VWP countries. Therefore, it is imperative that the United States government fully implement its own e-Passport program by October 2006. These considerations were identified in the Solicitation. 2005AR 24-25.

**B. The Solicitation**

A total of eighteen proposals (including OTI's) were submitted in response to EP-2004 and, as contemplated by the Solicitation, GPO awarded contracts to multiple bidders, among them OTI. Compl. ¶ 11. OTI's contract – as did all of the awardees' contracts – took place in various stages. 2005AR 40-44. The first stage was merely to evaluate each contractor's certification that it could satisfy certain technical standards. Id. During the second stage, the contractors delivered samples of their electronic passport book covers so that GPO could formally test and inspect them for compliance with contract requirements, such as their durability and how well the covers could be fabricated into complete passports.[1] Id.

For those products that pass the stage two testing, GPO then decided, based upon the results of that testing, whether to exercise a contract line item number ("CLIN") to purchase more passport book covers from a particular contractor to participate in a pilot program. 2005 AR 7-18, 26 (CLIN 0005). "If more than one awardee's products pass the testing regimen, GPO may elect to exercise [this CLIN] to more than one awardee." Id. The third stage of the contract then involves field testing of the electronic passports during the pilot program, along with continued laboratory testing. 2005 AR 40-44.

[1] "Stage two" testing involved a series of tests and or acts by both GPO and the DoS, which are detailed in the Solicitation. 2005 AR 41-43.

The fourth and final stage is the full production of the electronic passports. Id. During this stage, the GPO again will decide whether to exercise an additional CLIN to purchase electronic passport book covers from a particular contractor for the "full agency deployment." 2005AR 7-18 (CLIN 0006); 2005AR 28.

GPO's ultimate plan, under the Solicitation, is to make multiple purchase orders for the full production of the electronic passport program, but to purchase the majority of its electronic passport book covers from one contractor, and the remainder from other contractors. 2005 AR 26-27. The Solicitation, however, reserves the right to GPO to "place orders for deliverables in any quantity, to any of the awardees, at any time." Id.

**C. OTI's Repeated Testing Failures**

During the second stage of its contract with OTI, GPO ordered and paid for, and OTI delivered, a set number of sample electronic passport book covers for GPO to test, as required by the contract. The first attempt to fabricate OTI book covers into e-Passports took place in February 2005; however, OTI's product samples in its first delivery for formal testing were noncompliant because the covers exceeded the thickness requirement of the contract and had software problems. 2005 Compl. ¶ 22.

Because GPO was administering the contract that had been awarded to OTI, in March 2005, GPO sent OTI a cure notice regarding these problems. The cure notice informed OTI that it had an opportunity to remedy the deficiencies in its product and could resubmit its passport covers for retesting. OTI was also informed that if its adjusted product failed to pass testing a second time, GPO would no longer consider OTI's products for use in the pilot program (CLIN 0005) of EP-2004. This "two strikes" criterion had been developed and adopted by GPO and the

State Department in order to administer the contract given the relatively large number of contract awardees resulting from the Solicitation and the limited time GPO had to establish the e-Passport program.

Subsequently, OTI submitted a second batch of sample product for formal testing in April 2005. Attempts to fabricate OTI's book covers appeared to be successful; however, due to an adhesive problem, nearly all of OTI's passport covers failed. The adhesive flaw in the OTI replacement book covers was the second time that OTI failed to submit compliant book covers during this phase of GPO testing. Accordingly, GPO applied the testing criteria that was used with every other contractor, and informed OTI that it would not be considered for further contracts under the Solicitation.

OTI protested the GPO's decision to eliminate it from further consideration under the terms of the Solicitation to the GAO and, although the GAO found jurisdiction existed over OTI's protest, it ultimately denied OTI's protest on August 10, 2005. OTI then filed suit in this Court on August 18, 2005 seeking to enjoin GPO from proceeding with work under the other contracts that had been awarded pursuant to the Solicitation and to be reinserted back into the testing process.[2] On November 30, 2006, this Court issued an opinion denying OTI's request for an injunction halting the procurement process; however, the Court found that GPO's "two strikes" policy constituted evaluation criteria which had not been disclosed in the Solicitation,

[2] This was OTI's second protest regarding this Solicitation. In December 2004, OTI protested the GPO's decision not to award it a contract under the Solicitation. That protest was resolved when GPO relented and agreed to expand the number of contract awardees from four to ten, which then included OTI.

and ordered that GPO continue OTI's contract and conduct further testing of OTI's product from its contract.[3] OTI 2.

In December 2005, as part of implementing the Court's grant of limited equitable relief to OTI, GPO notified OTI and two other contractors, [ ], that they could resubmit their passport covers for retesting. AR 1-2, 304-06, 312. GPO also notified the parties that it would no longer employ any evaluation criteria outside of the Solicitation and that, due to the limited time available before the program was required to be operational, there would be no additional opportunities to cure any defects that may be identified during testing. Id. In response, all three contract awardees submitted additional passport covers, for which they were paid, and GPO again began to test all three contractor's passport covers pursuant to the specifications contained in the Solicitation. At no time did [ ] ever question the identified testing criteria or the GPO's explicitly stated policy that there would be no further opportunity to cure any defects in the submitted passport covers should they occur.

All three contractors passed the initial rounds of testing conducted by GPO, DoS, and APTISS. AR 40-41, 308, 315. OTI's product, as well as that of [ ], then were forwarded to NIST for a series of durability tests dictated by the Solicitation including: (1) Impact Testing, (2) Bend Testing, (3) Climate Testing, (4) Chemical Resistence Testing, and (5) Electromagnetic/Static Electricity Testing. Compl. ¶ 31. NIST, an independent third party agency, then conducted blind testing of all three contract participant's passport covers without knowing which product belonged to which contract awardee. AR 188-297 (NIST test report).

In late July 2006, NIST notified GPO that only one of the three contractor's passport covers successfully passed the required testing. Id. OTI was one of the contract awardees whose

[3] On December 7, 2006, the Court issued its redacted opinion for publication.

product failed testing by NIST. Specifically, for the NIST Electromagnetic Test, OTI's product failed all of the ten required tests for load modulation. Compl. ¶ 32; AR 41, 131-132, 289. This test measures the signal level of the e-Passport integrated circuit (IC) when it responds to a reader. AR 212-214. A minimum signal level is specified by ISO 14443-2, which was identified in the Solicitation. 2005AR 74.

Additionally, OTI's product did not perform adequately when subjected to the NIST durability tests. On the Impact Edge Steel Test, only 2 e-Passports out of 5 passed; on the Impact Point Steel Test, 3 e-Passports out of 5 passed; and on the Dynamic Bend Test, only 2 e-Passports out of 5 passed. Compl. ¶33; AR 41, 131. Shortly after testing concluded, GPO notified OTI of these test results and that it would no longer be considered for additional contracts under the Solicitation. AR 38-39.

OTI responded by filing yet another bid protest with this Court regarding this Solicitation on August 4, 2006, seeking, among other things, a preliminary injunction to enjoin GPO from proceeding in any way with the other contracts awarded pursuant to the Solicitation pending resolution of OTI's bid protest. Compl. at 10-11. Indeed, OTI seeks injunctive relief not just as to the other contract awardees that have recently completed testing through NIST, but also as to [ ], which successfully completed the identical testing nearly a year ago in October 2005, and has been awarded a contract under CLIN 6, the production phase of the Solicitation. Id.

**SUMMARY OF THE ARGUMENT**

As we demonstrate below, OTI can offer no evidence that GPO's decision that OTI should be eliminated because it failed the required testing at NIST was arbitrary or capricious or

not otherwise in accordance with the law. Although OTI's product passed all of the tests at GPO, DoS, and APTISS, it failed blind objective testing at NIST. Thus, GPO's decision that OTI failed to deliver a conforming product pursuant to the Solicitation's requirements was proper. OTI is not entitled to an injunction. As explained below, OTI has failed to demonstrate any of the required elements for an award of injunctive relief. Accordingly, the Government respectfully requests that OTI's complaint be dismissed, and its request for injunctive relief be denied.

## ARGUMENT

### I. The United States Is Entitled To Judgment Upon The Administrative Record

GPO's decisions were rational and supported by the administrative record. Accordingly, as demonstrated below, the United States is entitled to judgment upon the administrative record pursuant to RCFC 52.1.

This Court reviews bid protest actions under the standards set forth in the Administrative Procedure Act ("APA"). Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In particular, the Court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). An award may not be set aside, therefore, unless the protestor demonstrates that: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332 (citations omitted).

In evaluating whether an agency official's actions were rational, the "disappointed bidder bears a 'heavy burden' of showing that the award decision 'had no rational basis.'" Impresa, 238 F.3d at 1333 (citing Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)).

Courts have recognized that contracting officials may properly exercise wide discretion in their application of procurement regulations. See Impresa, 238 F.3d at 1332 (citations omitted); Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. CRC Marine Servs., Inc. v. United States, 41 Fed. Cl. 66, 83 (1998).

Moreover, when a protestor is asserting a violation of regulation or procedure, "the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'" Id. (citing Kentron Hawaii, Ltd. v. Warner, 480 F.2d 1166, 1169 (D.C. Cir. 1973); Latecoere Int'l, Inc. v. United States Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). To establish prejudice, a protestor must demonstrate that, but for the alleged error, there was a substantial chance it would have received the award. Statistica, Inc. v. Christopher, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

From a procedural standpoint, bid protest actions are considered upon cross-motions for judgment upon the administrative record pursuant to RCFC 52.1. Summary judgment standards are not pertinent to judicial review upon an administrative record. See Bannum v. United States, 404 F.3d 1346, 1355-56 (Fed. Cir. 2005).

## II. The GPO Has Not Acted Arbitrarily Or Capriciously And Has Not Violated Any Applicable Procurement Statute Or Regulation

Given all the disputed and undisputed facts, OTI cannot meet its burden of proof that GPO's decision to issue a no further procurement letter to OTI was arbitrary or capricious, or that it amounts to a prejudicial violation of applicable procurement law or regulations. GPO

reasonably concluded that OTI's product failed objective established testing criteria applied to all contractors, which necessitated the issuance of a no further procurement letter to OTI.

### A. The Contracting Officer's Determination That OTI's Product Failed To Meet Specifications Did Not Lack A Rational Basis

OTI alleges that the GPO's decision to eliminate or "downselect" OTI from the contract "lacked a rational basis." Compl. ¶¶ 7-8. OTI, however, fails to identify any basis for its claim. Indeed, its complaint is silent as to the alleged irrationality of the GPO's decision. A cursory review of the administrative record reveals that indeed, the GPO's decision was a rational one.

The determination of the contracting officer ("CO"), Ms. Broadnax, that OTI failed the required testing was rational. The CO's decision was based, in part, upon the NIST test report (AR 188-297) that had been forwarded to her by the contracting officer's technical representative ("COTR"), Richard Grasso. AR 129-303. The CO's determination that OTI failed to produce a compliant product for formal testing is consistent with that of the COTR and directly reflects the test results as reported by NIST.

At GPO, the COTR identified both that OTI was vendor number 7, and the tests that OTI failed to pass. Demonstrating her independent judgment, the CO reviewed both the NIST report and that of the COTR and identified various discrepancies or omissions in the latter report. Sept. 11, 2006 Broadnax Dep. At 16, 18-19. The CO then requested clarification of these issues. AR 8-10. [

]. AR 38-39.

The only relevant inquiry for the Court now is whether the record reveals a rational basis for GPO's [ ]. The record before the Court reveals that the three remaining contract awardees following this Court's prior decision were notified that they would have one final opportunity to submit passport covers for testing that complied with the Solicitation. AR 1-2, 304-06, 312. The record also reveals that all three contractors passed the preliminary phases of testing at GPO, DoS, and APTISS, and that all three contractors' products were forwarded to NIST for testing as contemplated by the Solicitation. The record further reveals that NIST conducted blind testing of the three participant's products without knowing which product was from which contractor (AR 188-297), and that only [ ]. AR 41-42, 308-09, 316-17.

The GPO's decision regarding which company was entitled to further contract awards under the Solicitation was a direct result of how the contractors performed during the Solicitation-specified testing process. This process included the blind testing conducted by NIST. The NIST test report, the COTR's report regarding each contractor's performance, and the CO's determination and findings ("D&F") are all contained in the administrative record currently before the Court. These documents spell out the full reasoning for the CO's, the COTR's, and NIST's conclusions and identify all testing results relied upon as support for their decisions.

Moreover, time was of the essence in this Solicitation given the deadlines for GPO to have the new e-Passport program operational and the delays that had already impacted the Solicitation. Accordingly, as the administrative record reflects, when GPO readmitted OTI and the other two contract participants back into the testing process in December 2005, it notified all participants that there would not be any further opportunity to remedy any defects in this

products should they again fail testing. AR 1-2, 304-06, 312. After receiving notification of this policy in December 2005, neither OTI nor any of the other two contract participants voiced any concern.

Given these facts, the CO's decision was clearly rational. Neither OTI nor the Court can substitute its judgment for that of CO, even if reasonable minds could reach differing conclusions, which we do not believe to be the case in this instance. CRC Marine Servs., 41 Fed. Cl. at 83.

**B. GPO Did Not Rely Upon Undisclosed Selection Criteria**

[

] Compl. ¶ 54. OTI fails to mention that there are no final ICAO standards for e-Passport durability that have been promulgated.[4] Thus, the test results from the laboratories it retained are irrelevant to the testing conducted pursuant to the Solicitation.

As the administrative record indicates, [

]. AR

[4] Nor are there any ISO (International Organization for Standardization) standards for e-Passport durability.

39, 41, 44, 131, 183, 229-230 ; Compl. ¶33. Nevertheless, OTI claims that these tests are over and above what ICAO requires. However, as the Solicitation states:

> For the purpose of testing EP Book Cover durability, construction and engineering, the government will consider ISO and Common Criteria Smart Card Security and contact and contactless testing standards **as the baseline for EP cover testing. These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1.**

AR 41 (emphasis added).

As indicated above, the Solicitation does not mention ICAO standards regarding e-Passport durability. Instead, it refers to "ISO" as well as other standards however, it was not limited to tests regarding these standards much less the ICAO standard OTI claims. OTI as well as the other contract participants had a meeting with GPO to discuss the testing and could have inquired about the anticipated durability testing at NIST, yet it chose not to do so. Moreover, all of the contract participant's products were subjected to the same durability testing by NIST. Accordingly, OTI's claim of undisclosed evaluation criteria is unfounded.

**C. <u>OTI Has Failed To Demonstrate Unequal Treatment</u>**

The sole basis for OTI's claim that it is the victim of unequal treatment is its claim that it [ ]. Compl. ¶¶ 44-50. As we demonstrated in our opposition to OTI's motion to supplement the administrative record, [ ]. Not only was this conference outside the testing criteria and processes contained in, and established by, the Solicitation, the conference was not a part of the RFP in any way. The irrelevance of the conference is further demonstrated by the fact that the

contracting officer – as demonstrated by her explicit D&Fs – did not consider the conference's results. Indeed, there is no evidence that the contracting officer had any knowledge of either the conference or its results. OTI's testing of a competitor's product simply has no bearing upon the rationale for the contracting officer's decision which is before the Court.

[

] is in an entirely different position from the other three contract participants who recently completed testing at NIST. Aug. 9, 2006 Tr. 32-33.

Accordingly, the only relevant inquiry regarding alleged unequal treatment in this case would be: "Did GPO treat any of the three participants who just completed testing, [

], differently from each other?" Clearly, the answer is no. There is no indication anywhere in the administrative record of any disparate treatment as to either [

] made such a claim. Accordingly, there is no basis for OTI's claim of unequal treatment.

**D. <u>OTI's Claim of An Incorrect Technical Evaluation Is Unfounded</u>**

OTI also claims that GPO, and more particularly the professionals at NIST, conducted an incorrect technical evaluation of its product. Compl. ¶¶ 35-43. In support of this allegation, OTI claims that its "product is compliant with ICAO standards including ISO 14443 for load modulation as shown by the testing conducted at FIME laboratories in March 2006 with

negligible exceptions." Compl. ¶ 38. Perhaps OTI provided a product for testing by the "FIME laboratories," which was retained by OTI, and that product passed. However, whatever product that was tested by FIME is of no relevance to the product that OTI provided to GPO for testing under the Solicitation. [

]. AR 38, 41, 44, 131, 183, 289.

Additionally, OTI claims that "test results for load modulation performed by the DoS have no impact on a 'real-life' ePassport reading scenarios." Compl. ¶ 39. OTI's allegation that the Government did not use the best test is irrelevant and has nothing to do with whether there was an incorrect technical evaluation. Such an allegation, even if correct, which it is not, cannot establish that the tests which were required by the Solicitation were performed improperly.

OTI has failed to identify any record evidence suggesting that there was an incorrect technical evaluation or that NIST improperly conducted any particular test.

## III. <u>OTI Has Failed To Establish That It Is Entitled To An Injunction</u>

OTI has not demonstrated that it is entitled to either a preliminary or permanent injunction. This Court has held that, to obtain a permanent injunction, a protestor must demonstrate the following: "(1) that it has succeeded on the merits; (2) that it will suffer irreparable harm if such relief is not granted; (3) the balance of the hardships tips in the movant's favor; and (4) an injunction will serve the public interest." <u>Gentex Corporation v. United States</u>, 58 Fed. Cl. 634, 654 (2003) (citing <u>Bean Stuyvesant, LLC v. United States</u>, 48 Fed. Cl. 303, 320-21 (2000); <u>Hawpe Constr., Inc. v. United States</u>, 46 Fed. Cl. 571, 582 (2000) <u>aff'd</u>, 10

Fed.Appx. 957 (Fed. Cir.2001)). Because injunctive relief is extraordinary in nature, OTI must demonstrate the right to such relief by clear and convincing evidence. Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 732 (2000) (citing Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991)). Moreover, even if OTI were to prevail upon the merits, it still would not be entitled to an injunction because it has not established that it will suffer irreparable harm, that the balance of the hardships tip in its favor, or that an injunction is in the public interest.

**A. OTI Will Not Suffer Irreparable Harm If An Injunction Is Not Issued**

Of the prerequisites for injunctive relief, the requirement that a movant show that it will suffer irreparable harm is the most important. Railway Labor Executives' Ass'n v. Gibbons, 448 U.S. 1301 (1980); Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)("[I]rrespective of relative or public harms, a movant must establish . . . irreparable harm."); Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed. Cir. 1990); 11 C. Wright and A. Miller Federal Practice and Procedure § 2948 at 431 (1973). A plaintiff must demonstrate a "likelihood of substantial and immediate irreparable injury," an element requisite to any grant of equitable relief. O'Shea v. Littleton, 414 U.S. 488, 501-03 (1974). To constitute irreparable harm, the alleged injury must be "certain and great," not theoretical. Tenacre Foundation v. INS, 78 F.3d 693, 695 (D.C. Cir. 1996); Wisconsin Gas Co. v. FERC, 758 F.2d 669, 674 (D.C. Cir. 1985).

OTI alleges that it "has been and continues to be harmed by GPO's conduct" and that it "would suffer additional and irreparable harm were the procurement to proceed in its absence." Compl. ¶¶ 61, 64, 66. However, nowhere in its complaint does OTI identify this alleged harm. Indeed, OTI failed to identify any specific harm. Presumably OTI is alleging economic harm that it may encounter should the Court deny its request for injunctive relief. Mere economic

harm; however, cannot establish irreparable harm. Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997) (holding that economic harm without more, does not rise to the level of irreparable injury); see Lilly and Co. v. American Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir.1996) (holding that economic harm by itself does not establish irreparable harm); see also Wisconsin Gas Co. 758 F.2d at 674 ("It is also well settled that economic loss does not, in and of itself, constitute irreparable harm . . . . The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough."). Thus, OTI has not shown that it will suffer irreparable harm if an injunction is not issued.

In its motion for temporary restraining order and preliminary injunction OTI contends that it will suffer financially if the Government is not enjoined from proceeding with the production phase of the electronic passport program. Among other things, OTI claims it will suffer "a loss in revenues" as well as "damage to its reputation as a prospective manufacturer of passports for other countries." Pl. Br. at 15. However, neither of these collateral effects – assuming they actually materialize as OTI predicts – amount to irreparable harm:

> [E]conomic loss does not, in and of itself, constitute irreparable harm." Id. Only economic loss that threatens the survival of a movant's business constitutes irreparable harm. Id.; Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 n.2 (D.C. Cir.1977). The plaintiffs do not claim that they will be destroyed if they do not obtain an injunction. Rather, they merely claim that they risk losing a valuable contract and some of their employees. This is insufficient.

Foundation Health Fed'l Servs. v. United States, 1993 WL 738426 (D.D.C. 1993); see also, Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm

without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

OTI has not alleged that elimination from further contract awards under the Solicitation would threaten the survival of its business. To the contrary, it claims that it has "a robust product already in development with a number of government customers." Compl. ¶ 29 (emphasis added). As before, it merely alleges that its reputation might suffer. This is not enough. Indeed, that same claim could be advanced by every single disappointed bidder in every single contract with the Government every time a competitor performs better than the complainant; however, that does not rise to the level of irreparable harm. If that were the case, there would be irreparable harm in every contract dispute. Thus, OTI has not shown that it will suffer irreparable harm if either a preliminary or permanent injunction is not issued.

**B. Any Harm Which Denial Of Injunctive Relief Would Cause To OTI Would Not Outweigh The Harm To The United States**

The United States will suffer significant harm if the Court enters either a preliminary or permanent injunction as requested by OTI. GPO's contract on behalf of the Department of State to implement the new e-Passport program is vital to the security of the United States. Congress mandated that VWP countries have such a program in place by October 26, 2004. This deadline was extended by Department of Homeland Security, in consultation with the Department of State. VWP countries were then required to have digital photographs in all passports by October 26, 2005, and VWP passports must also contain an integrated circuit chip or e-Passport by October 26, 2006, a mere 41 days from now.

In order to have the e-Passport program fully operational by October 26, 2006, GPO must be permitted to continue the procurement process with those participants that have produced

products that have met the requirements of the Solicitation and that have successfully passed the requisite testing. Any delay in the procurement process at this time will not permit GPO and the Department of State to meet the Department of Homeland Security's deadline for full implementation of the e-Passport program.

As a practical matter, the award of either a preliminary of permanent injunction would significantly harm the United States. Such injunctive relief would force the GPO to stop its procurement of electronic passports which are a vital component of homeland security less than two months prior to when the program is required to be operational. Indeed, the United States will suffer significant harm if the Court enters any injunction at this stage of the contract given its vital importance to the security of the United States.

Nonetheless, OTI seeks an order from the Court "suspend[ing] production trials and all other activities of the United States related to the solicitation and procurement . . . until this Court enters final judgment in this matter." Compl. at 11. However, in order to have the e-Passport program fully operational by October 26, 2006, GPO must have the ability to continue with the Solicitation with the participants that have successfully passed the requisite testing. For instance, [ ] which just completed testing at NIST, and there is no rational justification for [

] has just completed all tests successfully (AR 307) and has recently received an additional contract under CLIN 5 of the Solicitation. AR 310-11. Accordingly, there can be no justification for any delay to those contracts which will not permit

GPO and the Department of State to meet the Department of Homeland Security's deadline for full implementation of the e-Passport program.

Moreover, [

].

In the previous action brought by OTI, the Court granted OTI limited injunctive relief directing GPO to readmit OTI into the testing process; however, the Court explicitly stated that it would not halt the e-Passport program. Specifically, this Court stated:

> There is no question that the government would be harmed severely if the court were to enjoin it from pursuing its previously-announced plan to exercise CLIN 5, to order electronic covers for a pilot program . . . . **Such an injunction would delay the institution of the electronic passport program and prevent the government from meeting the October 2006 timeline to have such a program in place. Thus, the court will not impose any impediment to proceeding with the pilot program**.

<u>OTI 2</u>, 68 Fed. at 660 (internal citations omitted) (emphasis added).

The harm would be even greater today with the implementation date less than two months away, than it was last December when the Court issued its opinion. OTI fails to recognize this Court's previous determination that:

> **Any delay in the program would negatively affect the border security of the United States and [**
>
> **].** Apart from delaying an advance in border security, [an inability to satisfy the same electronic passport timelines that have been adopted by cooperating nations would "probably [
>
> ]."

Id. at 660-61 (internal citations omitted) (emphasis added). However, this is exactly what OTI is now asking this Court to do – something it specifically stated last December that it would not do. The Court recently reiterated its position on this matter at the August 9, 2006 hearing on OTI motion for a temporary restraining order ("TRO"), at which time it denied OTI's request for a TRO and stated: "**the Court is strongly persuaded that any action to delay the program would be contrary to the United States' interests in the international arena.**" Tr. 33 (emphasis added).

Ultimately, OTI has not established how any harm it may suffer by not obtaining injunctive relief is greater than the harm that the Government will suffer from a delay in the implementation of its e-Passport program. Indeed, the harm to the Government and its citizens from the issuance of any type of injunctive relief related to the separate contracts of either [ ] clearly outweighs any speculative harm that might be suffered by OTI. Therefore, because OTI's has failed to establish that it will suffer greater harm than the Government, its request for injunctive relief must be denied.

**C. Issuance Of An Injunction Would Not Be In The Public Interest**

GPO is in the final stages of this procurement and has just issued a purchase order to [ ]. As the Court recognized last year, this program is vital to the United States and its efforts to increase its border security. Id. If the process is delayed further, GPO will not possess the capability to perform what is required by Congress on October 26, 2006.

For the reasons already established, issuing injunctive relief would, at best, only serve to prevent GPO's lawful administration of its contracts with other participants in the e-Passport

program. It also would likely affect national security and [

]. Accordingly, an injunction would not be in the public interest.

**D. <u>OTI Cannot Demonstrate Actual Success Upon The Merits</u>**

To succeed on the merits of its claim, OTI must prove that the agency acted arbitrarily, capriciously, in abuse of its discretion, or otherwise not in accordance with law in eliminating it from further consideration for award of additional contracts under the Solicitation. On the facts of this case, OTI will be unable to so demonstrate.

**1. <u>Standard Of Review</u>**

As demonstrated above, judicial review of agency procurement decisions is "extremely limited." <u>CACI Field Services, Inc. v. United States</u>, 13 Cl. Ct. 718, 725 (1987), <u>aff'd</u>, 854 F.2d 464 (Fed. Cir. 1988). Additionally, under 28 U.S.C. § 1491(b), the standard of review over procurement decisions is an extremely deferential standard. Moreover, the deference to agency discretion has been described as especially strong in cases involving military procurements and matters of national defense and national security. <u>See</u> <u>North Dakota v. United States</u>, 495 U.S. 423, 443 (1990) ("When the Court is confronted with questions relating to . . . military operations, we properly defer to the judgment of those who must lead our Armed Forces in battle."); <u>Murphy v. United States</u>, 993 F.2d 871, 872 (Fed. Cir. 1993) ("Justiciability is a particularly apt inquiry when one seeks review of military activities."); <u>Voge v. United States</u>, 844 F.2d 776, 779 (Fed. Cir. 1988) ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.") Indeed, the statute that confers jurisdiction upon this Court in bid protests emphasizes the need to pay close attention to the "interests of national defense and national security." 28 U.S.C. § 1491(b)(3).

**2. The GPO's Determination That OTI's Product Failed To Meet Specifications Did Not Lack A Rational Basis**

OTI alleges that the GPO's decision to "downselect[]" OTI from the contract was not rational, that GPO relied upon undisclosed selection criteria, and that GPO treated OTI unequally from other contractors. Compl. ¶¶ 7-8. OTI's allegation is not only incorrect, it attempts to again excuse its repeated failure to provide GPO with a product that complies with contract requirements.

As indicated above, NIST is an independent third party agency under the control of neither GPO nor the State Department. Moreover, NIST conducted blind testing of all three contract participant's passport covers without knowing which product belonged to which participant. During this blind testing, OTI's product failed NIST's Electromagnetic Test when 0 out of 10 samples passed the required tests for load modulation. In response, OTI claims that its product is compliant with applicable standards for load modulation "as shown by testing conducted by FIME laboratories in March of 2006 with negligible exceptions." Compl. ¶ 38. However, any testing by a private firm outside the specified tests conducted by NIST have no import to OTI's contract performance.

OTI also claims, without support, that "the test results for load modulation performed by the DoS have no impact on a 'real-life' ePassport reading scenarios [sic]" Compl. ¶ 39. OTI's suggestion of what tests are appropriate for the Government's goals of national security is simply irrelevant. Jet Constr. Co. v. United States, 209 Ct. Cl. 200 (1976) (citing Farwell Co. v. United States, 137 Ct. Cl. 832 (1957) (contractor promises to perform according to specifications and the Government has the right to insist on contractor compliance)). Again, OTI's unsupported claim does not alter the fact that its product failed the required testing.

OTI further claims that it was evaluated unequally [ ].” Compl. ¶ 42. OTI is wrong. [ ]. Moreover, as the Court recognized at the September 6, 2006 hearing on OTI’s motion to supplement the administrative record, [ ]. Sept. 6, 2006 Tr. 62-63. It is absurd for OTI to ask the Court to enjoin performance of contracts where the contractor’s performance conclusively establishes that the specified tests can be passed by an acceptable product.

OTI also claims that “GPO eliminated OTI based on an undisclosed evaluation requirement” in terms of the durability testing conducted by NIST. Compl. ¶ 56. OTI further claims that its product was tested by two laboratories ExpertEye and Exponent Laboratories, and the tests were “materially compliant with the Solicitation.” Compl. ¶¶ 54-55. Again, this alleged successful testing occurred outside the contract. As previously indicated, OTI’s product did not perform adequately when subjected to the NIST durability tests. These tests were the same tests performed on the products of the other contract participants and were specifically contemplated by the terms of the contract. Again, <u>the NIST testing was blind</u> and, as such, OTI cannot claim that it was treated unequally. Indeed, other than Infineon, in this protest, OTI has not alleged desperate treatment by GPO as to any other contract participant.

Based upon the test results provided by NIST, an independent third party using blind tests, GPO concluded that OTI had again failed to submit a conforming product. Accordingly,

GPO determined that OTI would no longer be considered for further procurement under the contract. For these reasons, GPO's determination that OTI's passport book covers failed again did not lack a rational basis and was not in violation of any applicable laws or regulations. As such, OTI cannot demonstrate the requisite likelihood of success on the merits of its claim.

Given this deferential standard, and as shown above, OTI cannot "clearly and convincingly" demonstrate success on the merits. For these reasons, the Court should deny OTI's request for either an injunction.

## IV. OTI Is Not Entitled To The Relief Requested

Among other things, OTI asks this Court to issue "an injunction ordering GPO to reinstate OTI into the [procurement] process." Compl. ¶ 11. Additionally, OTI seeks a permanent injunction "**ordering GPO to pass OTI on to the next contract stage** or to reinstate OTI into the procurement process . . . ." Id. (emphasis added). OTI is explicitly asking this Court to do something that it cannot do – award OTI a contract under CLIN 5 of the Solicitation. OTI is not entitled to such relief. Indeed, this Court cannot order a contract award to a particular bidder because this would go beyond curing a cognizable mistake in award to an unqualified bidder. United Int'l Investig. Servs., Inc. v. United States, 41 Fed. Cl. 312, 323-24 (1998) (citing Hydro Eng'g, Inc. v. United States, 37 Fed. Cl. 448, 461 (1997), and Scanwell Lab., Incl. v. Shaffer, 424 F.2d 859, 869 (D.C. Cir. 1970)).

In this instance, OTI is seeking to have the Court substitute its judgment for not only that of the contracting officer, but for that of the professionals at NIST. As the Court recognized at the hearing on OTI's motion for a TRO, this is asking the Court to enter into the realm of contract administration – something it stated it would not do. Aug. 9, 2006 Tr. 25-26.

OTI also requests award of its reasonable costs, attorney fees and proposal costs. Compl. at 11. Attorney fees generally are not recoverable in this context. See AT&T Technologies, Inc. v. United States, 18 Cl. Ct. 315, 326 (1989). Furthermore, because OTI has not prevailed in this matter, and, in any event, the Government's position was substantially justified, OTI may not recover fees under the Equal Access to Justice Act, 5 U.S.C. § 504. See 28 U.S.C. § 2412(d)(1)(A).

Bid proposal or preparation costs are recoverable in some cases. 28 U.S.C. § 1491(b)(2); Lion Raisins, Inc. v. United States, 51 Fed. Cl. 238, 251 (2001). However, OTI has not shown prejudice, so this relief is not appropriate either. E.W. Bliss Co. v. United States, 77 F.3d 445 (Fed. Cir. 1996); see also AT&T Technologies, Inc., 18 Cl. Ct. at 326.

## CONCLUSION

For the reasons set forth above, the Court should grant defendant's motion for judgment upon the administrative record, dismiss plaintiff's complaint, and deny the relief requested.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner

DONALD E. KINNER
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tele: (202) 353-7760
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

September 14, 2006

CERTIFICATE OF FILING

I hereby certify that on October 25, 2006, an agreed-upon redacted copy of the foregoing "DEFENDANT'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans