**Agreed-Upon Redacted Copy –
May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-571C (Bid Protest)
(Judge Lettow)

OTI AMERICA, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

OF COUNSEL:

JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

September 21, 2006

Attorneys for Defendant

# TABLE OF CONTENTS


PAGE(S)

COUNTER-STATEMENT OF FACTS ..................... 1

ARGUMENT ..................... 5

I. OTI Has Not Met Its Heavy Burden In Challenging The GPO's Decision To Eliminate It From Further Consideration Under The Solicitation ..................... 5

II. GPO's Decision To Eliminate OTI From Further Consideration Under The Solicitation Was Rationally Based ..................... 6

A. OTI's Claims Of Disparate Treatment Are Unfounded ..................... 7

B. OTI's Claims Of Incorrect Technical Evaluation Are Unfounded ..................... 9

C. The GPO Did Not Utilize Any Undisclosed Evaluation Criteria ..................... 10

D. The Contracting Officer Made An Independent Inquiry Before Eliminating OTI ..................... 13

III. OTI Is Not Entitled to Injunctive Relief ..................... 16

A. The Harm To The United States Resulting From The Grant Of Injunctive Relief To OTI Outweighs Any Harm To OTI ..................... 17

B. OTI Will Not Suffer Irreparable Harm If An Injunction Is Not Issued ..................... 18

C. Injunctive Relief Would Not Serve The Public Interest ..................... 19

CONCLUSION ..................... 20

# TABLE OF AUTHORITIES

## CASES

PAGE(S)

ACRA, Inc. v. United States,
44 Fed. Cl. 288 (1999) .......... 6

Aero Corp., S.A. v. United States,
38 Fed. Cl. 237 (1997) .......... 20

Al Ghanim Combined Croup Co. Gen. Trad. & Cont., W.L.L. v. United States,
56 Fed. Cl. 502 (2003) .......... 20

Allied Technology Group, Inc. v. United States,
39 Fed. Cl. 125 (1997), aff'd, 173 F.3d 435 (Fed. Cir. 1998) .......... 12

Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,
731 F.2d 831 (Fed. Cir. 1984) .......... 17

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) .......... 17

CRC Marine Servs., Inc. v. United States,
41 Fed. Cl. 66 (1998) .......... 6, 16

Cincom Sys., Inc. v. United States,
37 Fed. Cl. 663 (1997) .......... 17

Custom Printing Co. v. United States,
51 Fed. Cl. 729 (2002) .......... 10

Electro-Methods, Inc. v. United States,
7 Cl. Ct. 755 (1985) .......... 6

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) .......... 8, 20

Illinois Tool Works, Inc. v. Grip-Pak, Inc.,
906 F.2d 679 (Fed. Cir. 1990) .......... 18

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 5, 6

Kropp Holdings, Inc. v. United States,
63 Fed. Cl. 537 (2005) ..................... 17

Lilly and Co. v. American Cyanamid Co.,
82 F.3d 1568 (Fed. Cir.1996) ..................... 19

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) ..................... 19

NVT Techns., Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) ..................... 12

Newsom v. United States,
230 Ct. Cl. 676 F.2d 647 (1982) ..................... 12

O'Shea v. Littleton,
414 U.S. 488 (1974) ..................... 18

OTI America, Inc. v. United States,
68 Fed. Cl. 646 (2005) ..................... 18

Overstreet Elec. Co., Inc. v. United States,
59 Fed. Cl. 99 (2003) ..................... 17

PGBA, LLC v. United States,
60 Fed. Cl. 196 aff'd, 389 F.3d 1219 (2004) ..................... 8

Railway Labor Executives' Ass'n v. Gibbons,
448 U.S. 1301 (1980) ..................... 18

Reebok Int'l Ltd. v. J. Baker, Inc.,
32 F.3d 1552 (Fed. Cir. 1994) ..................... 18

Saratoga Dev. Corp. v. United States,
21 F.3d 445 (D.C. Cir. 1994) ..................... 6

United Payors & United Providers Health Servs. v. United States,
55 Fed. Cl. 323 (2002) ..................... 6

Yakus v. United States,
321 U.S. 414 (1944) ..................... 17

Zenith Radio Corp. v. United States,
710 F.2d 806 (Fed. Cir. 1983) ..................... 19

## STATUTES

5 U.S.C. § 706 .......... 5

28 U.S.C. § 1491(b)(4) .......... 5

## MISCELLANEOUS

11 C. Wright and A. Miller Federal Practice and Procedure § 2948 at 431 (1973) .......... 18

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| OTI AMERICA, INC.<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 06-571C **(Bid Protest)**<br>(Judge Lettow)<br><br>**Agreed-Upon Redacted Copy -- May Be Made Public** |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION**
**FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's order dated August 14, 2006, defendant, the United States, respectfully submits this response to the motion of plaintiff, OTI America, Inc. ("OTI"), for judgment upon the administrative record, for a permanent injunction, and costs. As we demonstrate below, OTI has failed to carry its "heavy burden" of demonstrating that the decision of the Government Printing Office ("GPO") to eliminate OTI from further consideration had no rational basis or that it was contrary to applicable law.

**COUNTER-STATEMENT OF FACTS**

OTI's Statement Of The Case (Pl. Br. at 2-9) contains numerous omissions and factual inaccuracies. To begin, OTI fails to adequately identify the standards applicable to the testing of e-Passports at NIST. The Solicitation identifies certain International Standards Organization for Standardization ("ISO") and International Civil Aviation Organization ("ICAO") standards that must be met. However, OTI relies upon standards that have not been finalized and that were produced after the commencement of testing under the Solicitation. OTI states: "ICAO set the

standards for Impact Testing in the Durability of Machine Readable Passports, at 15-17 ICAO TF4 Doc. N0156 (Feb 9, 2006)." Pl. Br. at 6. Additionally, OTI claims that: "ICAO standards for Load Modulation Testing are set forth in RF Protocol and Application Test Standard for E-Passport – Part 2, Tests for Air Interface, Initialization, Anticollision and Transport Protocol, at 12-14, ICAO TF4 Doc. WG3TF4_SDXX_RF protocol and application test standard ePP Part 2.doc (Feb. 10, 2006)." Id. OTI further states: "These objective, written standards provided the 'target' against which offerors would naturally design their products." Id. at 7.

OTI's citations themselves reveal that these documents were published on February 9, 2006, and February 10, 2006, respectively, both more than a month after OTI had submitted its product for testing, and after testing on other contract participants' products (e.g., Infineon) had been completed. Moreover, both documents are merely **"drafts."** The cover of the Technical Report on Durability testing is labeled "DRAFT" and the Technical Report on load modulation carries a release note on the second page which states: "**Release 2006-02-10 is the second working draft of the technical report issued to the SC17 WG3 TF4 for final comments until March 31st , 2006."**[1]

Additionally, given that these two "draft" documents were published after OTI had submitted its product to GPO for testing, it is disingenuous for OTI to claim that they "would naturally design their product[]" in accordance with these standards. Pl. Br. at 7.

[1] Although OTI provided copies of these two draft technical reports as well as others to us, we did not include them with the standards filed with the Court on September 19, 2006, because 1) they were merely draft documents, 2) they were published after OTI submitted its product for testing, and 3) they were not used in any way for the testing of OTI's product.

GPO tested the products of all three remaining contract participants [ ] based upon the ISO and ICAO standards in effect at the start of the Solicitation. These standards and recommendations are enumerated in lines 611 through 633 of the Solicitation. 2005 AR 36. The documents themselves are also contained in the administrative record at pages 318 through 963.

Further, the Solicitation explicitly informed all contract participants that the enumerated standards were intended to be the "**baseline**" for testing and that there may be additional testing. Indeed, the Solicitation states:

> The offered cover sheets with the embedded inlays shall be capable of being integrated with the current passport book components to provide a secure and durable completed EP book that shall have a minimum useful life of 10 years. **For the purposes of testing the EP Book Cover durability, construction and engineering,** the government will consider ISO and Common Criteria Smart Card Security and contact and contactless testing standards **as the baseline for EP cover testing. These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1.**

2005 AR 40 (lines 801-07) (emphasis added). Accordingly, the fact that the NIST report details four tests for impact testing is not contrary to the requirements of the Solicitation.

Next, OTI resurrects a claim from its last protest that it was eliminated from competition "although other vendors' products suffered from much more serious problems." Pl. Br. at 7. Additionally, OTI also claims that: "The Solicitation does not detailed [sic] the relative weights of the tests." Id. OTI is wrong on both counts. [ ]. OTI acknowledged that the contracting officer, Albertha Broadnax ("CO"), found that Axalto "passed all of the NIST durability testings with the exception of a single failure in the Impact

Testing (Edge Steel Strike Face) test." Id. citing AR 308-09. [

].

OTI claims that since its product passed all of these tests, it was unfairly eliminated. Id. However, OTI failed to state that the 6 kV test is the only one required under the applicable standard. AR 212. Indeed, this requirement was specifically stated in the Solicitation, which also referenced ISO 10373-3. 2005 AR 166. OTI also misstates the applicable standard for load modulation, incorrectly claiming that testing at 4.5 A/m is required. Pl. Br. at 9. See AR 671 ("Changing the existing specification eg to 4.5 A/m would introduce numerous incompatibility issues and should be avoided even if applied only to e-passports.").

Contrary to OTI's allegation about the silence of the Solicitation as to the relative weight of the tests, the Solicitation explicitly states: "The selected test methods will be used to evaluate the performance of products from different manufacturers, **with preference being given to products that demonstrate greater durability based on these test results**. 2005 AR 40 (lines 809-11) (emphasis added). In this regard, the NIST report makes clear that in addition to failing all ten of the required load modulation tests, OTI's product failed more durability tests than any other contract participant. AR 183, 301.

Despite OTI's claims regarding its perception of the lack of the CO's knowledge of the details of the applicable technical standards for the contract participants' products, the CO is not expected to become technically proficient in the engineering considerations of the product testing. That is the job of the agency's technical staff, and what the independent testing entity will provide. Rather, not entirely dissimilar to the role of this Court, who also cannot be

expected to be a technical expert in the scientific aspects of the work, the CO is to use sound judgment to assess the advice of those responsible for technical considerations and ensure that her decision is rationally based upon sound information. There is certainly no infirmity in the contracting officer's decision because she was not versed in the details of the applicable ISO and ICAO standards.

Finally, the Test & Evaluation Master Plan ("TEMP"), a document prepared by the Department of State ("DoS") to track the numerous tests by the various agencies involved, was provided to NIST by DoS. Contrary to OTI's assertion, the TEMP does not constitute "evaluation criteria" (Pl. Br. at 8, n.7), but is simply a tracking device that ties the required tests back to the Solicitation. Additionally, although the CO provided NIST with neither the TEMP nor the Solicitation, both were provided to NIST by DoS. The reason for this is simple – NIST was retained by DoS, not GPO, to perform the required testing under the Solicitation. Thus, OTI's allegations regarding the CO's understanding are baseless.

## ARGUMENT

### I. OTI Has Not Met Its Heavy Burden In Challenging The GPO's Decision To Eliminate It From Further Consideration Under The Solicitation

This Court reviews bid protest actions under the standards set forth in the Administrative Procedure Act ("APA"). Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). In particular, the Court must determine whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706; 28 U.S.C. § 1491(b)(4). An award may not be set aside, therefore, unless the protestor demonstrates that: "(1) the procurement official's decision lacked a rational basis;

or (2) the procurement procedure involved a violation of regulation or procedure." Impresa, 238 F.3d at 1332 (citations omitted).

In evaluating whether an agency official's actions were rational, the "disappointed bidder bears a '**heavy burden**' of showing that the award decision 'had no rational basis.'" Impresa, 238 F.3d at 1333 (citing Saratoga Dev. Corp. v. United States, 21 F.3d 445, 456 (D.C. Cir. 1994)) (emphasis added). Courts have recognized that contracting officials may properly exercise wide discretion in their application of procurement regulations. See Impresa, 238 F.3d at 1332 (citations omitted); Electro-Methods, Inc. v. United States, 7 Cl. Ct. 755, 762 (1985). In this regard, the Court cannot substitute its judgment for that of the agency, even if reasonable minds could reach differing conclusions. CRC Marine Servs., Inc. v. United States, 41 Fed. Cl. 66, 83 (1998). We agree with OTI that the "test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." United Payors & United Providers Health Servs. v. United States, 55 Fed. Cl. 323, 329 (2002). Pl. Br. at 11. As explained below, GPO has met that burden.

OTI's motion, submitted after discovery, fails to rebut the core facts in the administrative record regarding OTI's elimination from further consideration under the Solicitation. Blind testing by an independent third party agency revealed that OTI's product failed numerous tests required by the Solicitation. Moreover, OTI has failed to demonstrate that it was treated any differently from any of the other contractors who were similarly situated.

## II. GPO's Decision To Eliminate OTI From Further Consideration Under The Solicitation Was Rationally Based

OTI has failed to carry its "heavy burden" of showing that GPO's decision "had no rational basis." Impresa, 238 F.3d at 1332; see also, ACRA, Inc. v. United States, 44 Fed. Cl.

288, 293 (1999) (aggrieved bidder has the burden to demonstrate that there is no rational basis for the agency's decision). Instead, OTI relies upon scattergun claims of disparate treatment of contractors, incorrect technical evaluations, undisclosed evaluation criteria, and lack of independent judgment by the contracting officer in an attempt to have the Court reinstate it into the contract process. OTI's claims are without merit.

**A. <u>OTI's Claims Of Disparate Treatment Are Unfounded</u>**

OTI's claims of disparate treatment are unfounded and quickly dispatched. At the outset of this action OTI claimed that it had been the victim of disparate treatment by GPO given the fact that [

].

Not to be deterred, OTI now clams that it is again the victim of disparate treatment, this time, in relation to [ ]. Pl. Br. at 31-33. Again, OTI's claims are unfounded and easily rebutted. As OTI acknowledged, the testing done by NIST was <u>blind</u>. <u>Id.</u> at 24. Moreover, NIST subjected the products of all three remaining contract participants, [ ], to the exact same tests. OTI has not, nor can it, identify anything in the administrative record to show that OTI was subjected to any test that the other two contract participants were not also subjected. Nor can OTI identify any impropriety in the testing procedure from one contract participant to another, or how the results were interpreted.

[

] Id. The fallacy with OTI's argument is that it fails to acknowledge that 6 kV is the standard that must be met. 2005 AR 166. Indeed, the NIST test report explicitly states: "**The standard ISO test level is 6 kV.**" AR 212 (emphasis added). Moreover, [

]. For the same reason, the fact that "OTI's product is the only ePassport that successfully passed the ESD test at 15 kV" is irrelevant. Pl. Br. at 31. OTI also incorrectly states that "[

]" id., and provides no support for its bald assertion.

OTI also claims that it suffered from disparate treatment because of a lack of specificity or clarity in the Solicitation. In support of its claim, OTI cites PGBA, LLC v. United States, 60 Fed. Cl. 196, 207, aff'd, 389 F.3d 1219 (2004), for the proposition "that lack of clarity in a Solicitation demands the government ask for the same level of performance from each bidder." Pl. Br. at 32. That is exactly what transpired in this case. To the extent that there was any ambiguity in the Solicitation regarding the testing to be conducted by NIST, all of the contract participants were operating with the same information. Accordingly, OTI's citation to Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003), for the proposition that the "lack of clarity in the Solicitation 'skew[ed] the playing field' and resulted in disparate treatment," is a non-sequitur. Moreover, all remaining contract participants had the opportunity to ask for clarification if they

thought it necessary. OTI never asked for any clarification of the testing procedures at NIST. Additionally, as explained above, all of the contract participants were treated in the identical manner.

OTI also makes the unsupported statement that "OTI did not have the serious technical problems with its passports that other contractors did." Pl. Br. at 34. Again, OTI is wrong. OTI was the only contractor to fail the load modulation testing. Indeed, OTI's product failed 100 percent of the load modulation tests – a perfect 10 out of 10 failure rate. AR 131, 183, 301. In addition, OTI failed three separate durability tests, more than any other contract participant. Id. Accordingly, OTI's claim that its technical problems were not as serious as other contractors is false.

**B. OTI's Claims Of Incorrect Technical Evaluation Are Unfounded**

OTI makes the blanket statement that GPO's decision to eliminate OTI from further contract awards was based upon "incorrect technical evaluations." Pl. Br. at 25. OTI further states: "Given the lack of detail in the NIST report, several plausible explanations exist for OTI's product "failures" in the load modulation testing." Id. at 26. OTI then conjectures as to how NIST might have conducted the testing incorrectly. Id. OTI's claims are both unsupported and unfounded. Indeed, OTI provides no record support to its claim that NIST conducted incorrect technical evaluations. Instead, it merely assumes that NIST must have done something wrong if OTI's product failed testing. This is nothing more than a continuation of OTI's victim mentality – our product failed but it couldn't be our fault.

As the administrative record makes clear, NIST conducted the load modulation testing of all contract participants' products in accordance with the Solicitation. The NIST test report identifies the applicable ISO standards for such testing, ISO 14443-2 and ISO 10373-6 (AR 212-

14), and the results of that testing. AR 289-90. Given that the other two contract participants' products passed the same load modulation testing, the only plausible explanation is not that NIST somehow deviated from the testing procedures it used with the products of the other contract participants, but that OTI's product was defective and did not meet the required specifications. For this reason, the Court should disregard OTI's claims of incorrect technical evaluation.

### C. The GPO Did Not Utilize Any Undisclosed Evaluation Criteria

To begin, GPO did not "deviate from the Solicitation requirements" as alleged by OTI. Pl. Br. at 13-14. Moreover, OTI's citation to the Federal Acquisition Regulation ("FAR") is inapposite given that the GPO is not subject to the FAR. Custom Printing Co. v. United States, 51 Fed. Cl. 729, 733, n.8 (2002) (because the GPO is part of the legislative branch of the United States, the FAR does not apply).

OTI claims that GPO eliminated it based upon an "undisclosed evaluation criteria." OTI is wrong. OTI's claim regarding alleged undisclosed evaluation criteria concerns the durability tests conducted by NIST. Pl. Br. at 12-23;Compl. ¶¶ 51-56. OTI claims that the Solicitation required "ICAO standards and recommendations (which incorporates the standards set by ISO)," and that "stand-alone testing criteria is not specified." Pl. Br. at 14. As we demonstrated above, OTI fails to acknowledge that **there are no final ICAO standards for e-Passport durability that have been promulgated**.[2] Accordingly, all of its comparisons to the draft technical reports published in February 2006, are irrelevant. See Pl. Br. at 15-23; Exhibit B (Comparison Chart).

[2] Nor are there any ISO standards for e-Passport durability.

Despite this fact, OTI claims that: "ICAO standards exist dictating the required durability of the ePassport." Pl. Br. at 14. Again, these draft standards, promulgated in February 2006, could not be employed by NIST because that would have constituted a change in the testing used to test the products of other contract participants. Indeed, NIST tested Infineon's product more than a year ago, well before the publication of the subject draft standards in February 2006. If NIST had adopted these new standards and applied them to [ ], then there would have indeed been disparate treatment in the way the contract participant's products were tested. However, this did not occur.

As indicated above, GPO tested the products of all three remaining contract participants [ ] based upon the ISO and ICAO standards in effect at the start of the Solicitation. These standards and recommendations are enumerated in lines 611 through 633 of the Solicitation. 2005 AR 36. See also AR 318-963. Further, the Solicitation explicitly informed all contract participants that the enumerated standards were intended to be the "baseline" for testing and that there may be additional tests. Indeed, the Solicitation states:

> The offered cover sheets with the embedded inlays shall be capable of being integrated with the current passport book components to provide a secure and durable completed EP book that shall have a minimum useful life of 10 years. For the purposes of testing the EP Book Cover durability, construction and engineering, the government will consider ISO and Common Criteria Smart Card Security and contact and contactless testing standards as the baseline for EP cover testing. **These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1.**

2005 AR 40 (lines 801-07) (emphasis added). Accordingly, all contract participants were on notice as to the standards that would apply and that there might be additional tests. Indeed, the

Solicitation further states: "As part of evaluating the durability of the EP Book Cover in Stage 2, DoS though NIST will conduct durability testing. . . . The testing planned during this stage includes" Impact Testing, Torsion/Flexure Testing, Chemical Resistance Testing, Band Testing, Electromagnetic/Static Electricity Testing, and Environmental Exposure/Cycling Testing. 2005 AR 42-43 (lines 901-928). Thus, there was no ambiguity as to the type of testing that would be conducted.

To the extent that there was any ambiguity in the Solicitation as to the required testing, it was incumbent upon OTI to clarify that ambiguity prior to the submission of its product under the Solicitation. Indeed, in a bid protest, a challenge to a provision of the solicitation that is apparent on its face must be asserted prior to the time that bids are due; otherwise, such a challenge is untimely. NVT Techns., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004); Allied Technology Group, Inc. v. United States, 39 Fed. Cl. 125, 146 (1997), aff'd, 173 F.3d 435 (Fed. Cir. 1998). The rationale for this "patent ambiguity" rule is obvious: (1) it prevents a contractor from taking advantage of the Government, and (2) it materially aids in the administration of contracts by requiring that ambiguities be raised before the contract is bid on, this avoiding costly litigation after the fact. Newsom v. United States, 230 Ct. Cl. 301, 676 F.2d 647, 649 (1982).

OTI's claims of undisclosed evaluation criteria are without merit. The facts in the administrative record fully support GPO's decision to eliminate OTI from further consideration and reveal that GPO's decision was neither arbitrary nor capricious. Additionally, tests were evenly applied to all contractors.

### D. The Contracting Officer Made An Independent Inquiry Prior To Eliminating OTI

OTI incorrectly claims that the contracting officer failed to make an independent inquiry into the matter before eliminating OTI from the competition. Pl. Br. at 27-31. OTI cites to numerous cases in support of its claim that Ms. Broadnax did not "act with independent judgment." Id. at 28, n 17. However, these cases are inapposite because the factual predicate for theses cases – that the contracting officer simply carried out a termination directive of a superior – is not present in this case. Indeed, the administrative record and Ms. Broadnax's deposition testimony demonstrate that Ms. Broadnax made her own determination regarding the testing failures of OTI's product and its elimination from further consideration under the Solicitation.

Although OTI provides numerous citations to Ms. Broadnax's deposition, they are of no import to the Court's review of the record in this matter. Id. at 8-9. At the deposition, counsel for OTI asked Ms. Broadnax numerous questions regarding the NIST tests and how they related to ICAO standards, which OTI claimed were applicable. It should come as no surprise that Ms. Broadnax was unfamiliar with these standards because, as explained above, they are only "draft" standards published after testing by NIST had begun. Indeed, they were never used by NIST to assess OTI's, or any other contract participant's, compliance with the Solicitation. Thus, they are inapplicable to this matter, and any inquiries into these draft standards during Ms. Broadnax's deposition are irrelevant.[3]

[3] OTI appears to infer that Ms. Broadnax could never exercise her independent judgment to eliminate a contract participant from the Solicitation because she lacks technical knowledge regarding the e-Passport program. This is not the law. Indeed, that is why there is a contracting officer's technical representative to assist with technical issues.

OTI also claims that Ms. Broadnax testified that she "did not interface with NIST during the testing" and that she did not provide NIST with a copy of the Solicitation. Pl. Br. at 30. As we previously explained to the Court, DoS was the agency that contracted with NIST for it to conduct certain tests, chief among them durability tests, for the Solicitation. Accordingly, it was DoS that interfaced with NIST and provided NIST with documents such at the Solicitation and the TEMP. Therefore, it is not surprising that Ms. Broadnax did not perform these functions or attend the testing at NIST.[4]

Notwithstanding these irrelevant references to the CO's deposition testimony, the fact remains the same – Ms. Broadnax testified that she exercised her "**independent judgment**" in reviewing the test results for all three contract participants, and in making her decision to eliminate OTI from further consideration. Sept. 11, 2006 Broadnax Dep. at 16. The documents in the administrative record further support this testimony.

The CO's decision was based, in part, upon the NIST test report (AR 188-297) that had been forwarded to her by the GPO's Chief Technical Evaluation Officer ("CTEO") and Contracting Officer's Technical Representative ("COTR"), Richard Grasso. AR 129-303. As the record reflects, OTI failed all of the load modulation tests. Additionally, [

]. AR 39, 41, 44, 131, 183, 229-30; Compl. ¶33.

---

[4] Ms. Broadnax did attend the testing of the contract participant's products during the phases of testing conducted by GPO.

Demonstrating her independent judgment, the CO reviewed both the NIST report and that of the COTR and identified various discrepancies or omissions in the latter report. Sept. 11, 2006 Broadnax Dep. at 16, 18-19. The CO then requested clarification of these issues. AR 8-10. Only after receiving the requested information (AR 11-37) did she exercise her independent judgment that [ ]. Accordingly, the CO notified OTI that its product had failed formal testing at NIST and that, as a result, it would no longer be considered for further procurement. AR 38-39.

The only relevant inquiry for the Court is whether the record reveals a rational basis for GPO's decision [ ]. The record before the Court reveals that the three remaining contract awardees following this Court's prior decision were notified that they would have one final opportunity to submit passport covers for testing that complied with the Solicitation. AR 1-2, 304-06, 312. The record also reveals that all three contractors passed the preliminary phases of testing at GPO, DoS, and APTISS, and that all three contractors' products were forwarded to NIST for testing as contemplated by the Solicitation. The record further reveals that NIST conducted blind testing of the three participant's products without knowing which product was from which contractor (AR 188-297), and that only [ ]. AR 41-42, 308-09, 316-17.

The CO's decision regarding which company was entitled to further contract awards under the Solicitation was a direct result of how the contractors performed during the Solicitation-specified testing process. This process included the blind testing conducted by NIST. The NIST test report, the COTR's report regarding each contractor's performance, and the CO's determination and findings ("D&F") are all contained in the administrative record

currently before the Court. These documents spell out the full reasoning for the CO's, the COTR's, and NIST's conclusions and identify all testing results relied upon as support for their decisions.

Moreover, time was of the essence in this Solicitation given the deadlines for GPO to have the new e-Passport program operational and the delays that had already impacted the Solicitation. Accordingly, as the administrative record reflects, when GPO readmitted OTI and the other two contract participants back into the testing process in December 2005, it notified all three participants that there would not be any further opportunity to remedy any defects in this products should they again fail testing. AR 1-2, 304-06, 312. After receiving notification of this policy in December 2005, neither OTI nor any of the other two contract participants voiced any concern.

Given these facts, there can be no doubt that the CO's decision was rational. Neither OTI nor the Court can substitute its judgment for that of CO, even if reasonable minds could reach differing conclusions, which we do not believe to be the case in this instance. CRC Marine Servs., 41 Fed. Cl. at 83.

## III. OTI Is Not Entitled To Injunctive Relief

Finally, if, despite the fundamental factual and legal shortcomings of OTI's claims for relief, the Court should conclude that it is relevant to consider whether OTI could satisfy the equitable tests for an injunction, this record establishes that the balance of harms tilts against such relief.

**A. The Harm To The United States Resulting From The Grant Of Injunctive Relief To OTI Outweighs Any Harm To OTI**

The burden to justify injunctive relief lies with the protestor and "[c]ourts interfere with the government's procurement process only in extremely limited circumstances." Overstreet Elec. Co., Inc. v. United States, 59 Fed. Cl. 99, 109 (2003). Moreover, OTI must present clear and convincing evidence of its entitlement to extraordinary relief. Cincom Sys., Inc. v. United States, 37 Fed. Cl. 663, 671 (1997); Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991). Unsupported assertions that harm will or will not occur cannot meet that standard. See Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd., 731 F.2d 831, 836 (Fed. Cir. 1984). OTI has failed to meet its onerous burden in this case.

The need for an E-Passport program was driven by Section 303 of the Enhanced Border Security and Visa Entry Reform Act of 2002. 2005 AR 24. The stated purpose of the E-Passport program was threefold: 1) to insure continued international acceptability and interoperability of the United States passports; 2) to recognize that Visa Waiver Program countries will likely impose reciprocal requirements on Americans traveling to their nations; and 3) to improve United States border security. Id. Accordingly, the potential for delay and disruption of this important program if GPO is enjoined should weigh heavily against an injunction.

As the Court observed in Overstreet Electric Co.: “In these times of heightened security at home, as well as lethal hostilities overseas, it is appropriate for the court to weigh in its calculus that the nation can ill afford any temporary, let alone permanent, weakness in national security.” Id. at 118-19 (citing Yakus v. United States, 321 U.S. 414, 440 (1944)). See also Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537 (2005) (determination by court that

reaching the merits of an override decision should be the exception rather than the rule when legitimate interests of national defense and national security are raised and established). Accordingly, in OTI's previous protest this Court recognized that the balance of harm to the United States outweighed any potential harm to OTI when it refused to enjoin the Government from proceeding with the e-Passport program as to the other contract participants. OTI America, Inc. v. United States, 68 Fed. Cl. 646, 660-61 (2005). The balance of harm in this instance, should an injunction be granted – the possible loss of profits by OTI versus the potential harm to national security – dictates that the Court deny OTI's request for injunctive relief.

**B. OTI Will Not Suffer Irreparable Harm If An Injunction Is Not Issued**

Of the prerequisites for injunctive relief, the requirement that a movant show that it will suffer irreparable harm is the most important. Railway Labor Executives' Ass'n v. Gibbons, 448 U.S. 1301 (1980); Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)("[I]rrespective of relative or public harms, a movant must establish . . . irreparable harm."); Illinois Tool Works, Inc. v. Grip-Pak, Inc., 906 F.2d 679, 682 (Fed. Cir. 1990); 11 C. Wright and A. Miller Federal Practice and Procedure § 2948 at 431 (1973). A plaintiff must demonstrate a "likelihood of substantial and immediate irreparable injury," an element requisite to any grant of equitable relief. O'Shea v. Littleton, 414 U.S. 488, 501-03 (1974).

OTI alleges that it "has been and continues to be harmed by GPO's conduct" and that it "would suffer additional and irreparable harm were the procurement to proceed in its absence." Compl. ¶¶ 61, 64, 66. However, nowhere in its complaint does OTI identify this alleged harm. In its motion for judgment on the administrative record OTI contends that it will suffer financially if the Government is not enjoined from proceeding with the production phase of the electronic passport program. Among other things, OTI claims it will suffer "a loss in revenues"

as well as "damage to its reputation as a prospective manufacturer of passports for other countries." Pl. Br. at 36. However, neither of these collateral effects – assuming they actually materialize as OTI predicts – amount to irreparable harm. See Lilly and Co. v. American Cyanamid Co., 82 F.3d 1568, 1578 (Fed. Cir.1996) (holding that economic harm by itself does not establish irreparable harm); Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997) ("However, economic harm without more, does not seem to rise to the level of irreparable injury.") (citing Zenith Radio Corp. v. United States, 710 F.2d 806, 810 (Fed. Cir. 1983)).

OTI has not alleged that elimination from further contract awards under the Solicitation would threaten the survival of its business. To the contrary, it claims that it has "a robust product already in development with a number of government customers." Compl. ¶ 29 (emphasis added). As before, it merely alleges that its reputation might suffer. This is not enough. Thus, OTI has not shown that it will suffer irreparable harm if a permanent injunction is not issued.

### C. Injunctive Relief Would Not Serve The Public Interest

OTI seeks an injunction preventing GPO from proceeding with the production portion of the Solicitation, Pl. Br. at 40; however, the public interest would not be served by such an order. Indeed, in this instance, the public interest favors continuation of the testing process and production portion of the Solicitation for those contractors whose products already have passed testing. As the Solicitation itself makes clear, the e-Passport program is intended to: "Improve the security of the U.S. passport and help strengthen U.S. border security by allowing the Department of Homeland Security to focus its efforts on travelers (Americans and otherwise) with less secure travel documents." 2005 AR 24-25.

In a case such as this, national security interests must be taken into account in fashioning relief. See, e.g., Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 241-42 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harm factor on defendant's side of the scale."); see also Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003) (denying injunctive relief where delay would adversely impact capability of military); Al Ghanim Combined Croup Co. Gen. Trad. & Cont., W.L.L. v. United States, 56 Fed. Cl. 502 (2003) (deferring to national security concerns where there was evidence that "the slightest delay in contract award and execution will have a direct and tangible impact of the military's ability . . . to prepare soldiers for combat"). Given the national security implications of GPO's e-Passport program, the public interest will only be served by allowing GPO to proceed with the production phases of the Solicitation. Additionally, reinserting OTI back into the Solicitation would only delay the testing process given that OTI would have to redesign its product and, when and if that is completed, testing of OTI's product would have to begin again. Accordingly, the Court should deny OTI's request for a permanent injunction.

## CONCLUSION

For the reasons set forth above, the Court should deny plaintiff's motion for judgment upon the administrative record, dismiss plaintiff's complaint, and deny the relief requested.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner

DONALD E. KINNER
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tele: (202) 353-7760
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

September 21, 2006

## CERTIFICATE OF FILING

I hereby certify that on October 25, 2006, an agreed-upon redacted copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD " was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans