**Agreed-Upon Redacted Copy –
May Be Made Public**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 06-571C (Bid Protest)
(Judge Lettow)

OTI AMERICA, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S REPLY IN SUPPORT OF OUR
MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

DONALD E. KINNER
Assistant Director

OF COUNSEL:

JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 353-7760
Facsimile: (202) 305-7643

September 26, 2006

Attorneys for Defendant

## TABLE OF CONTENTS

**PAGE(S)**

I. GPO Did Not Violate Any Procurement Regulations ..... 1

A. The Contracting Officer's Decision Was Rational ..... 1

B. OTI's Claim Of Undisclosed Selection Criteria Is Unfounded ..... 6

C. OTI Has Failed To Demonstrate Any Disparate Treatment ..... 10

D. OTI's Claims Of Incorrect Technical Evaluation Are Unfounded ..... 12

II. OTI Has Not Satisfied the Requirements For Injunctive Relief ..... 13

A. OTI's Claim Of Irreparable Harm Absent An Injunction is Misplaced ..... 14

B. The Harm To The United States From An Injunction Outweighs Any Harm To OTI ..... 15

C. Issuance Of An Injunction Would Not Be In The Public Interest ..... 16

CONCLUSION ..... 18

## TABLE OF AUTHORITIES

## CASES

PAGE(S)

Aero Corp., S.A. v. United States,
38 Fed. Cl. 237 (1997) ........ 16

Al Ghanim Combined Group Co. General Trade & Cont. W.L.L. v. United States,
56 Fed. Cl. 502 (2003) ........ 17

Allied Technology Group, Inc. v. United States,
39 Fed. Cl. 125 (1997), aff'd, 173 F.3d 435 (Fed. Cir. 1998) ........ 9

Avtel Services, Inc. v. United States,
70 Fed. Cl. 173 (2005) ........ 13

Banknote Corp. Of Am., Inc. v. United States,
56 Fed. Cl. 377 (2003) ........ 13

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) ........ 13

CACI, Inc.-Fed. v. United States,
719 F.2d 1567 (Fed. Cir. 1983) ........ 13

CHEMS, Inc. v. United States,
65 Fed. Cl. 473 (2005) ........ 5

CRC Marine Servs. Inc. v. United States,
41 Fed. Cl. 66 (1998) ........ 6

Cardinal Maintenance Services, Inc. v. United States,
63 Fed. Cl. 98 (2004) ........ 15

Custom Printing Co. v. United States,
51 Fed. Cl. 729 (2002) ........ 6

Gentex Corp. v. United States,
58 Fed. Cl. 634 (2003) ........ 11

Impresa Construzioni Geom. Domenico Garufi v. United States,
52 Fed. Cl. 421 (2002) ........ 5

Isratex, Inc. v. United States,
25 Cl. Ct. 223 (1992) ........ 7

Kropp Holdings, Inc. v. United States,
63 Fed. Cl. 537 (2005) ........ 16

Maintenance Engs. v. United States,
50 Fed. Cl. 399 (2001) ........ 13

Minor Metals, Inc. v. United States,
38 Fed. Cl. 379 (1997) ........ 14

NVT Techns., Inc. v. United States,
370 F.3d 1153 (Fed. Cir. 2004) ........ 9

Newsom v. United States,
230 Ct. Cl. 676 F.2d 647 (1982) ........ 10

Norfolk Dredging Co. v. United States,
58 Fed. Cl. 167 (2003) ........ 14

Nuclear Research Corp. v. United States,
814 F.2d 647 (Fed. Cir. 1987) ........ 3

OTI America, Inc. v. United States,
68 Fed. Cl. 646 (2005) ........ 16, 17

Overstreet Elec. Co. v. United States,
47 Fed. Cl. 728 (2000) ........ 13, 15

PGBA, LLC v. United States,
60 Fed. Cl. 196 aff'd, 389 F.3d 1219 (2004) ........ 11

PGBA, LLC v. United States,
389 F.3d at 1225-26 (Fed. Cir. 2004) ........ 13

SDS Int'l, Inc. v. United States,
55 Fed. Cl. 363 (2003) ........ 17

United Payors & United Providers Health Servs.,
55 Fed. Cl. 323 (2002) ........ 14, 17

West Coast General Corp. v. Dalton,
39 F.3d 312 (Fed. Cir. 1994) ........ 3

Yakus v. United States,
321 U.S. 414 (1944) .......................................................................................... 16

**STATUTES**

28 U.S.C. § 1491(b)(4) .......................................................................................... 13

**MISCELLANEOUS**

Gibson & Beardon, AGBCA No. 88-139-1, 93-2 BCA ¶ 25,615,
1992 WL 355512 at 9* (1992) .......................................................................................... 3

PLB Grain Storage Corp., AGBCA No. 89-153-1, 92-1 BCA ¶ 24,731 (1992),
aff'd, 113 F.3d 1257 (Fed. Cir. 1997) (table) .......................................................................... 3

Sperry Rand Corp., Univac Div., No. B-179875, 74-2 C.P.D. (Fed. Pub.) ................................. 7

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**(BID PROTEST)**

| | | |
|---|---|---|
| OTI AMERICA, INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 06-571C<br>(Judge Lettow)<br><br>**Agreed-Upon Redacted Copy – May Be Made Public** |

**DEFENDANT'S REPLY IN SUPPORT OF OUR**
**MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD**

Pursuant to Rule 52.1(b) of the Rules of the United States Court of Federal Claims ("RCFC"), and the Court's order dated August 14, 2006, defendant, the United States, respectfully replies in support of its motion for judgment upon the administrative record. As we demonstrate below, plaintiff, OTI America, Inc. ("OTI"), has failed to carry its "heavy burden" of demonstrating that the decision of the United States Government Printing Office ("GPO") to eliminate OTI from further consideration under the Solicitation had no rational basis or that it was contrary to applicable law.

## I. GPO Did Not Violate Any Procurement Regulations

### A. The Contracting Officer's Decision Was Rational

OTI incorrectly claims that the contracting officer failed to make a "rational independent decision" before eliminating OTI from the competition. Pl. Resp. at 7. In support of its claim, OTI cites to numerous cases for the proposition that the contracting officer, Ms. Broadnax, did not "act with independent judgment," id. at 7-8; however, these cases are inapposite because the

factual predicate for theses cases – that the contracting officer simply carried out a termination directive of a superior – is not present in this case. Indeed, the administrative record and Ms. Broadnax's deposition testimony demonstrate that Ms. Broadnax made her own determination regarding the testing failures of OTI's product and its elimination from further consideration under the Solicitation.

Although OTI provides numerous citations to Ms. Broadnax's deposition, they are of no import to the Court's review of the record in this matter. Id. at 9-11. At the deposition, counsel for OTI asked Ms. Broadnax numerous questions regarding the NIST tests and how they related to ICAO standards, which OTI claimed were applicable. Indeed, counsel for OTI marked several "draft" ICAO standards as exhibits to Ms. Broadnax's deposition.[1] These "draft " standards had just been published in February 2006, after OTI had submitted its product for testing. OTI's counsel then asked Ms. Broadnax numerous questions about how the NIST testing compared to these draft standards which OTI claims are somehow applicable. It should come as no surprise that Ms. Broadnax was unfamiliar with these newly-published "draft" technical reports. Moreover, they were never used by NIST to assess OTI's, or any other contract participant's, compliance with the Solicitation. Thus, they are inapplicable to this matter, and any inquiries into these draft standards during Ms. Broadnax's deposition are irrelevant.

OTI also infers that Ms. Broadnax could never exercise her independent judgment to eliminate a contract participant from the Solicitation because she lacks technical knowledge regarding the e-Passport program. Indeed, OTI claims: "Because Broadnax did not have the

[1] See Exhibits 3, 7, and 10, which were not included with the deposition transcript filed by OTI.

technical knowledge – nor did she attempt to remedy that lack by reading the international standards as set forth in the Solicitation – Broadnax did not exercise independent judgment when evaluating the NIST report." Pl. Resp. at 11. This is not the law. Indeed, while the decision must be that of the CO, "the courts have recognized that **the complexities of Government contracting may require extensive consultation, coordination and other staff assistance**." PLB Grain Storage Corp., AGBCA No. 89-153-1, 92-1 BCA ¶ 24,731 (1992) (termination for default proper even though contracting officer was not primary decision maker and had little or no role in preparing termination decision), aff'd, 113 F.3d 1257 (Fed. Cir. 1997) (table) (emphasis added); see also Gibson & Beardon, AGBCA No. 88-139-1, 93-2 BCA ¶ 25,615, 1992 WL 355512 at 9* (1992) ("the legislative history, however, is consistent with the case law in giving the CO and the agency virtually limitless access to advice, consultation, and staff assistance. It is also clear that the CO need not be the primary decision maker.");[2] cf. Nuclear Research Corp. v. United States, 814 F.2d 647, 649-50 (Fed. Cir. 1987) (decision to terminate valid even though contracting officer originally decided against termination, but later changed his mind after consulting with agency). That is why there is a contracting officer's technical representative ("COTR") and chief technical evaluation officer ("CTEO") to assist with technical issues. In this Solicitation, Richard Grasso, another GPO employee, filled both of these roles.

OTI also claims that Ms. Broadnax testified that she "did not interface with NIST during the testing," "did not provide NIST with a copy of the Solicitation," and "did not confirm that

[2] Although they are not binding upon this Court, decisions of Boards of Contract Appeals are accorded careful consideration because of the Board's expertise in construing Government contracts. See e.g., West Coast General Corp. v. Dalton, 39 F.3d 312, 314-15 (Fed. Cir. 1994).

NIST performed any or all of the required tests pursuant to the ICAO Standards." Pl. Resp. at 10. As we previously explained to the Court, the Department of State ("DoS") was the agency that contracted with NIST for it to conduct certain tests, chief among them durability tests, for the Solicitation. Accordingly, it was DoS that interfaced with NIST and provided NIST with documents such at the Solicitation and the TEMP.[3] Therefore, it is not surprising that Ms. Broadnax did not perform these functions nor attend the testing at NIST.[4] Pl. Resp. at 9.

Notwithstanding these irrelevant references to the CO's deposition testimony, the fact remains the same – Ms. Broadnax testified that she exercised her "**independent judgment**" in reviewing the test results for all three contract participants, and in making her decision to eliminate OTI from further consideration. Sept. 11, 2006 Broadnax Dep. at 16. The documents in the administrative record further support this testimony.

The CO's decision was based, in part, upon the NIST test report (AR 188-297) that had been forwarded to her by Richard Grasso. AR 129-303. As the record reflects, OTI failed all of the load modulation tests. Additionally, [

]. AR 39, 41, 44, 131, 183, 229-30; Compl. ¶33.

---

[3] Contrary to OTI's claim, the TEMP does not contain "undisclosed evaluation criteria" that "DoS gave to NIST." Pl. Resp. at 15. DoS provided NIST with a copy of the Solicitation and asked that it identify the appropriate tests to be performed given the Solicitation's requirements. DoS then incorporated NIST's input into the TEMP, which was merely an internal checklist designed to track the various tests being conducted.

[4] Mr. Grasso also did not attend the testing at NIST. However, Ms. Broadnax did attend the testing of the contract participant's products during the phases of testing conducted by GPO.

Demonstrating her independent judgment, the CO reviewed both the NIST report and that of the COTR and identified various discrepancies or omissions in the latter report. Sept. 11, 2006 Broadnax Dep. at 16, 18-19. The CO then requested clarification of these issues. AR 8-10. Only after receiving the requested information (AR 11-37) did she exercise her independent judgment that [ ]. Accordingly, the CO notified OTI that its product had failed formal testing at NIST and that, as a result, it would no longer be considered for further procurement. AR 38-39.

OTI fails to address these facts and instead focuses on whether Ms. Broadnax could correctly answer certain technical questions such as "whether a force of 1800 Newtons was part of either ICAO or ISO standard [sic]." Pl. Resp. at 10. Indeed, it is irrelevant whether Ms. Broadnax could differentiate between force or fig when it came to Newtons. The contracting officer was entitled to rely upon the expertise of both the COTR and the professionals at NIST that the proper test methods were followed when making her decision as to OTI. Contrary to OTI's claims, the contracting officer's decision to eliminate OTI from further consideration was consistent with the decision in both <u>Impresa Construzioni Geom. Domenico Garufi v. United States</u>, 52 Fed. Cl. 421, 427 (2002), and <u>CHEMS, Inc. v. United States</u>, 65 Fed. Cl. 473 (2005).

The only relevant inquiry for the Court is whether the record reveals a rational basis for GPO's decision [ ]. The record before the Court reveals that the three remaining contract awardees following this Court's prior decision were notified that they would have one final opportunity to submit passport covers for testing that complied with the Solicitation. AR 1-2, 304-06, 312. The record also reveals that all three contractors passed the preliminary phases of testing at GPO, DoS, and

APTISS, and that all three contractors' products were forwarded to NIST for testing as contemplated by the Solicitation. The record further reveals that NIST conducted blind testing of the three participant's products without knowing which product was from which contractor (AR 188-297), and that only [ ]. AR 41-42, 308-09, 316-17.

The CO's decision regarding which company was entitled to further contract awards under the Solicitation was a direct result of how the contract participants performed during the Solicitation-specified testing process. This process included the blind testing conducted by NIST. The NIST test report, the COTR's report regarding each contractor's performance, and the CO's determination and findings ("D&F") are all contained in the administrative record currently before the Court. These documents spell out the full reasoning for the CO's, the COTR's, and NIST's conclusions and identify all testing results relied upon as support for their decisions.

Given these facts, there can be no doubt that the CO's decision was rational. Neither OTI nor the Court can substitute its judgment for that of the CO, even if reasonable minds could reach differing conclusions, which we do not believe to be the case in this instance. <u>CRC Marine Servs. Inc. v. United States</u>, 41 Fed. Cl. 66, 83 (1998).

**B. <u>OTI's Claim Of Undisclosed Selection Criteria Is Unfounded</u>**

To begin, GPO did not rely upon undisclosed selection criteria as alleged by OTI. Pl. Resp. at 12-18. Moreover, OTI's citations to the Federal Acquisition Regulation ("FAR") (<u>id.</u> at 12, 14) are inapposite given that the GPO is not subject to the FAR. <u>Custom Printing Co. v. United States</u>, 51 Fed. Cl. 729, 733, n.8 (2002) (because the GPO is part of the legislative branch of the United States, the FAR does not apply). Accordingly, OTI's discussion of the

requirements for disclosure of the "existence and relative weight of evaluation factors" is of limited import. Pl. Resp. at 14 (emphasis in original).

OTI also cites extensively to this Court's opinion in Isratex, Inc. v. United States, 25 Cl. Ct. 223 (1992); however, that case is distinguishable from the facts here. Indeed, the facts in Isratex are significantly different than those in this case. Accordingly, the relevance of OTI's discussion regarding Isratex is limited. Isratex involved a solicitation for the manufacture of cold weather clothing. The action was brought by a disappointed bidder who claimed that it had been improperly eliminated from the competition because it failed a hydrostatic resistance test which the contracting officer deemed "very important," and failure of which resulted in rejection of the proposed product regardless of any other factor. Id. at 228. The Court sustained the protest because the solicitation did not disclose that the hydrostatic resistence test would be accorded greater weight than any other factor. In doing so, the Court stated: "[W]here one factor is to have predominant consideration over the other factors, this should be disclosed to the offerors." Id. at 230 citing Sperry Rand Corp., Univac Div., No. B-179875, 74-2 C.P.D. (Fed. Pub.) ¶ 158, at 11.

That is exactly what happened in this case. Although there was no specific recitation of how many tests a contract participant could fail and still remain in the competition, none was necessary. The Solicitation required that all submitted products comply with applicable ISO and ICAO standards and failure to do so would result in elimination from further consideration under the Solicitation. Theses are objective standards and thus, it was not difficult to determine who passed and who failed. To the extent that OTI claims that the relative importance of these tests was not disclosed in the Solicitation, OTI is wrong. Indeed, the Solicitation specifically states: "

> The offered cover sheets with the embedded inlays shall be capable of being integrated with the current passport book components to provide a secure and durable completed EP book that shall have a minimum useful life of 10 years. For the purposes of testing the EP Book Cover durability, construction and engineering, the government will consider ISO and Common Criteria Smart Card Security and contact and contactless testing standards as the baseline for EP cover testing. These methods, procedures and standards might include, but are not limited to those specified in C7.2.2.1.
>
> **The selected test methods will be used to evaluate the performance of products from different manufacturers, with preference being given to products that demonstrate greater durability on these test results**.

2005 AR 40 (lines 801-811) (emphasis added). Accordingly, all contract participants were on notice that durability was paramount given that the e-Passports were intended to have a useful life of 10 years. As demonstrated above, the Solicitation in this matter complies with the requirements of this Court's decision in Isratex. Moreover, it was the durability tests conducted by NIST, that OTI failed.

As the administrative record demonstrates, GPO tested the products of all three remaining contract participants [ ] based upon the ISO and ICAO standards in effect at the start of the Solicitation. These standards and recommendations are enumerated in lines 611 through 633 of the Solicitation. 2005 AR 36. See also AR 318-963. Further, the Solicitation explicitly informed all contract participants that the enumerated standards were intended to be the "**baseline**" for testing and that there may be additional tests. 2005 AR 40 (lines 801-07) (emphasis added). Accordingly, all contract participants were on notice as to the standards that would apply and that there might be additional tests. Indeed, the Solicitation further states: "As part of evaluating the durability of the EP Book Cover in Stage 2, DoS though NIST will conduct durability testing. . . . The testing planned during this stage

includes" Impact Testing, Torsion/Flexure Testing, Chemical Resistance Testing, Band Testing, Electromagnetic/Static Electricity Testing, and Environmental Exposure/Cycling Testing. 2005 AR 42-43 (lines 901-928). Thus, there was no ambiguity as to the type of testing that would be conducted.

OTI responds to the explicit notification in the Solicitation that there may be other tests by stating: "Why would OTI ask about the evaluation criteria for durability testing at NIST if the Solicitation contained all the criteria necessary for evaluation." Pl. Resp. at 18. This is a bit of a non sequitur given that the evaluation criteria were contained in the Solicitation. Rather, not all tests were specifically detailed. GPO reserved the right to conduct additional durability tests and to the extent that OTI had questions regarding what tests these were, it had an obligation to ask. Moreover, OTI passed the additional bend test, the Static Bend Test, conducted by NIST. AR 183, 234-35, 301. Accordingly, it was not the basis for eliminating OTI from further consideration under the Solicitation.

To the extent that there was any ambiguity in the Solicitation as to the required testing, it was incumbent upon OTI to clarify that ambiguity prior to the submission of its product under the Solicitation. Indeed, in a bid protest, a challenge to a provision of the solicitation that is apparent on its face must be asserted prior to the time that bids are due; otherwise, such a challenge is untimely. NVT Techns., Inc. v. United States, 370 F.3d 1153, 1162 (Fed. Cir. 2004); Allied Technology Group, Inc. v. United States, 39 Fed. Cl. 125, 146 (1997), aff'd, 173 F.3d 435 (Fed. Cir. 1998). The rationale for this "patent ambiguity" rule is obvious: (1) it prevents a contractor from taking advantage of the Government, and (2) it materially aids in the administration of contracts by requiring that ambiguities be raised before the contract is bid on,

thus avoiding costly litigation after the fact. Newsom v. United States, 230 Ct. Cl. 301, 676 F.2d 647, 649 (1982).

[

]

and reveal that GPO's decision was neither arbitrary nor capricious. Additionally, as explained below, the tests were evenly applied to all contractors.

**C. OTI Has Failed To Demonstrate Any Disparate Treatment**

OTI's claims of disparate treatment as to Axalto are unfounded. Pl. Resp. at 19-20. OTI has not disputed that the testing done by NIST was blind. Moreover, NIST subjected the products of all three remaining contract participants, [ ], to the exact same tests. OTI has not, nor can it, identify anything in the administrative record to show that OTI was subjected to any test that the other two contract participants were not also subjected. Nor can OTI identify any impropriety in the testing procedure from one contract participant to another. [

] Id. The fallacy with OTI's argument is that it fails to acknowledge that 6 kV is the standard that must be met. 2005 AR 166. Indeed, the NIST test report explicitly states: "**The standard ISO test level is 6 kV.**" AR 212 (emphasis added). Moreover, [

]. For the

same reason, the fact that "OTI's product is the only ePassport that successfully passed the ESD test at 15 kV" is irrelevant. Pl. Resp. at 19-20.

[

].

OTI also claims that it suffered from disparate treatment because of a lack of specificity or clarity in the Solicitation. In support of its claim, OTI cites PGBA, LLC v. United States, 60 Fed. Cl. 196, 207, aff'd, 389 F.3d 1219 (2004), for the proposition that lack of clarity in a Solicitation demands the government ask for the same level of performance from each bidder. Pl. Resp at 20-21. That is exactly what transpired in this case. To the extent that there was any ambiguity in the Solicitation regarding the testing to be conducted by NIST, all of the contract participants were operating with the same information. Accordingly, OTI's citation to Gentex Corp. v. United States, 58 Fed. Cl. 634 (2003), for the proposition that the "lack of clarity in the Solicitation 'skew[ed] the playing field' and resulted in disparate treatment," is a non-sequitur. Pl. Resp. at 20. Moreover, all remaining contract participants had the opportunity to ask for clarification if they thought it necessary. OTI never asked for any clarification of the testing procedures at NIST. Additionally, as explained above, all of the contract participants were treated in the identical manner.

**D. <u>OTI's Claims Of Incorrect Technical Evaluation Are Unfounded</u>**

OTI alleges that GPO's decision to eliminate OTI from further contract awards was based upon "incorrect technical evaluations." Pl. Resp. at 21-22. OTI further states: "Given the lack of detail in the NIST report, several plausible explanations exist for OTI's product "failures" in the load modulation testing." <u>Id.</u> at 22. OTI then conjectures as to how NIST might have conducted the testing incorrectly. <u>Id.</u> OTI's claims are unsupported and unfounded. Indeed, OTI provides no record support to its claim that NIST conducted incorrect technical evaluations. Instead, it merely assumes that NIST must have done something wrong if [ ].

As the administrative record makes clear, NIST conducted the load modulation testing of all contract participants' products in accordance with the Solicitation. The NIST test report identifies the applicable ISO standards for such testing, ISO 14443-2 and ISO 10373-6 (AR 212-14), and the results of that testing. AR 289-90. Given that the other two contract participants' products passed the same load modulation testing, the only plausible explanation is not that NIST somehow deviated from the testing procedures it used with the products of the other contract participants, but that OTI's product was defective and did not meet the required specifications.

OTI claims that "GPO's conclusion that OTI failed the LM test, based solely on NIST's technical evaluation with no further explanation, lacked any reasonable, rational basis." Pl. Resp. at 22. However, it is OTI's argument that lacks a "reasonable, rational basis." What was GPO supposed to do when it received the NIST test report – ask "are you sure that you tested OTI's product properly?" As we have explained many times, NIST is an independent third-party agency, retained by DoS, that conducted blind testing of the three remaining contract

participants' products. If GPO can not rely upon the test results from NIST, what can it rely upon? Accordingly, the Court should disregard OTI's claims of incorrect technical evaluation.

## II. OTI Has Not Satisfied The Requirements For Injunctive Relief

Assuming for the sake of argument that the Court concludes that GPO's decision was not rational or that it violated applicable law, OTI is still not entitled to injunctive relief because it has failed to demonstrate that the four equitable requirements are satisfied in this case. Pl. Resp. at 24-30. It is well settled that courts should interfere with the Government procurement process "only in extremely limited circumstances." Avtel Services, Inc. v. United States, 70 Fed. Cl. 173, 226 (2005) citing Banknote Corp. Of Am., Inc. v. United States, 56 Fed. Cl. 377, 380 (2003) (quoting CACI, Inc.-Fed. v. United States, 719 F.2d 1567, 1581 (Fed. Cir. 1983)). OTI must present clear and convincing evidence of its entitlement to extraordinary relief. Maintenance Engs. v. United States, 50 Fed. Cl. 399, 426 (2001) (citing Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 732 (2000)); see also Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991).

Moreover, as this Court recognized in Avtel, the Federal Circuit has stated: "[E]ven if a trial court finds that the government's actions in soliciting and awarding a contract were arbitrary, capricious, or not in accordance with law, the trial court retains discretion on whether to issue an injunction." 70 Fed. Cl. at 226 (citing PGBA, LLC v. United States, 389 F.3d at 1225-26 (Fed. Cir. 2004) (finding that trial court retains discretion in deciding whether injunctive relief is appropriate and that 28 U.S.C. § 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract). As we demonstrate below, OTI has failed to carry its burden that this is one of those "extremely limited circumstances" where the Court should involve itself.

### A. OTI's Claim Of Irreparable Harm Absent An Injunction Is Misplaced

As we explained in our motion, this Court has previously held that mere economic harm cannot establish irreparable harm. Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381 (1997) (holding that economic harm, without more, does not rise to the level of irreparable injury). In response, OTI cites Norfolk Dredging Co. v. United States, 58 Fed. Cl. 167 (2003), which was reversed on appeal, noting that it distinguished Minor Metals and "questions its fundamental premise that economic harm, may never rise to the level of irreparable injury." Pl. Resp. at 24. One thing is clear, unlike the decision in Norfolk Dredging, the holding in Minor Metals has not been overturned.

OTI cites several other cases in support of its claim of irreparable harm, none of which are binding on this Court. See Pl. Resp. at 24-27. Although several recent cases have held that lost profit can constitute irreparable harm, that is by no means always the case. See United Payors & United Providers Health Servs., 55 Fed. Cl. 323, 333 (2002) ("[t]his type of loss, deriving from a lost opportunity to compete on a level playing field for a contract, **has been found** sufficient to prove irreparable harm") (internal citations omitted) (emphasis added). Indeed, none of the cases cited by OTI stand for the proposition that the potential for lost profits always equates to irreparable harm.

In this instance, OTI assumes that it will suffer irreparable harm if it is not reinserted into the competition because it will not be awarded the ultimate production contract envisioned by CLIN 6 of the Solicitation. However, OTI repeatedly has failed to submit a product that meets the Solicitation's requirements and there is no reason to believe that it will do so if given another opportunity. Accordingly, OTI has failed to demonstrate by clear and convincing evidence that it will suffer irreparable harm if an injunction is not issued.

**B. The Harm To The United States From An Injunction Outweighs Any Harm To OTI**

OTI claims that any harm to it "far outweighs" any harm to the Government. Pl. Resp. at 27. In support of this proposition, OTI cites several cases, none of which involved solicitations where either national defense or national security issues were present. Id. For instance, OTI cites Cardinal Maintenance Services, Inc. v. United States, 63 Fed. Cl. 98, 110 (2004), in support of its claim of harm; however, that case involved a contract for custodial services at an Air Force base in Hawaii. The subject of the Solicitation in this case – e-Passports – has far greater ramifications for the people of the United States.

The need for an e-Passport program was driven by Section 303 of the Enhanced Border Security and Visa Entry Reform Act of 2002. 2005 AR 24. The stated purpose of the e-Passport program is threefold: 1) to insure continued international acceptability and interoperability of the United States passports; 2) to recognize that Visa Waiver Program countries will likely impose reciprocal requirements on Americans traveling to their nations; and 3) to improve United States border security. Id. Accordingly, the potential for delay and disruption of this important program if GPO is enjoined outweighs any harm claimed by OTI.

As the Court observed in Overstreet Electric Co.: "In these times of heightened security at home, as well as lethal hostilities overseas, it is appropriate for the court to weigh in its calculus that the nation can ill afford any temporary, let alone permanent, weakness in national security." Id. at 118-19 (citing Yakus v. United States, 321 U.S. 414, 440 (1944)). See also Kropp Holdings, Inc. v. United States, 63 Fed. Cl. 537 (2005) (determination by court that reaching the merits of an override decision should be the exception rather than the rule when legitimate interests of national defense and national security are raised and established).

Accordingly, in OTI's previous protest this Court recognized that the balance of harm to the United States outweighed any potential harm to OTI when it refused to enjoin the Government from proceeding with the e-Passport program as to the other contract participants. OTI America, Inc. v. United States, 68 Fed. Cl. 646, 660-61 (2005).

OTI has not established how any harm it may suffer by not obtaining a permanent injunction is greater than the harm that the Government will suffer from a delay in the continuation of its e-Passport program. Indeed, the harm to the Government and its citizens from the issuance of a permanent injunction affecting the production portion of the Solicitation clearly outweighs any speculative harm that might be suffered by OTI. In a case such as this, national security interests must be taken into account. See, e.g., Aero Corp., S.A. v. United States, 38 Fed. Cl. 237, 241-42 (1997) ("The fact that a delay in the conduct of this procurement would raise national defense concerns clearly places the weight of the balance-of-harm factor on defendant's side of the scale."). The balance of harm in this instance, should an injunction be granted – the possible loss of profits by OTI versus the potential harm to national security – dictates that the Court deny OTI's request for injunctive relief.

**C. Issuance Of An Injunction Would Not Be In The Public Interest**

OTI responds to our motion wherein we demonstrated that an injunction in this case would **not** be in the public interest by offering the same cases it has in the past for the proposition that by granting the requested injunctive relief "public confidence in the competitive process will be preserved." Pl. Br. at 28 (citing United Payors & United Providers Health Servs., 55 Fed. Cl. 323 (2002)). Similarly, OTI cites to this Courts' decision in Al Ghanim Combined Group Co. General Trade & Cont. W.L.L. v. United States, 56 Fed. Cl. 502 (2003), in support of this same proposition. However, OTI fails to acknowledge that in Al Ghanim, this Court held

that the protestor was **not** entitled to an injunction requiring the Army Corps of Engineers to resolicit a construction contract for military facilities in Kuwait, **even though the disappointed bidder prevailed on the merits of its claim** that the Corps violated applicable procurement regulation **and established that it would suffer irreparable harm if not granted injunctive relief**. Id. at 520-22. The Court did so based upon the United States' argument that an injunction could negatively impact national security. Id. at 521-22. ("Defendant's national security argument is of paramount import.") (citing SDS Int'l, Inc. v. United States, 55 Fed. Cl. 363, 365-66 (2003)). Accordingly, the Court held that "concerns of national security supersede plaintiff's entitlement to injunctive relief." Id. at 522.

This Court, as it did in Al Ghanim, recognized this same principle in its decision in OTI's previous bid protest when it stated: "Strong national defense and security interests are present in this case." OTI America, 68 Fed. Cl. at 659. Accordingly, the Court held that "any delay in the program would negatively affect border security of the United States" and that it would not constrain the Government from proceeding with the procurement. Id. at 660-61. As before, the public interest will only be served if GPO is permitted to continue with the production portion of the Solicitation.

OTI claims that our argument that an injunction would not be in the public interest "rests solely on the erroneous assumption that OTI seeks a complete halt to the ePassport program." Pl. Resp. at 28. However, that is exactly what OTI is asking this Court to do. Not only is OTI asking the Court "to reinstate OTI into the selection process," it also seeks an injunction "**enjoining GPO from granting any further production portions of the contract** unless and until OTI is permitted to participate in this procurement and is fully and fairly evaluated on a level playing field with other contractors." Id. at 30 (emphasis added). [

].

Moreover, GPO will need to be able to award additional production orders for additional passport covers in the coming months in order to meet the continuing demand for e-Passports. Were the Court to grant OTI's motion for an injunction, GPO would not be able to meet this ongoing demand, and the e-Passport program would grind to a screeching halt.

Given the national security implications of GPO's e-Passport program, the public interest will only be served by allowing GPO to proceed with the production phase of the Solicitation. Additionally, reinserting OTI back into the Solicitation would only delay the testing process given that OTI would have to redesign its product and, when and if that is completed, testing of OTI's product would have to begin again.[5] Accordingly, the Court should deny OTI's request for a permanent injunction.

**CONCLUSION**

For the reasons given above and in our moving brief, we respectfully request that the Court enter judgment for defendant upon the administrative record, dismiss plaintiff's complaint, and deny the relief requested.

---

[5] In its response, OTI states that it does not wish to "resubmit products to remedy alleged defects." Pl. Resp. at 10, n.12. Rather, OTI seeks an order from the Court directing GPO (and, therefore, NIST) to conduct the tests OTI deems appropriate. Were this to occur, the Court would no doubt be entering into the realm of contract administration, something the Court was concerned about during the TRO hearing last month. See August 9, 2006 Tr. 25-26. Moreover, such an order would ensure disparate treatment among the contract participants.

Respectfully Submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/Donald E. Kinner

DONALD E. KINNER
Assistant Director

s/Richard B. Evans

RICHARD B. EVANS
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tele: (202) 353-7760
Fax: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:
JENNIFER R. SEIFERT
Assistant General Counsel
Government Printing Office

September 26, 2006

CERTIFICATE OF FILING

I hereby certify that on October 25, 2006, an agreed-upon redacted copy of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF OUR MOTION FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Richard B. Evans