# In the United States Court of Federal Claims

No. 06-571C

(Filed Under Seal: October 31, 2006)
(Reissued: November 8, 2006)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * | ) | Deselection bid protest; cross-motions for judgment upon the administrative record; multiple-award contracts with the Government Printing Office for development of devices and materials for electronic passports, preparation and testing of prototypical materials for use in electronic passports, and production of such materials; application of the technical testing criteria for materials to be used with electronic passports |
| OTI AMERICA, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| UNITED STATES, | ) | |
| Defendant. | ) | |
| * * * * * * * * * * * * * * * * * * * * * | | |

William M. Weisberg, Sullivan & Worcester LLP, Washington, D.C. for plaintiff. With him on the briefs was Beth L. Jacobson, and on the briefs and at the hearing was Joyce L. Tong, Sullivan & Worcester LLP, Boston, MA.

Richard B. Evans, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Assistant Attorney General Peter D. Keisler, David M. Cohen, Director, Commercial Litigation Branch, and Donald E. Kinner, Assistant Director, Washington, D.C. Of counsel was Jennifer R. Seifert, Assistant General Counsel, Government Printing Office, Washington, D.C.

## OPINION AND ORDER[1]

---

[1]This opinion and order as initially rendered contained "confidential or proprietary information" within the meaning of Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, and the protective order issued in this case on August 10, 2006. Accordingly, it was first filed under seal. The parties were requested to review the decision and provide proposed redactions of any such confidential or proprietary information on or before November 6, 2006. After receipt and consideration of the proposals, the decision was redacted for publication.

LETTOW, Judge.

This bid protest concerns contracts issued by the Government Printing Office ("GPO"), in partnership with the Department of State ("State Department") and the Department of Homeland Security ("DHS") for the development of electronic passports on a multi-stage, multi-awardee basis. Under the procurement, GPO awarded eight entities, including plaintiff OTI America, Inc. ("OTI"), identical contracts to develop prototypes of electronic passport book covers or other sheets ("sheets") with embedded integrated circuit chips. If an awardee then passed a series of test stages, it would be eligible to receive orders to produce sheets bearing electronic chips for use in a pilot passport program and, ultimately, for full production of electronic materials for all new U.S. passports.

This is the second time OTI has been before the court challenging an action by GPO under the matching contracts. In November 2005, this court considered a bid protest by OTI after OTI had been eliminated from the multi-contractor competition and granted partial relief, ordering that OTI be reinstated into the competition and that GPO "resume testing OTI's products at the same stage at which OTI was eliminated." *OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 661 (2005) ("*OTI II*").[2] GPO duly reinstated OTI along with another contractor that had been eliminated, and thereafter resumed testing the prototype products of OTI, the other contractor that was reinstated, and one other contractor that remained viable in the competition at the testing stage.[3] The products of OTI and the other two contractors successfully passed the intermediate testing stages and advanced to the final stage. At that point, OTI and one of the other two contractors were eliminated from the competition because of test failures.

---

Redactions are represented by brackets enclosing asterisks "[****]."

[2]This court determined that it had jurisdiction under 28 U.S.C. § 1491(b) to hear the previous bid protest filed by OTI, even though the protest "[did] not fit neatly into either of the two standard categories of such cases, *i.e.*, a pre-award protest of a proposed procurement or a post-award protest of a contractual award," *OTI America, Inc. v. United* States, 68 Fed. Cl. 108, 109 (2005) ("*OTI I*"), because "a set of identically phrased contracts [were being] used by a procuring agency as a means of winnowing candidates for a procurement to determine which candidate or candidates will receive or share the ultimate award." *Id*. at 117. Consequently, jurisdiction existed under the third, concluding portion of the first sentence of paragraph (1) of Subsection 1491(b) to consider the dispute as a bid protest. *Id*. (referring to the last clause of the first sentence of 28 U.S.C. § 1491(b)(1), *viz*., "an action . . . objecting . . . to . . . any alleged violation of statute or regulation in connection with a procurement or proposed procurement.").

[3]One other contracting competitor, [****], had proceeded through all of the testing stages and had received orders for electronic devices and associated materials to be used in a pilot program. That competitor has now received additional orders for production of electronic materials for general use with new U.S. electronic passports. Hr'g Tr. 17:23-18:25 (Aug. 9, 2006).

OTI then filed this further bid protest on August 4, 2006. In its complaint, OTI alleged that GPO's decision to eliminate OTI from the competition was contrary to law, lacked a rational basis, and relied on undisclosed selection criteria. Compl. at 1. OTI requested an injunction requiring GPO to reinstate OTI into the competition, a temporary restraining order pending the court's consideration of its request for a preliminary injunction, and a preliminary injunction pending final judgment on the merits in this case. Compl. at 1; Pl.'s Emergency Mot. for Temporary Restraining Order and Preliminary Injunction at 1. The government filed a motion to dismiss on August 8, 2006, arguing that this court lacked subject matter jurisdiction to hear OTI's claims, but in light of the court's jurisdictional ruling in *OTI I*, the government subsequently withdrew that motion on September 18, 2006. By an order dated August 10, 2006, this court denied OTI's application for a temporary restraining order, and on August 14, 2006, the court adopted an expedited schedule for submitting the administrative record and for filing cross-motions for judgment on the administrative record.[4] A hearing on the cross-motions for judgment was held on September 28, 2006, and supplemental filings were received on October 6 and 12, 2006.

For the reasons set forth below, the government's motion for judgment on the administrative record is granted and plaintiff's motion for judgment on the administrative record is denied.

## FACTS[5]

### A. Background

As part of a cooperative effort with the State Department and DHS to develop an electronic U.S. passport, GPO issued Solicitation GPO-EP2004 ("Solicitation") on July 12, 2004. 2005 Administrative Record ("2005 AR") 4, 24 (Solicitation § C1.1). By replacing traditional passports with electronic ones, the government aims to "enhance the security of the passport and facilitate the movement of travelers at points of entry." 2005 AR 24 (Solicitation § C1.1). To accomplish these goals, the Solicitation required offerors to provide passport book covers or sheets that contained an "[integrated circuit]/antenna assembly in a protective plastic envelope," as well as associated electronic "reader/writers." 2005 AR 24, 27 (Solicitation §§ C1.1, C1.3.2).

The government's decision to use electronic passports was related to the requirements of the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. L. No. 107-173, 116 Stat. 543 (2002) ("Enhanced Border Security Act") (codified, as amended, at 8 U.S.C. §§ 1701-1775). 2005 AR 24 (Solicitation § C1.1). Section 303 of that Act required each foreign country

---

[4]The administrative record from *OTI I* and *OTI II* also was incorporated into the administrative record of this case. *See* Hr'g Tr. 38:3-17 (Aug. 9, 2006).

[5]The recitations that follow constitute findings of fact by the court drawn either from the administrative record of the procurement, a deposition of the contracting officer in this case, or the parties' submissions regarding equitable relief.

participating in the Visa Waiver Program[6] to certify by October 26, 2004 that it had in place a program to issue electronic passports compliant with standards established by the International Civil Aviation Organization ("ICAO"). Enhanced Border Security Act § 303(c)(1), 116 Stat. at 554 (codified, as amended, at 8 U.S.C. § 1732); *see also* 8 U.S.C. § 1187 (2002) (providing the statutory basis for the Visa Waiver Program).[7] Thus, citizens of countries participating in the Visa Waiver Program generally would only be permitted to travel to the United States without a visa if they held ICAO-compliant electronic passports. *See* Enhanced Border Security Act § 303(c)(1), 116 Stat. at 554 (codified, as amended, at 8 U.S.C. § 1732(c)(1)); 8 U.S.C. § 1187.

When it became apparent that participating countries would not be able to meet the Visa Waiver Program's October 2004 deadline, Congress, at the urging of the State Department and DHS, extended the deadline to October 26, 2005. Def.'s Mot. for Judgment on the Administrative Record at 4 ("Def.'s Mot."); Act of Aug. 9, 2004, Pub. L. No. 108-299, §1, 118 Stat. 1100 (2004) (amending 8 U.S.C. § 1732). Roughly ten months later, recognizing that few, if any, participants in the Visa Waiver Program would be able to meet the extended deadline, the Secretary of DHS announced on June 15, 2005, that participating countries would be required to produce passports with electronic photographs by October 26, 2005 and to present an "acceptable plan" to issue passports with integrated circuit chips by October 26, 2006. Def.'s Mot. at 4; Def.'s Mot. to Dismiss Protest at 4.[8] Although the United States is not itself obliged to comply with the requirements of the Enhanced Border Security Act, in the interest of enhanced border security, international comity, and reciprocity, it is implementing its own electronic passport program to meet the same requirements as those applicable to countries participating in the Visa Waiver Program. Def.'s Mot. at 5; 2005 AR at 24-25 (Solicitation § C1.1).

To reduce risk to the government, the Solicitation was designed as a "multi-[o]fferor, multi-option procurement," 2005 AR 29 (Solicitation § C3), under which contracts would be awarded to multiple offerors, calling for completion of various sequential developmental and testing stages, with the ultimate goal of making a "high volume purchase of book covers . . . from one awardee and lower volume purchases of book cover[s] . . . from the other awardees." 2005

---

[6]The Visa Waiver Program allows foreign nationals from designated countries to be admitted to the United States without first obtaining a non-immigrant visa, provided that the proposed visit is for 90 days or fewer, the purpose of the visit is for business or pleasure, and the applicant meets certain security prerequisites. *See* Visa Waiver Permanent Program Act, Pub. L. No. 106-396, 114 Stat. 1637, 1637-45 (codified, as amended, at 8 U.S.C. § 1187).

[7]The International Civil Aviation Organization is a United Nations agency that develops standards to promote safety and efficiency in international civil aviation. *See Making an ICAO Standard*, http://www.icao.int/icao/en/m_about.html (last visited Oct. 26, 2006).

[8]The government states that the Secretary of DHS, under Section 217 of the Immigration and Naturalization Act, has the authority to "establish conditions [under the Visa Waiver Program] to protect United States law enforcement and security interests." Def.'s Mot. at 5.

AR 27 (Solicitation § C1.2.8).[9] The Solicitation noted that the purpose of the procurement was to enable the introduction of a new U.S. passport that was "an internationally interoperable [electronic passport] compliant with the recommendations of the [ICAO]." 2005 AR 29 (Solicitation § C2). A footnote in the Solicitation stated that the "latest versions of most of the [ICAO recommendations] are available at http://www.icao.int/mrtd/Home/Index.cfm" and that "[t]hose not yet publicly available w[ould] be provided." 2005 AR 36 (Solicitation § C7.2.2.1 n.1). Under the Solicitation, contract awards would be based on the proposals that offered the best value in terms of price and technical factors. 2005 AR 207 (Solicitation § M.4.3). The Solicitation was for a one-year contract, plus four optional one-year contracts, and listed a series of contract line item numbers ("CLINs") that spanned the entire five-year period. 2005 AR 25, 7-18 (Solicitation §§ C1.2.1, B3). These CLINs identified particular products or services that GPO would order under the various phases of the contract. 2005 AR 7-18 (Solicitation § B3).

The procurement involved three phases. Phase I was geared toward testing prototype electronic passports for a pilot program under which the passports would initially be issued to U.S. government employees and eventually to a limited number of private U.S. citizens. 2005 AR 27-28 (Solicitation §§ C1.3.2-C1.3.3). Under Phase II, the government conducted the pilot program and prepared for the final phase. 2005 AR 28 (Solicitation § C1.3.3). Phase III, known as "full agency deployment," has yet to be undertaken, and involves the introduction of the new passports to all domestic passport agencies, with the goal of issuing all new passports as electronic passports. 2005 AR 28 (Solicitation § C1.3.4). This controversy involves the later elements of testing in Phase I even though the government has moved to Phase II and is preparing to move to Phase III in reliance on electronic materials produced by a contractor whose products are not at issue here. *See supra*, at 2 n.3.

The testing at issue was performed by the National Institute of Standards and Technology ("NIST") "to investigate the durability of the Offeror's product in a finished [electronic passport] book." 2005 AR 206 (Solicitation § M.2.2); *see also* 2006 AR 40-41 (Letter from Albertha M. Broadnax, Contracting Officer, to Ohad Bashan, President and CEO, OTI (Jul. 26, 2006)). The Solicitation outlined six durability tests that NIST would perform: impact testing, torsion/flexure testing, chemical resistance resting, bend testing, electromagnetic/static electricity testing, and environmental exposure/cycling testing. 2005 AR 42-43 (Solicitation § C7.2.3.1).[10] Based on

---

[9]The Solicitation was incorporated into each of the matching contracts, including OTI's, and accordingly continues to provide the lodestar for GPO's actions under the contracts. *See e.g.*, 2005 AR 209 (E-mail from Albertha M. Broadnax, Contracting Officer, to Ohad Bashan, President and CEO, OTI (Dec. 20, 2004)) (explaining that GPO's contract award to OTI in December 2005 would be "under the terms and conditions of [OTI's] proposal to the GPO in response to Solicitation GPO-EP2004").

[10]The executive summary of the NIST report detailing the test results notes that the "results section" of the report includes cross references to the "Test and Evaluation Master Plan (TEMP) . . . drawn up by the [State Department]." 2006 AR 190 (Memorandum from Richard

the results of these tests, GPO would determine which contractors were eligible to receive CLIN 0005 – namely, an order of up to 60,000 electronic passport-book sheets for use in a pilot program. 2005 AR 8, 26 (Solicitation §§ B3, C1.2.6, C1.2.7).

During a further stage of the testing, passport books assembled with the electronic sheets that GPO ordered under CLIN 0005 would be field tested during two pilot programs: an initial one where electronic passports would be issued only to U.S. government employees and a subsequent one where a single domestic passport agency would issue the passports to private U.S. citizens. 2005 AR 26, 28, 44 (Solicitation §§ C1.2.6, C1.2.7, C1.3.3, C7.2.3.1). Additional laboratory testing of the electronic passport-book materials was possible during this stage. 2005 AR 44 (Solicitation § C7.2.3.1).[11] Under a final stage, the government reserved the right to conduct a series of "verifications" to test the electronic-book materials' durability, functionality, and quality. 2005 AR 44 (Solicitation § C7.2.3.1).[12] Upon an offeror's successful completion of the final stage, GPO would move to "full agency deployment," under which it would exercise its option under CLIN 0006 to order up to three million electronic passport-book sheets from that contractor. 2005 AR 9, 28, 206 (Solicitation §§ B3, C1.3.4, M.2.2). At that point, all "domestic [passport] issuance agencies" would begin to issue exclusively the new electronic passports to meet the expected demand of eight million per year. 2005 AR 28 (Solicitation § C1.3.4).

---

Grasso, Chief Technical Evaluation Officer and Contracting Officer Technical Representative, GPO, to Broadnax, Attachment I (Interim Report to the U.S. Department of State on Stage 2 Testing for Durability of Proposed Electronic Passports) ("NIST Report") (Jun. 27, 2006)). The NIST report contains references to several TEMP "Item" numbers, including Items 17, 27, 79, 107 and 125. *See, e.g.*, 2006 AR 230, 235, 297. The government contends that the TEMP is the "E-Passport Vendor Product (Stage II) Test & Evaluation Plan" in the administrative record of 2005. Def.'s Resp. to Pl.'s Emergency Renewed Mot. for Leave of Court to Supplement Administrative Record at 6; *see* 2005 AR 279-373 ("Test & Evaluation Plan"). The test and evaluation plan to which the government refers does contain "item numbers," including the ones to which the NIST report refers, but the title of the plan does not include the word "Master" and is marked "DRAFT Version 0.91a," raising a question as to whether this plan is in fact the TEMP. *Compare* 2005 AR 279 (Test & Evaluation Plan), *with* 2006 AR 190, 297 (NIST Report). Nonetheless, responding to the court's request that the government verify whether the test and evaluation plan of 2005 was the TEMP to which the NIST report refers, the government represented that with the exception of Item 21, "IC Assembly Tolerance to Electromagnetic, Physical, Mechanical Effects," the 2005 document accurately represents the TEMP. Def.'s Notice of Filing (Oct. 12, 2006) at 1.

[11]Thus, the further testing would coincide with Phase II of the procurement. 2005 AR 28 (Solicitation § C1.3.3).

[12]The last stage of testing of testing would coincide with Phase III of the procurement. 2005 AR 28 (Solicitation § C1.3.4).

### B. OTI's Reinstatement, Renewed Testing, and Subsequent Deselection

After OTI had been "deselected" from further participation in May 2005, *see* 2005 AR 226 (Letter from Broadnax to Bashan (May 18, 2005)), and after OTI had prevailed in a bid protest with the result that this court ordered that OTI be reinserted into the procurement process, *see OTI II*, 68 Fed. Cl. at 660-61,[13] Ms. Broadnax informed OTI on December 15, 2005, that it was being reinstated into the electronic passport procurement. 2006 AR 1 (Letter from Broadnax to Bashan (Dec. 15, 2005)). GPO also reinserted two other competitors, [****] and [****]. 2006 AR 304-05 (Letter from Broadnax to [****] (Dec. 20, 2005)); 2006 AR 312 (Letter from Broadnax to [****] (Dec. 6, 2005)). Ms. Broadnax's letter to OTI indicated that OTI's passport book materials would be evaluated only on the basis of the criteria in the Solicitation and that due to the time constraints under which the electronic passport program was operating, OTI would have no additional opportunities to cure any defects in its samples. 2006 AR 1-2 (Letter from Broadnax to Bashan (Dec. 15, 2005)).

OTI resubmitted passport book materials for testing on January 6, 2006. *See* 2006 AR 3 (E-mail from Broadnax to Michael Emery, Director of the Passport and Postcard Section, GPO, and Grasso, GPO (Dec. 20, 2005); 2006 AR 4 (E-mail from Bashan to Grasso (Jan. 24, 2006)). OTI's prototypes, along with those of [****] and [****], were evaluated in the next testing regimes for Phase I. 2006 AR 40-41 (Letter from Broadnax to Bashan (Jul. 26, 2006)); 2006 AR 308 (Letter from Broadnax to [****] (Jul. 14, 2006)); 2006 AR 315-16 (Letter from Broadnax to [****] (Jul. 26, 2006)).

Following these first tests, all of which OTI's, [****]'s, and [****]'s prototype materials completed successfully,[14] these three contractors' prototypes were submitted to NIST for blind testing under the final segment of Phase I. 2006 AR 40-41 (Letter from Broadnax to Bashan (Jul. 26, 2006)); 2006 AR 308-09 (Letter from Broadnax to [****] (Jul. 14, 2006)); 2006 AR 315-16 (Letter from Broadnax to [****] (Jul. 26, 2006)); Def.'s Mot. at 9. OTI's product failed the electromagnetic tests for load modulation at the lowest signal level (this test measures the signal level of the integrated circuit as it responds to an electronic passport reader). 2006 AR 183, 212 (Memorandum from Grasso to Broadnax, Attachments H (Chart Compiling All Test Results))

---

[13]Although this court ordered GPO to reinsert OTI into the procurement process, the court denied OTI's "principal request for injunctive relief," *i.e.,* an order halting the pilot program until OTI could seek to qualify its product for a CLIN 0005 order. *OTI II,* 68 Fed. Cl. at 660.

[14]OTI's and [****]'s prototypes passed all portions of these tests. 2006 AR 40-41 (Letter from Broadnax to Bashan (Jul. 26, 2006)); 2006 AR 132 (Memorandum from Grasso to Broadnax (Jun. 27, 2006)); 2006 AR 308 (Letter from Broadnax to [****] (Jul. 14, 2006)). [****]'s materials passed the initial segments, but failed an intermediate segment because [****]. Nonetheless, those [****] prototypes [****] moved on to the next segments, which they passed. 2006 AR 315-16 (Letter from Broadnax [****] (Jul. 26, 2006)).

("Test Results"), I ("NIST Report") (Jun. 27, 2006)).[15] OTI's passport-book materials also faired poorly on two of the impact tests for durability, which tests are intended to determine the effect of hand stamps on the integrated circuits embedded in the books. 2006 AR 183 (Test Results), 195 (NIST Report). OTI passed two of five "impact edge steel" tests and three of five "impact point steel" tests. 2006 AR 183 (Test Results). Finally, OTI passed two of five "dynamic bend" tests, which are designed to mimic the bending forces electronic passports are likely to undergo during normal usage. 2006 AR 183 (Test Results), 207 (NIST Report).

GPO determined that [****]'s prototype materials passed the tests administered by NIST, 2006 AR 308 (Letter from Broadnax to [****] (Jul. 14, 2006)), 183 (Test Results), although that contractor's samples failed a particular electrostatic discharge test. 2006 AR 192 (Memorandum from Grasso to Broadnax) (Jun. 27, 2006).[16] GPO found that [****]'s prototypes failed the NIST tests. 2006 AR 315-16 (Letter from Broadnax to [****] (Jul. 26, 2006)). [****]'s materials performed poorly on the load modulation test at the lowest signal level, with only seven of ten chips functioning under the test conditions. 2006 AR 183 (Test Results); 2006 AR 315-16 (Letter from Broadnax to [****] (Jul. 26, 2006)). Respecting durability, [****]'s materials passed four of five "impact flat steel" tests, one of five "impact edge steel" tests, three of five "impact point steel" tests, and four of five "dynamic bend" tests. 2006 AR 183 (Test Results); 2006 AR 315-16 (Letter from Broadnax to [****] (Jul. 26, 2006)).

In a memorandum dated June 27, 2006, Richard Grasso, GPO's Chief Technical Evaluation Officer and Contracting Officer Technical Representative, conveyed OTI's test results to Ms. Broadnax and transmitted, among other things, the NIST-authored report on those tests. 2006 AR 130-32 (Memorandum from Grasso to Broadnax (Jun. 27, 2006)); *see* 2006 AR 188-297 (NIST Report). Based on the NIST test results, Mr. Grasso recommended that OTI not be awarded a CLIN 0005 contract for an electronic passport pilot program. 2006 AR 131-32 (Memorandum from Grasso to Broadnax (Jun. 27, 2006)). Ms. Broadnax reviewed the Solicitation, compared Mr. Grasso's memorandum to the NIST report, and spoke with Mr. Grasso to clarify certain issues that she believed were not explicitly covered in his memorandum. Pl.'s Am. Mem. in Support of Mot. for Judgment on the Administrative Record ("Pl.'s Am. Mem."), App. A (Deposition of Broadnax) (Sept. 11, 2006) ("Broadnax Dep.") at 16:8-19, 18:6-11; 2006 AR 8-9 (E-mail from Broadnax to Grasso (Jul. 11, 2006)). In a letter

---

[15]In very simplistic terms, the electronic passport reader creates a magnetic field that supplies energy to the chip embedded in an electronic passport. The chip modulates the carrier frequency of the field and transmits that modulated frequency to the reader so the reader can translate (demodulate) the electronic data on the chip. An antenna affixed to the chip serves the purpose of taking in the energy from the reader and returning the modulated load of energy at a specific frequency to the reader. Hr'g Tr. 39:25 to 40:5, 51:2 to 53:7 (Sept. 28, 2006).

[16]OTI's prototypes passed this particular electrostatic discharge test, 2006 AR 193 (Memorandum from Grasso to Broadnax) (Jun. 27, 2006), but [****]'s materials, like [****]'s, failed it. 2006 AR 191 (Memorandum from Grasso to Broadnax) (Jun. 27, 2006).

dated July 26, 2006, Ms. Broadnax informed OTI that, based on the performance of OTI's passport-book materials in the tests conducted by NIST, OTI would not be "eligible to receive CLIN 0005 orders." 2006 AR 38-39 (Letter from Broadnax to Bashan (Jul. 26, 2006)).

**C. Procedural History**

On August 4, 2006, OTI filed a new bid protest. In accord with 28 U.S.C. § 1491(b)(3),[17] this court promptly consulted with the parties and adopted an accelerated briefing and hearing schedule.

Following the government's filing of the administrative record on August 18, 2006, OTI filed a motion to supplement the administrative record on August 24, 2006. The government filed its response to that motion on August 29, 2006, and OTI filed its reply to the government's response on September 1, 2006. On September 6, 2006, this court held a hearing on that motion and granted in part OTI's motion to supplement the administrative record by permitting OTI to depose GPO's contracting officer.[18] This court also requested that the government provide to the court the text of certain international scientific standards to which the solicitation referred.

On September 12, 2006, OTI filed a renewed emergency motion to supplement the administrative record, claiming that its deposition of the contracting officer uncovered information that warranted the court's granting leave to depose GPO's chief technical evaluation officer and that the administrative record should be further supplemented with inclusion of the Test and Evaluation Master Plan ("TEMP"), a document NIST allegedly used as a reference in conducting tests on the passport book covers. Pl.'s Mem. in Support of its Emergency Renewed Mot. for Leave of Court to Supplement the Administrative Record at 5, 8. On September 14, 2006, both parties filed cross-motions for judgment on the administrative record.[19] The

[17]Under 28 U.S.C. § 1491(b)(3), courts are directed, "[i]n exercising jurisdiction under this subsection, . . . [to] give due regard to the interests of national defense and national security and the need for expeditious resolution of the action."

[18]This court permitted OTI to depose GPO's contracting officer, Ms. Albertha Broadnax, for an hour and one-half on three topics: her findings concerning OTI, the responses of Richard Grasso, GPO's chief technical evaluation officer, to various communications from Ms. Broadnax particularly regarding NIST's test results, and the role the tests conducted by NIST played in Ms. Broadnax's decision. Hr'g Tr. 63:25-64:10 (Sept. 6, 2006).

[19]In support of its motion for judgment on the administrative record, filed on September 14, 2006, OTI mistakenly filed a statement of facts separate from its memorandum in support of the motion, relying on RCFC 56.1, which had been abrogated on June 20, 2006. On September 18, 2006, OTI then filed a motion to amend its motion for judgment on the administrative record by incorporating its statement of facts into the supporting memorandum, pursuant to RCFC 52.1(b), which new rule replaced RCFC 56.1.

government responded to OTI's emergency motion for leave to supplement the administrative record on September 18, 2006, objecting to OTI's requests for an additional deposition and asserting that a version of the TEMP already was included in the administrative record of OTI's previous bid protest, filed in 2005. Def.'s Resp. to Pl.'s Emergency Renewed Mot. for Leave of Court to Supplement Administrative Record at 5-6.

On September 19, 2006, the government supplemented the administrative record with certain international scientific standards to which the solicitation refers. The parties filed responses to the cross-motions for judgment on the administrative record on September 21, 2006, and both filed replies to those responses on September 26, 2006. OTI also filed a second emergency motion to supplement the administrative record on September 25, 2006, alleging that the government's supplementation of the administrative record with the pertinent scientific standards was incomplete. Pl.'s Mem. in Support of its Emergency Mot. for Leave of Court to Supplement the United States' Supplementation of the Administrative Record as It is Incomplete at 1.

On September 28, 2006, this court held a hearing on the cross-motions for judgment on the administrative record and on OTI's two emergency motions to supplement the administrative record. During the hearing, this court requested that the government verify that the version of the TEMP in the administrative record of 2005 was the one referred to in the administrative record of 2006 and that the parties submit to the court a regulatory history of the international scientific standards to which the solicitation refers.

On October 6, 2006, OTI filed a motion for leave of court to file in paper form the regulatory history of the international scientific standards, noting that OTI and the government had failed to agree on the content or form of the submission and that the requested regulatory history was hundreds of pages long. Pl.'s Mot. for Leave of Court to File the Notice of Filing in Paper Form at 1. In an Order of October 10, 2006, this court granted that motion. OTI filed a second motion on October 6, 2006, requesting this court to take judicial notice of Subpart 15.3 of the Materials Management Acquisition Regulation ("MMAR"), noting that the solicitation states that the MMAR is applicable to all GPO procurements. Pl.'s Mot. Requesting the Court Take Judicial Notice at 1-2. On October 12, 2006, the government submitted a Notice of Filing that addressed the TEMP.

---

RCFC 52.1 was adopted to eliminate the confusion that had arisen between motions for summary judgment and motions for judgment on the administrative record. *See* RCFC 52.1 Rules Committee Note (2006) ("Summary judgment standards [particularly whether any genuine issues of mutual fact exist] are not pertinent to judicial review upon an administrative record.").

## STANDARDS FOR DECISION

As specified in 28 U.S.C. § 1491(b)(4), the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, govern this court's review of an agency's decision regarding a contractual solicitation or award.[20] Under the APA, the court may set aside an agency contracting decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Judicial review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977) (abrogating *Overton Park* to the extent it recognized the Administrative Procedure Act as an independent grant of subject matter jurisdiction). In adhering to those limitations, a court must not "substitute its judgment for that of the agency," *Keeton Corr., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Overton Park*, 401 U.S. at 416), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citing *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)); *see also Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003).

The plaintiff has the burden of proof to demonstrate that the contracting agency did not "provide[] a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni*, 238 F.3d at 1332-33 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir.1994)). A contracting officer's decision may be deemed arbitrary and capricious if it "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Keeton Corr.*, 59 Fed. Cl. at 755 (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

As a general rule, in determining whether the agency's actions are arbitrary or irrational, the "focal point for judicial review [of an agency's decision] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142 (1973)). Nonetheless, the Federal Circuit has noted that the informal administrative decision-making involved in awarding government contracts warrants allowing trial courts some latitude to supplement the administrative record. *See Impresa Construzioni*, 238 F.3d at 1339. Supplementation, as, for example, through a limited deposition of the contracting officer, may enable the court to "give 'due regard' to 'the need for expeditious resolution of the action.'"

---

[20]Section 1491(b)(4) of Title 28 provides: "In any action under [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."

*Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (quoting 28 U.S.C. § 1491(b)(3)). *See also Impresa Construzioni,* 238 F.3d at 1338 ("[E]ven if the agency is not obligated to provide reasons, a court may nonetheless order the agency to provide [an] explanation if such an explanation is required for meaningful judicial review.").

Beyond a showing that the agency acted without a rational basis or contrary to law, the disappointed bidder, to prevail in a bid protest, must show that the government's actions actually prejudiced the bidder in the procurement process. *See Bannum*, 404 F.3d at 1351 (in deciding whether to award relief to a protestor, the court must "determine, as a factual matter, if the bid protester was prejudiced by [the government's] conduct"); *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (protestor "must show not only that significant errors occurred in the procurement process, but also that the errors were prejudicial"). In short, the protesting plaintiff must show that "that there was a 'substantial chance it would have received the contract award but for that error.'" *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed. Cir. 2004) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed. Cir. 1996)); *see also Systems Plus, Inc. v. United States*, 69 Fed. Cl. 757, 769, 774 (2006).

## ANALYSIS

### A. *The Evaluation Criteria Described in the Solicitation*

The goal of the procurement was the deployment of an ICAO-compliant electronic passport with an "International Organization for Standardization 14443 Type A or Type B contactless [integrated circuit]/antenna assembly embedded in its back cover." 2005 AR 29 (Solicitation § C2).[21] In this respect, the Solicitation required that the "[integrated circuit]/antenna assembly . . . meet the tolerance limits for exposure to the various electromagnetic, physical, mechanical effects, etc., as described in ISO 14443-1." 2005 AR 37 (Solicitation § C7.2.2.2). The Solicitation also stated:

> The following international recommendations and standards shall be met, as appropriate:
>
> - ICAO recommendations[]:
>   - Document 9303 Part 1, *Passport with Machine Readable Capability*
>   - ICAO Technical Report: *Development of a Logical Data Structure (LDS) for Optional Capacity Expansion Technologies,* ICAO's

[21]The International Organization for Standardization is a non-governmental organization, comprised of the national standards institutes of 157 countries; it develops international standards for use by both public and private economic sectors. *See*, ISO, *ISO in Brief: International Standards for a Sustainable World* (2006), available at http://www.iso.org.

description of how Data must be placed onto the [integrated circuit] of an electronic passport

- ICAO Technical Report: *Selection of a Globally Interoperable Biometric for M-A Identity Confirmation with [Machine Readable Travel Documents]*

. . .

- ISO 14443 – Contactless integrated circuit(s) cards – Proximity cards
  - Part 2: Radio frequency interface power and signal interface
  - Part 3: Initialization and anti-collision
  - Part 4: Transmission protocols

- ISO 10373 Identification cards – Test methods
  - Part 1 – General characteristics tests
  - Part 3 – Integrated circuit(s) cards with contacts and related interface devices
  - Part 6 – Proximity card

2005 AR 35-36 (Solicitation § C7.2.2.1). The reference to ICAO recommendations also included a footnote indicating that the "[l]atest versions of most of these [ICAO recommendations] are available at http://www.icao.int/mrtd/Home/Index.cfm" and that "[t]hose not yet publicly available [would] be provided." 2005 AR 36 n.1 (Solicitation § C7.2.2.1).

The Solicitation included general guidelines on how the testing of the electronic passport prototypes would be conducted:

> For the purposes of testing [electronic passport] Book Cover durability, construction and engineering, the government will consider ISO and Common Criteria Smart Card Security and contact and contactless testing standards as the baseline for [electronic passport] cover testing. These methods, procedures, and standards might include, but are not limited to those specified in C7.2.2.1.
>
> The selected test methods will be used to evaluate the performance of products from different manufacturers, with preference being given to products that demonstrate greater durability based on these test results.

2005 AR 40 (Solicitation § C7.2.3). The Solicitation described briefly the purpose of the various tests that NIST would perform:

- *Impact Testing*: to assess the ability of the submittals ([integrated circuit] readability) to survive the stamping process. One possibility will be to strike the [integrated circuit]/antenna directly on the cover page a certain number of times at a force level that can be expected in actual usage.

> Loading is envisioned to be imparted by a falling weight testing machine. One question that will be addressed is "Can the [integrated circuit] /antenna survive the full number of strikes, and if not, then when do they [sic] fail?"
>
> - *Torsion/Flexure Testing*: to estimate the structural stability of the passport. The goal of this test will be to see if the book materials separate after a certain number of flexings.
>
> . . .
>
> - *Bend Testing*: to determine if the [integrated circuit]/antenna can continue to be read if the book is subjected to bending forces.
> - *Electromagnetic/Static Electricity Testing*: to identify vulnerabilities in these areas.

2005 AR 42-43 (Solicitation § C7.2.3.1).

### B. *Testing Performed by NIST*

#### 1. *Load modulation tests.*

In accord with the Solicitation, NIST performed electromagnetic tests on the prototype materials supplied by OTI, [****], and [****]. *See* 2006 AR 212-222 (NIST Report). These tests included a load modulation test which measured the signal level of the integrated circuit as it responded to an electronic passport reader. 2006 AR 212 (NIST Report). NIST's testing report indicated that the load modulation test was used to "quantify the level of signal modulation produced by the [integrated circuit in the electronic passport] and to determine if [it] mee[t]s the minimum levels as specified by ISO 10373-6:2001/Amd2:2003(E)." 2006 AR 213 (NIST Report); *see* 2006 AR 922-51 (ISO/IEC 10373-6:2001(E)), 2006 AR 952-63 (ISO/IEC 10373-6:2001/Amd.2:2003(E)). ISO 10373 was a standard mandated by the Solicitation, 2005 AR 35-36 (Solicitation § C7.2.2.1), and NIST employed ISO 10373-6:2001/Amd2:2003(E), a version of that standard published in 2001 and amended in 2003. *See* 2006 AR 213 (NIST Report); *see also* 2006 AR 952 (ISO/IEC 10373-6:2001/Amd.2:2003 (E)). OTI appears to agree that ISO 10373-6:2001/Amd2:2003(E) was an appropriate standard to employ, if not the only one that might have been applied. *See* Pl.'s Am. Mem., Appendix B (Comparison Chart of Solicitation Requirements, ICAO Testing and NIST Testing) at 6-7.[22]

---

[22]OTI does claim that an ICAO technical report, *Machine Readable Travel Documents: RF Protocol and Application Test Standard for E-Passport – Part 2, Tests for Air Interface, Initialisation, Anticollision, and Transport Protocol,* Version 0.9 (Feb. 10, 2006) ("*RF Protocol*") provides the appropriate standard for electromagnetic tests. Pl.'s Am. Mem. at 6, 18. Nonetheless, Appendix B of OTI's Amended Memorandum lists ISO 10373-6:2001/Amd

ISO 10373-6:2001/Amd2:2003(E) indicates that load modulation tests should be conducted at three magnetic field levels: 1.5 amperes per minute (A/m), 4.5 A/m, and 7.5 A/m. 2006 AR 959-960 (ISO/IEC 10373-6:2001/Amd.2:2003(E)); *see* 2006 AR 213 (NIST Report) (indicating that ISO 10373-6:2001/Amd.2:2003(E)7.2 refers to load modulation testing). NIST, however, only tested the samples submitted by OTI, [****], and [****] at 1.5 A/m and 7.5 A/m, *i.e.,* at the minimum and maximum magnetic field strength levels dictated by ISO 10373-6:2001/Amd2:2003(E). 2006 AR 213-14, 289 (NIST Report). NIST conducted no tests at 4.5 A/m, the third level also included in the standard. *See* 2006 AR 213-14, 289 (NIST Report); 2006 AR 959-960 (ISO/IEC 10373-6:2001/Amd.2:2003(E)).[23]

None of the forty OTI prototypes passed the 1.5 A/m tests; all 40 of [****]'s prototypes passed, and 34 of 35 of [****]'s prototypes passed. 2006 AR 289 (NIST Report). All three vendors passed the 7.5 A/m tests conducted on ten of each of their electronic passports. 2006 AR 213, 289 (NIST Report). GPO ultimately cited OTI's failure on the lower-level load modulation tests as one of the grounds for eliminating OTI from the competition. 2006 AR 38 (Letter from Broadnax to Bashan (Jul. 26, 2006)). GPO also eliminated [****] from the competition based in part on its load modulation test results, even though only one of thirty-five of that contractor's materials failed. 2006 AR 313 (Letter from Broadnax to [****] (Jul. 26, 2006)); *see* 2006 AR 289 (NIST Report).

OTI's chief argument respecting NIST's load modulation testing is that GPO violated a Federal Acquisition Regulation, 48 C.F.R. § 15.304(d), and a federal procurement statute, 10 U.S.C. § 2305, by not applying the load modulation test at 4.5 A/m. *See* Pl.'s Am. Mem. at 13,

---

2:2003(E), the standard that NIST applied, among the appropriate standards for load modulation testing. *See* Pl.'s Am. Mem., Appendix B (Comparison Chart of Solicitation Requirements, ICAO Testing and NIST Testing) at 7.

[23] *RF Protocol* and ISO 10373-6:2001/Amd2:2003(E) are in accord on the central point of contention for the load modulation tests: namely, whether a test at 4.5 amperes per minute ("A/m") is required. Although the ICAO technical report specifically refers to tests at 1.5 A/m, 4.5 A/m, and 7.5 as "mandatory," while ISO 10373-6:2001/Amd2:2003(E) merely lists those three magnetic field levels in a table, both can fairly be interpreted as requiring a test at 4.5 A/m, as well as at 1.5 A/m and 7.5 A/m. *Compare* 2006 AR 959-960 (ISO/IEC 10373-6:2001/Amd.2:2003(E)), *with* Pl.'s Mot. for Leave of Court to File the Notice of Filing in Paper Form ("Pl.'s Mot. for Leave of Court"), Appendix A (Notice of Filing, Supplemental International Standards) at 513 (*RF Protocol*).

The government asserts that ISO 14443-2, a standard included in the Solicitation, also specifies a minimum signal level of 1.5 A/m. *See* Def.'s Mot. at 10. NIST, however, applied a version of that standard that was not included in the administrative record, precluding the court from verifying the government's claims. *Compare* 2006 AR 700 (ISO/IEC 14443-2:2001(E)), *with* 2006 AR 212 (NIST Report) (referring to ISO 14443-1:2000(E)).

18.[24] The government responds that NIST applied the two applicable standards laid out in the Solicitation, ISO 14443-2 and ISO 10373-6, and suggests that the 4.5 A/m test is not required. Def's. Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 4, 9-10 (OTI "incorrectly claim[s] that testing at 4.5 A/m is required"). Notwithstanding the government's contentions, the court is satisfied that testing at 4.5 A/m was required. *See supra*, at 15 n.23 (explaining why a test at 4.5 A/m was required).[25] The question is whether this omission prejudiced OTI.

To prevail, OTI must show that NIST's failure to test the OTI passport books at the 4.5 A/m level lacked a rational basis or violated the MMAR, which governs GPO procurements,[26] and that NIST's decision prejudiced OTI. *See Bannum*, 404 F.3d at 1351; *Impresa Construzioni*, 238 F.3d at 1332; *Advanced Data Concepts*, 216 F.3d at 1057. By not conducting a test at 4.5 A/m, 2006 AR 213, 289 (NIST Report), NIST deviated from the terms of ISO 10373-6:2001/Amd.2:2003(E), a mandatory standard laid out in the Solicitation. *See* 2005 AR 36 (Solicitation § C7.2.2.1). However, even assuming NIST's decision not to apply the test at 4.5 A/m was irrational and that OTI would have passed such a test had it been conducted,[27] OTI's

---

[24]OTI also claims that the Solicitation relied on undisclosed criteria because it did not "indicate that [load modulation] is an essential element of Electromagnetic/Static Electricity Testing, failure of which would result in deselection." Pl.'s Am. Mem. at 23. This argument is without merit. ISO 10373-6, which provides the testing regime for load modulation tests, is listed as a mandatory standard in the Solicitation, 2005 AR 35-36 (Solicitation § C7.2.2.1), and that listing provides fair warning that failure to meet that standard might well be fatal to an offeror's prospects.

[25]The government quotes a statement in *Annex K of ICAO NTWG Biometrics Deployment Technical Report* that a test at 4.5 A/m "would introduce numerous incompatibility issues and should be avoided." Def's. Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 4; *see* 2006 AR 671. As OTI points out, however, Pl.'s Reply to Def.'s Response to Pl.'s Mot. for Judgment on the Administrative Record at 4, this statement is a comment by a member of an ICAO working group, not an ICAO standard. *See* 2006 AR 671.

[26]GPO, as a legislative agency, is not bound by the FAR or by federal procurement statutes, such as 10 U.S.C. § 2305, that apply to executive-branch agencies. *See OTI II,* 68 Fed. Cl. at 655 n.17. Nonetheless, as the Solicitation itself stated, "all GPO procurements" are subject to the MMAR, which is issued under the authority of Title 44 of the U.S. Code and mirrors the FAR in many respects, such as the requirement that contract-award decisions be based on disclosed criteria. 2005 AR 148 (Solicitation § I); MMAR §§ 1.103, 15.303; *see generally* MMAR, GPO Publication 805.33 (May 15, 2003).

[27]The assumption that OTI would have passed the tests at 4.5 A/m seems to be warranted, given that OTI's prototypes responded when a magnetic field strength of 2.5 A/m was employed by NIST and that OTI passed all ten of the tests at 7.5 A/m. 2006 AR 289 (NIST Report).

test results at 1.5 A/m would still stand. All 40 of OTI's samples failed to meet this minimum threshold of 1.5 A/m – a requirement of a specific standard, ISO 10373-6, identified in the Solicitation. 2006 AR 289 (NIST Report). As the NIST test report notes: "Failure to meet this minimum specified signal level may cause some readers to be unable to read the [electronic passport integrated circuit]." 2006 AR 212 (NIST Report). Moreover, the Solicitation, in identifying particular technical evaluation criteria on which GPO would judge offerors' proposals, ranked interoperability as the most important. 2005 AR 207 (Solicitation § M.4.3.2). The Solicitation also stressed that the electronic passport program was aimed at "ensur[ing] the continued international acceptability and interoperability of the U.S. passports." 2005 AR 24 (Solicitation § C1.1). By not meeting the minimum threshold specified in ISO 10373-6:2001/Amd.2:2003(E), the OTI passport books ran the risk of not being read by the electronic passport readers employed by some countries participating in the Visa Waiver Program. Under these facts, OTI cannot prove prejudice – OTI cannot show that, even with samples that did not satisfy the minimum threshold for the load modulation tests, conducting a series of tests at 4.5 A/m would have given it a "substantial chance" to receive a CLIN 0005 award. *See Galen Med. Assocs.,* 369 F.3d at 1331; *Systems Plus*, 69 Fed. Cl. at 774-75. Therefore, having failed to show that NIST's actions prejudiced its position in the procurement process, OTI's challenge to the results of the load modulation tests is unavailing.

2. *Impact tests.*

The Solicitation called for impact tests to be conducted on the passport books, although it described only one such test: "One possibility will be to strike the [integrated circuit]/antenna directly on the cover page a certain number of times at a force level that can be expected in actual usage." 2005 AR 42 (Solicitation § C7.2.3.1). NIST designed and performed four types of impact tests on the electronic passports of OTI, [****], and [****]. 2006 AR 195-204, 226-30 (NIST Report). The four impact tests – the flat-rubber impact test, the flat-steel impact test, the edge-steel impact test, and the point-steel impact test – were designed to measure the effect that hand stamps might have on the integrated circuit embedded in the book covers. 2006 AR 195-96 (NIST Report). The flat-rubber impact test simulated the impact of a rubber hand stamp, and the other three tests simulated various effects of a steel stamp. 2006 AR 227 (NIST Report).[28]

---

[28]The flat-rubber impact test, using an impact area of 772 square millimeters("$mm^2$"), simulated an impact with the rubber part of a hand stamp. 2006 AR 227 (NIST Report). The electronic passports were struck 100 times from a drop height of 13.5 centimeters ("cm"). *Id*. The flat-steel impact test, using an impact area of 14 $mm^2$, simulated a flat impact with the steel frame of a hand stamp. The passports were struck 100 times from a drop height of 1.5 cm. *Id*. The edge-steel impact test, using an impact area of 0.88 $mm^2$, simulated a glancing impact with the steel frame of a hand stamp. The passports were struck twenty times from a drop height of 1.5 cm. *Id*. The point-steel impact test also simulated a glancing impact with the steel frame of a hand stamp, but used an impact area of only 0.27 $mm^2$. The passports were struck twenty times from a drop height of 1.5 cm. *Id*.

All three vendors passed the flat-rubber impact test. 2006 AR 230 (NIST Report). On the flat-steel impact test, all of OTI's and [****]'s passport covers passed; four of five of [****]'s covers passed. 2006 AR 230 (NIST Report). On the edge-steel impact test, four of five [****] covers passed, two of five of OTI's books passed, and one of five of [****]'s books passed. 2006 AR 230 (NIST Report). All of [****]'s prototypes passed the point-steel impact test, three of five OTI samples passed, and three of five [****] samples passed. 2006 AR 230 (NIST Report). GPO cited [****]'s and OTI's impact test results as a reason for eliminating each contractor from the competition. 2006 AR 38-39 (Letter from Broadnax to Bashan (Jul. 26, 2006)); 2006 AR 313 (Letter from Broadnax to [****] (Jul. 26, 2006)).

OTI objects to the four impact tests employed by NIST, alleging that these tests deviated from the Solicitation's requirements and constituted undisclosed evaluation criteria. Pl.'s Am. Mem. at 14-16, 22.[29] Specifically, OTI alleges that the tests were not consistent with ICAO standards and constituted undisclosed criteria because the Solicitation did not explicitly identify the tests. *Id*. The government responds that the Solicitation expressly stated that impact tests would be conducted, Def.'s Reply in Support of Mot. for Judgment on the Administrative Record ("Def.'s Reply") at 8-9, and insists that NIST did not deviate from the Solicitation's reference to ICAO standards because "no final ICAO standards for [electronic passport] durability" exist. Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 10.

In support of its contention that NIST's tests deviated from ICAO standards, OTI asserts that an ICAO technical report, *Machine Readable Travel Documents: Durability of Machine Readable Passports*, Version 1.0 (Feb. 9, 2006) ("*Durability of Machine Readable Passports*"), sets out the standard NIST should have applied. Pl.'s Am. Mem. at 15. The ICAO report requires testing only to simulate a single flat-steel stamp. *See* Pl.'s Mot. for Leave of Court, Appendix A (Notice of Filing, Supplemental International Standards) ("International Standards") at 149 (*Durability of Machine Readable Passports*); *see* Pl.'s Am. Mem. at 15. OTI alleges that the report "provided the 'target' against which offerors would naturally design their products." Pl.'s Am. Mem. at 7. OTI also points to a footnote on page 13 of the Solicitation that refers offerors to an ICAO website on which the "[l]atest versions of these [ICAO standards]" could be obtained. Pl.'s Am. Mem. at 5; Pl.'s Reply to Def.'s Response to Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Reply") at 9; *see* 2005 AR 36 n.1 (Solicitation § C7.2.2.1). OTI avers that the footnote, coupled with the "absence of explicit Solicitation requirements regarding durability," essentially directed OTI to rely on the ICAO report and on other emerging draft standards. Pl.'s Reply at 9.

---

[29]OTI also contends that NIST's tests violated "FAR [§] 15.304 and other applicable law," Pl.'s Am. Mem. at 16, but, as explained previously, the FAR does not apply to GPO procurements. The Solicitation does incorporate MMAR §§ 15.204-5(c), 15.303(b)(4), and 15.304(d), which require the disclosure of evaluation factors in GPO solicitations. *See supra* at 16 n.26.

OTI's claim that *Durability of Machine Readable Passports* provided a baseline against which offerors would design their passport covers is without merit. ICAO published that report in February 2006, more than a month after OTI resubmitted its prototype materials to GPO. *See* 2006 AR 3 (E-mail from Broadnax to Emery and Grasso, GPO (Dec. 20, 2005); 2006 AR 4 (E-mail from Bashan to Grasso (Jan. 24, 2006)).[30] OTI could not have designed its passport book materials to comply with criteria set out in an ICAO report issued after its prototypes were delivered.

The regulatory history of *Durability of Machine Readable Passports* also reveals that the version OTI cites and all previous versions are conspicuously marked "DRAFT," Pl.'s Mot. for Leave of Court (International Standards) at 5, 8, 14, 34, 42, 54, 91, 135, raising the question of whether draft reports could supply standards that NIST was required to apply. The text of the Solicitation bears on this question.[31]

Page 13 of the Solicitation includes a bulleted list that includes "ICAO recommendations," under which seven ICAO reports are listed. *See* 2005 AR 36 (Solicitation § C7.2.2.1). A footnote states that offerors could obtain from the ICAO website the latest version of "these [recommendations]." *Id*. The question is whether the footnote suggests that OTI and its competitors should have relied on *any* relevant ICAO drafts or recommendations or just further iterations of the seven ICAO topical reports listed under "ICAO recommendations." The reference to "these" recommendations in the footnote suggests that it relates to the seven reports listed under the heading, not simply to any ICAO draft or report that might be relevant to the Solicitation. *See* 2005 AR 36 (Solicitation § C7.2.2.1). *Durability of Machine Readable Passports* is not among those seven reports. *See id*. Assuredly, the electronic passport program has as its major goal the development of an ICAO-compliant product, 2005 AR 24 (Solicitation § C1.1), and the Solicitation contains numerous general references to ICAO recommendations and standards. *See, e.g.,* 2005 AR 29, 36, 37, 42 (Solicitation §§ C2, C7.2.2.1, C7.2.2.3, C7.2.3.1). Nonetheless, the footnote's specific reference to "these" ICAO recommendations must control the Solicitation's other general references to ICAO standards and recommendations.

---

[30]Prior drafts of the report did not describe the proposed impact surface of the stamp. *See* Pl.'s Mot. for Leave of Court (International Standards) at 64, 102 (noting the "[n]eed to describe the stamp"); *see also id*. at 49 (omitting any description); *but see id*. at 29 (showing an illustration of a "cylindrical dart," an illustration abandoned in later drafts).

[31]Construing the language of the footnote in the Solicitation is a matter of contract interpretation, presenting a question of law to be decided by this court. *See Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997-98 (Fed. Cir. 1996) (interpreting a solicitation using contract-interpretation rules). The language of the Solicitation must be given its plain meaning, and the Solicitation "must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (en banc).

*See Hometown Fin., Inc. v. United States,* 409 F.3d 1360, 1369 (Fed. Cir. 2005) ("Our precedent establishes as a principle of contract interpretation that a specific contract provision will control over a general contract provision.") (citing *Hol-Gar Mfg. v. United States,* 351 F.2d 972, 980 (Ct. Cl. 1965)).[32] Thus, because *Durability of Machine Readable Passports* was not among those ICAO reports for which the Solicitation specifically directed offerors to obtain updated versions, it cannot provide the criteria that NIST should have applied for the impact tests.[33]

OTI further argues that the four impact tests NIST conducted constituted undisclosed criteria because the Solicitation gave only one "limited example" of an impact test and did not specifically identify the four tests. Pl.'s Am. Mem. at 19, 22. OTI correctly states the principle that "the government may not rely upon undisclosed evaluation criteria in evaluating proposals." *PHT Supply Corp. v. United States,* 71 Fed. Cl. 1, 13 (2006) (quoting *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 386 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004)); *see also PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004), *aff'd*, 389 F.3d 1219 (Fed. Cir. 2004). Nonetheless, "it is well-settled that 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors.'" *Banknote,* 56 Fed. Cl. at 387 (quoting *Analytical & Research Tech., Inc. v. United States,* 39 Fed. Cl. 34, 45 (1997)). In *Banknote*, the plaintiff objected to the U.S. Postal Service's downgrading of its proposal based on its lack of experience as a prime contractor. *Id.* The court rejected this argument, explaining that the Solicitation's disclosure that the Postal Service would consider bidders' experience with "similar" contracts was sufficient. *Id.; see also Forestry Surveys & Data v. United States,* 44 Fed. Cl. 493, 497 (1999) (solicitation listing "experience and knowledge" as evaluation factors justified consideration of the educational level of contractors' representatives).

In this case, the four tests developed and used by NIST *are* impact tests, and OTI does not claim that the tests do not actually measure the impact of a hand stamp on an electronic passport

---

[32]In specifying how GPO will evaluate proposals at stage one of the testing regime, the Solicitation refers to the "certifications provided by the [o]fferor in [its] proposal that the [o]fferor meets *prescribed* ISO and ICAO standards and recommendations." 2005 AR 40-41 (Solicitation § C7.2.3.1) (emphasis added). Although this case deals with testing at the pilot stage, the reference to *prescribed* standards, *i.e.*, ones contained in the Solicitation, provides indirect support for the conclusion that the footnote in question refers to the ICAO reports actually listed in the Solicitation.

[33]As a corollary to its argument that NIST deviated from the Solicitation, OTI also claims that references in the NIST report to the TEMP demonstrate that NIST evaluated the prototypes according to the TEMP rather than the Solicitation. Pl.'s Am. Mem. at 14-15. Item 17 of the TEMP discusses, among other things, the impact test, *see* 2005 AR 312, and refers to a single line in the Solicitation: "The inlay protective envelope shall be of a material that will securely and durably adhere." *Id.* The TEMP simply lists impact tests among four durability tests to be performed, and describes NIST's role in developing and running the tests. *See id.*

book cover. That NIST, acting on behalf of GPO, would develop and run impact tests was implicit in the Solicitation. The Solicitation indicates that the impact test described there is merely "one possibility," 2005 AR 42 (Solicitation § C7.2.3.1), suggesting that other tests might be used and even that the test described might *not* be used. Moreover, the Solicitation did not elsewhere specify a particular ICAO or ISO standard for impact testing. *See, e.g.,* 2005 AR 42 (Solicitation § C7.2.3.1); *see also* 2005 AR 36 (Solicitation § C7.2.2.1) (listing the mandatory ICAO and ISO standards). This omission apparently was due to the fact that no international standard for impact testing had yet been finally adopted. As OTI concedes, an ICAO working group "is developing" standards for impact tests and in February 2006 distributed a draft of *Durability of Machine Readable Passports* for comment. Pl.'s Resp. to Def.'s Mot. for Judgment on the Administrative Record at 18 n.17; *see also* Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 10.[34] The absence of final ICAO standards for impact testing, coupled with the indefinite language of the Solicitation, supports NIST's use of the four impact tests it employed. Under *Banknote*, these tests were not undisclosed criteria. *See Banknote,* 56 Fed. Cl. at 387-88.

Accordingly, OTI has failed to sustain either of its arguments that the impact tests NIST used deviated from the Solicitation or that NIST employed undisclosed criteria. OTI has not met its burden of showing that NIST's impact tests lacked a rational basis or violated the law. *See Impresa Construzioni*, 238 F.3d at 1332.

3. *Bend tests*.

The Solicitation provides simply that bend testing will be performed "to determine if the [integrated circuit]/antenna can continue to be read if the book is subjected to bending forces." 2005 AR 43 (Solicitation § C7.2.3.1). NIST performed two bend tests: a static bend test and a dynamic bend test. 2006 AR 231, 236 (NIST Report).[35] The tests were intended to simulate the

---

[34]*Durability of Machine Readable Passports* covers impact and bend testing. Pl.'s Mot. for Leave of Court (International Standards) at 149-155.

[35]In the static bend test, NIST used rubber bands to wrap the electronic passport books around a metal bar 56 mm in diameter for twenty four hours. 2006 AR 231 (NIST Report). Five passports from the three vendors each underwent four different methods of static bending: with the back cover facing the bar and the spine of the passport parallel to the bar, with the front cover facing the bar and the spine parallel to the bar, with the back cover facing the bar and the spine perpendicular to the bar, and with the front cover facing the bar and the spine perpendicular to the bar. 2006 AR 205 (NIST Report). In the dynamic bend test, five passports with covers from each of the three vendors were deformed perpendicular to the spine, parallel to the spine, and oblique (diagonal) to the spine. 2006 AR 207-08, 236-46 (NIST Report). In these tests, the passports were bent in one direction, held for 2.5 minutes, unbent, bent in the opposite direction, and held for another 2.5 minutes. *Id*. The 2.5 minute holding time is meant to mimic a person sitting down with a bent passport in his or her back pocket. A total of 144 cycles were performed

bending forces that an electronic passport might undergo in a person's back pocket or purse, or by customs agents handling the passports during processing. 2006 AR 205, 207 (NIST Report).

All five of OTI's and [****]'s prototype passports passed the static bend test, and four of five [****] prototypes passed. All of [****]'s prototypes passed the dynamic bend test, four of five [****] prototypes passed, and two of five OTI prototypes passed. 2006 AR 231-246 (NIST Report); 2006 AR 183 (Test Results); 2006 AR 39 (Letter from Broadnax to Bashan (Jul. 26, 2006)); 2006 AR 313 (Letter from Broadnax to [****] (Jul. 26, 2006)).

OTI's objections to the bend testing that NIST performed mirror those put forward regarding the impact tests – namely, that NIST deviated from the Solicitation and used undisclosed criteria. Pl.'s Am. Mem. at 16, 23.[36] OTI again claims that *Durability of Machine Readable Passports*, which describes two bending tests that differ from those NIST used, provides the standard for bend testing that NIST should have used. Pl.'s Am. Mem. at 16; *see* Pl.'s Mot. for Leave of Court (International Standards) at 152-155.[37] OTI also avers that the lack of specificity in the Solicitation as to the type of tests NIST would perform meant that NIST employed undisclosed criteria and that had OTI known what tests NIST would perform, it would have designed its product differently. Pl.'s Am. Mem. at 23. The government responds that the Solicitation specifically referred to bend testing and defends NIST's tests by noting that no ICAO standards for bend testing existed at the pertinent time. Def.'s Reply at 8-9; Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 10 (noting that no final ICAO standards for durability testing existed).

OTI's assertions concerning the impact tests are as unavailing as its contentions regarding impact testing. First, as discussed *supra*, at 19, *Durability of Machine Readable Passports*, published in February 2006, could not have guided OTI's design because OTI submitted its prototypes in January 2006. Second, *Durability of Machine Readable Passports* was a draft

---

on each passport. *Id.*

[36]OTI also argues that NIST applied a dynamic bend test that not only differs from the standard in the Solicitation, but also is not included in the TEMP. Pl.'s Am. Mem. at 22. The addendum to this argument has little weight because NIST was required to follow the Solicitation, not an internal summary such as the TEMP.

[37]The first test, the book-bend stress method, involves pressing a rounded anvil against the passport as it rests on a cushion. Pl.'s Mot. for Leave of Court (International Standards) at 152. The anvil is to be pressed with a force of 350 Newtons for five seconds. *Id.* at 153. The second test, the dynamic-bend stress method, uses an apparatus that clips the passport at one end and flexes the book at 0.5 Hertz. Pl.'s Am. Mem. at 16; *see* Pl.'s Mot. for Leave of Court (International Standards) at 154.

report and no ICAO standard for bend testing existed at the time of the NIST testing. *See id*.[38] Third, *Durability of Machine Readable Passports* was not among the ICAO reports for which the Solicitation directed offerors to obtain updated versions from ICAO's website. *See id*. at 19-20. Fourth, in the absence of a final international standard for bend testing, the Solicitation's failure to spell out specific tests does not support a conclusion that the criteria employed were undisclosed. The static and dynamic bend tests that NIST developed and used were implicit in the Solicitation's notice that bend testing would be performed on the contractors' book sheets. *See id*. at 20-21. Thus, OTI's arguments as to bend testing are not persuasive. OTI has failed to demonstrate that NIST's bend tests lacked a rational basis or violated the law. *See Impresa Construzioni*, 238 F.3d at 1332.

4. *Electrostatic discharge tests.*

OTI next avers that NIST's electrostatic discharge tests subjected OTI to disparate treatment. The Solicitation refers to "Electromagnetic/Static Electricity testing," 2005 AR 43 (Solicitation § C7.2.3.1), and NIST performed an electrostatic discharge ("ESD") test on ten passports from OTI, [****], and [****] to determine the effect on the electronic passports of exposure to static electricity generated by a person. 2006 AR 214-15, 291-92 (NIST Report); Hr'g Tr. 68:6-7, 24-25; 69:1-2 (Sept. 28, 2006). The ESD test applied "successive 6[-kilovolt] discharges in normal polarity . . . to 20 equally sized test zones on the [electronic passport] back cover as described in ISO 14443-1:200[sic](E) (4.3.7), ISO 10373-6:2001/Amd.2:2003(E), and IEC 61000-4-2:2001." 2006 AR 215 (NIST Report). ISO 14443 and ISO 10373 are specified in the Solicitation, 2005 AR 36 (Solicitation § C7.2.2.1), and IEC 61000 is cross-referenced in ISO 10373-6:2001(E). *See* 2006 AR 929 (ISO/IEC 10373-6:2001(E)). NIST also conducted tests on five passports from each vendor at 15 kilovolts ("kV"). 2006 AR 292 (NIST Report). All passports of each contractor passed the 6 kV test. 2006 AR 291 (NIST Report). However, none of [****]'s or [****]'s passports could be read after the 15 kV test; all five of OTI's passports could be read. 2006 AR 292 (NIST Report).

---

[38]As a corollary to its specific arguments that GPO deviated from the Solicitation as to the load modulation, impact, and bend tests, OTI argues more broadly that GPO improperly changed the Solicitation's evaluation requirements without notice to OTI and applied "incorrect technical evaluations." Pl.'s Am. Mem. at 23-26; *see MVM, Inc. v. United States,* 46 Fed. Cl. 126, 131-32 ("When the agency decided to [alter the solicitation], the agency should have amended the solicitation and should have requested new bids."). The argument that GPO improperly changed the Solicitation's requirements is without merit – GPO had no need to inform contractors of changes to the Solicitation because GPO either did not deviate from the Solicitation or it deviated in a way that did not prejudice OTI. OTI's allegations of "incorrect technical evaluations" by NIST similarly rest on the faulty premise that GPO deviated from the Solicitation. OTI speculates as to the types of errors that *might* have occurred during the load modulation testing. Unsubstantiated claims provide no evidence of arbitrary and capricious conduct. *See RISC Mgmt. Joint Venture v. United States*, 69 Fed. Cl. 624, 634-36 (2006).

OTI claims GPO exercised disparate treatment when it awarded [****] a CLIN 0005 contract despite its 100% failure rate on the 15 kV ESD test and yet eliminated OTI from the competition based on other test failures, in spite of OTI's successful completion of the 15 kV test. Pl.'s Am. Mem. at 7. The government claims that the 6 kV charge is the only required test under the applicable electrostatic-discharge standards and notes that the Solicitation's "Test Requirements Checklist" refers only to a 6 kV test. Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record at 4; *see* 2005 AR 166 (Solicitation § J, Attachment 4).

"A fundamental principle of government procurement is that [contracting officers should] treat all offerors equally and consistently apply the evaluation factors listed in the solicitation." *TLT Constr. Corp. v. United States,* 50 Fed. Cl. 212, 216 (2001); *PGBA*, 60 Fed. Cl. at 207 ("[U]neven treatment goes against the standard of equality and fair play that is a necessary underpinning of the federal government's procurement process."). IEC 61000, cross-referenced in ISO 10373-6:2001(E), describes two ESD testing methods: a contact discharge test and an air discharge test. Pl.'s Mot. for Leave of Court (International Standards, IEC 61000-4-2:2001) at 564. In a contact discharge test, which NIST used, the ESD device is pressed directly against the passport. 2006 AR 215 (NIST Report); Hr'g Tr. 71:3-7 (Sept. 28, 2006). In an air discharge test, the discharging device is aimed at, but not placed in direct contact with, the passport. Pl.'s Mot. for Leave of Court (International Standards, IEC 61000-4-2:2001) at 564; Hr'g Tr. 70:2-8 (Sept. 28, 2006). IEC 61000-4-2:2001 indicates that voltages of 2 kV, 4 kV, 6 kV, and 8 kV should be used for the contact discharge test and voltages of 2 kV, 4 kV, 8 kV, and 15 kV should be used for the air discharge test. Pl.'s Mot. for Leave of Court (International Standards, IEC 61000-4-2:2001) at 564.[39] The standard also indicates that "contact discharge is the preferred test method [and] [a]ir discharges shall be used where contact discharge cannot be applied." Pl.'s Mot. for Leave of Court (International Standards, IEC 61000-4-2:2001) at 564.

The plain language of the Solicitation and IEC 61000-4-2:2001 indicates that OTI did not suffer disparate treatment at the hands of GPO. The 15 kV test is only specified for the air discharge test, a test that the standard says should be used only if the contact discharge test cannot be performed. Pl.'s Mot. for Leave of Court (International Standards, IEC 61000-4-2:2001) at 564. NIST demonstrated that the contact discharge test could be performed at the 6 kV and 15 kV levels. 2006 AR 291-92 (NIST Report). Moreover, as the government points out, the 6 kV test is specifically spelled out in the Solicitation and is the only voltage level mentioned. 2005 AR 166 (Solicitation § J, Attachment 4). Given these facts, OTI has not established that NIST acted "unfairly or irrationally in evaluating [OTI's] offer[]." *Banknote,* 56 Fed. Cl. at 383. Thus, OTI's contention of disparate treatment regarding the electronic-discharge testing is not accepted.

---

[39] Each test also refers to another "Special" voltage level, an "open level" that would have to be specified in the equipment specification. The IEC standard notes that special equipment might be needed to achieve voltages higher than those specified for these two tests. Pl.'s Mot. for Leave of Court (International Standards) at 564 (IEC 61000-4-2:2001).

C. *Absence of a Matrix to Weigh Evaluation Factors*

Regarding testing, OTI finally argues that GPO relied on undisclosed criteria because the Solicitation did not include any "weighing scheme" indicating how much each evaluation criterion would be worth in the overall evaluation. In support of this argument, OTI cites *Isratex, Inc. v. United States,* 25 Cl. Ct. 223 (1992), for the proposition that a factor essential to a contract award must be disclosed. Pl.'s Am. Mem. at 19.

Under the MMAR, which governs GPO procurements, "evaluation factors and significant subfactors that apply to an acquisition and their relative importance, are within the broad discretion of agency acquisition officials," with certain exceptions related to costs and past performance of bidders. MMAR, § 15.304(c). More importantly, the MMAR provides that "[a]ll factors and significant subfactors that will affect contract award and their relative importance shall be stated clearly in the solicitation . . . . [but] *[t]he rating method need not be disclosed in the solicitation.*" MMAR, § 15.304(d) (emphasis added). Consequently, under the MMAR, GPO was under no obligation to provide a weighing scheme or matrix announcing the relative weights of the various evaluation factors.

Although the Solicitation did not provide a mathematical formula for weighing evaluation criteria, it certainly put offerors on notice of the importance of interoperabilty and durability. In detailing particular technical evaluation criteria on which GPO would judge offerors' proposals, the Solicitation ranked interoperability and durability as the two most important. 2005 AR 207 (Solicitation § M.4.3.2). The load modulation, impact, and bend tests all fall under these two categories. Moreover, the Solicitation explained that "[t]he ability of the embedded chip array to remain functional over the useful life of the passport is crucial to the performance of the document." 2005 AR 103 (Solicitation, Appendix A). Finally, the Solicitation states: "The selected test methods will be used to evaluate the performance of products from different manufacturers, *with preference being given to products that demonstrate greater durability based on these test results*." 2005 AR 40 (Solicitation § C7.2.3). Thus, the Solicitation's language rebuts any contention that GPO's decision to eliminate OTI in the absence of a matrix was arbitrary or capricious. *See Keeton Corr.*, 59 Fed. Cl. at 755 (discussing the "arbitrary and capricious" standard for judicial review).[40]

D. *The Contracting Officer's Independent Judgment*

OTI lastly avers that Ms. Broadnax, GPO's contracting officer, did not exercise her independent judgment in deciding to eliminate OTI from the electronic-passport-book competition. Pl.'s Am. Mem. at 28-30. OTI argues that Ms. Broadnax lacked knowledge of the technical aspects of the procurement and, as a result, inappropriately relied solely upon the evaluation of her technical advisor in determining that OTI was not eligible for a CLIN 0005

[40]*Isratex* simply requires that any "mandatory minimum requirement . . . be clearly identified as such." *Banknote,* 56 Fed. Cl. at 382 (explaining *Isratex*, 25 Cl. Ct. 223).

award. *See* Pl.'s Am. Mem. at 28, 30. OTI specifically notes that Ms. Broadnax did not read the ICAO and ISO standards to which the Solicitation referred and did not know whether NIST had applied those standards or had been directed to do so by GPO or State Department officials. Pl.'s. Am. Mem. at 28-29. The government responds that Ms. Broadnax addressed the test results on the competitors' prototypes in an appropriate way, reading the reports from NIST and Mr. Richard Grasso, GPO's chief technical evaluation officer, requesting certain clarifications regarding Mr. Grasso's report, and then making an independent decision as to OTI's elimination. Def.'s Resp. at 15.

The plaintiff in a bid protest bears the burden of demonstrating that an award decision had no rational basis, a burden that is even heavier when the procurement is based on "best value." *See Information Scis. Corp. v. United States,* __ Fed. Cl. __, 2006 WL 2686753, at *24, (Sept. 19, 2006) (citing *Impresa Construzioni*, 238 F.3d at 1333, and *Galen Med. Assocs.,* 369 F.3d at 1330); *RISC Mgmt.*, 69 Fed. Cl. at 636 ("a court must accord considerable deference to an agency's best-value decision") (citing *Information Tech. & Applications Corp. v. United States,* 51 Fed. Cl. 340, 343, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003)). Nonetheless, in making a contract award decision, "[a] contracting officer should exercise her discretion independently and in an informed manner." *OTI II,* 68 Fed. Cl. at 657 (citing *Impresa Construzioni Geom. Domenico Garufi v. United States,* 52 Fed. Cl. 421, 427 (2002), *on remand from Impresa Construzioni,* 238 F.3d 1324). Similarly, MMAR § 15.308 states that "[w]hile the [contracting officer] may use reports and analyses prepared by others, the source selection decision shall represent the [contracting officer's] independent judgment."[41]

According to the administrative record and the deposition of Ms. Broadnax,[42] Ms. Broadnax

[41]This language in MMAR § 15.308 is identical to that contained in the FAR. *Compare* MMAR § 15.308, *with* 48 C.F.R. § 15.308 (2006).

[42]This court granted in part plaintiff's original motion to supplement the administrative record by permitting the deposition of Ms. Broadnax on a limited number of subjects on which the administrative record was silent. *See supra* at 9 n.18. This court will deny plaintiff's request for leave of court to depose Mr. Grasso, one of two requests in plaintiff's emergency renewed motion for leave of court to supplement the administrative record. *See* Pl.'s Mem. in Support of its Emergency Renewed Mot. for Leave of Court to Supplement the Administrative Record at 5-7. OTI seeks to question Mr. Grasso about "what, if any, evaluation criteria NIST employed," how he reached his conclusions, and what he knew about the TEMP, as well as to fill in gaps in the administrative record regarding his responses to certain e-mails from Ms. Broadnax. *Id.* Mr. Grasso's deposition would not aid the "'expeditious resolution'" of this case, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (quoting 28 U.S.C. § 1491(b)(3)), because the relevant information he could supply is not "required for meaningful judicial review." *Impresa Construzioni,* 238 F.3d at 1338. First, this court already has determined that NIST generally applied the standards prescribed by the Solicitation. Second, Mr. Grasso's report adequately explains his rationale for recommending the elimination of OTI and [****]. 2006 AR

mainly based her decision to eliminate OTI from the competition on her review and comparison of two reports: the NIST report and Mr. Grasso's report, which included his recommendations on which of the three contractors should receive a CLIN 0005 award. Broadnax Dep. at 16:8-19, 18:6-11; 2006 AR 8-9 (E-mail from Broadnax to Grasso (Jul. 11, 2006)); *see* 2006 AR 129-32, 188-297 (Memorandum from Grasso to Broadnax, NIST Report) (Jun. 27, 2006)). In addition, Ms. Broadnax compared the standards specified in the Solicitation to those that NIST used in its testing, discussed Mr. Grasso's report with him and Catherine Yates, a GPO printing specialist, and requested certain clarifications from Mr. Grasso as to his report. Broadnax Dep. at 16:8-19, 18:6-11; 20:12-16; 2006 AR 8-9 (E-mail from Broadnax to Grasso (Jul. 11, 2006)). Ms. Broadnax then determined that OTI would not be eligible for a CLIN 0005 award. 2006 AR 38-39 (Letter from Broadnax to Bashan (Jul. 26, 2006)).

OTI focuses on Ms. Broadnax's concessions that she had not read the ICAO and ISO standards to which the Solicitation referred, that she did not know whether NIST had applied those standards or had been directed to do so by GPO or State Department officials, and that she "had no idea" whether Grasso, who served as the GPO liaison to NIST, even had access to the standards. Pl.'s. Am. Mem. at 28-29; Broadnax Dep. at 11:19-13:16; 16:20-17:2; 21:13-15.[43] This court need not delve deeply into Ms. Broadnax's familiarity with the particular ICAO and ISO standards to which the Solicitation referred, nor need it address the extent to which she should have ensured that Mr. Grasso had verified NIST's use of those standards. MMAR § 15.308 specifically authorizes contracting officers to "use reports and analyses prepared by others." This regulation suggests that Ms. Broadnax's decision not to read every one of the highly technical standards to which the Solicitation referred may have been reasonable. Moreover, even if Ms. Broadnax should have ensured that NIST was abiding by the standards in the Solicitation, that point may have been rendered moot by this court's determinations, *supra,* that NIST either did not deviate from the Solicitation or deviated in a way that did not prejudice OTI. The evidence in the administrative record justifies Ms. Broadnax's decision.

The NIST tests results supplied Ms. Broadnax with independent reasons to oust OTI from the competition. OTI's prototypes failed in the two areas – interoperability and durability – that the Solicitation ranked as the most important technical evaluation criteria. *See* 2005 AR 207 (Solicitation § M.4.3.2). On the load modulation test, all of OTI's passport books failed to meet

---

130-32 (Memorandum from Grasso to Broadnax). Third, as explained *supra* at 20 n.33, the sections of the TEMP to which the NIST report refers contain brief descriptions of the tests to be performed and references to the Solicitation, not alternate standards that NIST applied. Fourth, Mr. Grasso's oral responses to certain e-mails from Ms. Broadnax would not aid the court's determination of whether *Ms. Broadnax* used her independent judgment in eliminating OTI.

[43]In suggesting that Ms. Broadnax did not understand NIST's obligations to adhere to the standards in the Solicitation, OTI also points to Ms. Broadnax's statement that she would have been "satisfied" if NIST had followed only a portion of the standards because NIST's officials "are the experts." Pl.'s Am. Mem. at 29; Broadnax Dep. at 54:1-9.

the minimum threshold of 1.5 A/m – a requirement spelled out in ISO 10373-6, which was identified in the Solicitation. 2006 AR 289 (NIST Report); *see* 2005 AR 36 (Solicitation § C7.2.2.1); 2006 AR 959 (ISO 10373-6:2001/Amd. 2:2003(E)). As discussed *supra*, this shortcoming could affect interoperability, a major factor noted in the Solicitation, by preventing electronic passport readers from reading an OTI passport. OTI also performed poorly on key durability tests: the edge steel impact test, the point steel impact test, and the dynamic bend test. 2006 AR 183 (Test Results). As the Solicitation stated, preference would be given to "products that demonstrate greater durability based on these test results." 2005 AR 40 (Solicitation § C7.2.3). Viewing all of OTI's test results from a comparative perspective, OTI's prototypes failed more key tests than those of the other two contractors whose prototypes NIST tested in the pertinent test round. 2006 AR 183 (Test Results). Moreover, Ms. Broadnax had already warned OTI and [****] that given the time constraints under which the government was operating, there would be "no further opportunities to correct deficiencies or for re-testing." 2006 AR 1 (Letter from Broadnax to Bashan (Dec. 15, 2005)); 2006 AR 305 (Letter from Broadnax to [****] (Dec. 20, 2005)).

Mindful that a court must not "substitute its judgment for that of the agency," *Keeton Corr.*, 59 Fed. Cl. at 755 (quoting *Overton Park*, 401 U.S. at 416), this court cannot say that Ms. Broadnax's determination to eliminate OTI from the competition was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Ms. Broadnax had ample reasons to oust OTI. Ms. Broadnax did not blindly endorse the NIST test results or Mr. Grasso's recommendations. Although she ultimately relied on Mr. Grasso's recommendation that OTI and [****] not receive CLIN 0005 orders, she first examined the raw NIST test results, reviewed the Solicitation and Mr. Grasso's report, and discussed Mr. Grasso's report with him. Broadnax Dep. at 16:8-19, 18:6-11; 20:12-16; 2006 AR 8-9 (E-mail from Broadnax to Grasso (Jul. 11, 2006)).

Particularly in light of the deference due agency decisions, such as this one, that involve procurements conducted on a "best value" basis, *Galen Med. Assocs.,* 369 F.3d at 1330; *see* 2005 AR 207 (Solicitation § M.4.3), Ms. Broadnax's actions demonstrate sufficient evidence of independent judgment to preclude this court from overturning the GPO's decision. *See RISC Mgmt.*, 69 Fed. Cl. at 637-38 (finding that despite several flaws in the procurement process, the contracting officer had "independent reasons to assign [lower] confidence ratings" to the protesting plaintiff and denying the protest). On the record of the procurement decision being contested, Ms. Broadnax acted rationally.

## CONCLUSION

For the reasons set forth, the government's motion for judgment on the administrative record is GRANTED, and OTI's motion for judgment on the administrative record is DENIED.[44]

---

[44]OTI's motion to amend or correct its memorandum in support of its motion for judgment on the administrative record is GRANTED. OTI's first emergency renewed motion to

Because this decision might contain "confidential or proprietary information" within the meaning of RCFC Appendix C, ¶ 4, it was first issued under seal. The parties were requested to review the decision and to submit proposed redactions on or before November 6, 2006.

The Clerk shall enter final judgment as specified above. No costs.

It is so ORDERED.

s/ Charles F. Lettow
Charles F. Lettow
Judge

supplement the administrative record is GRANTED IN PART and DENIED IN PART. OTI's request to supplement the administrative record with the TEMP is granted, but its request to depose Mr. Grasso is denied. OTI's second emergency motion to supplement the administrative record with certain ICAO and IEC standards is GRANTED IN PART. Those standards have been incorporated into the record because the recitation in the standards of the historical record of their development is pertinent to this action. OTI's motion requesting that this court take judicial notice of Subpart 15.3 of the MMAR is GRANTED.